IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CINCINNATI INSURANCE COMPANY ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 11-cv-02055 |
| ) | Hon. Joan H. Lefkow |
| BLUE CAB COMPANY, INC. and ) | |
| ROSE M. WASHINGTON-SANDERS, ) | |
| ) | |
| Defendants. ) | |

### CINCINNATI INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff, Cincinnati Insurance Company ("Cincinnati"), by its counsel, states as follows in support of its Motion for Summary Judgment pursuant to F.R.C.P. 56.

### INTRODUCTION

This is a dispute over insurance coverage for a taxicab accident. Cincinnati seeks a declaration under 28 U.S.C. § 2201 that the policy it issued to Blue Cab Company, Inc. ("Blue Cab") does not provide coverage for the underlying lawsuit. Because there are no genuine issues of material fact, the insurance coverage issues can be determined as a matter of law.

### SUMMARY OF THE FACTS

In September of 2007, Blue Cab ran a taxi dispatch service. *SMF 2.*[1] For a fee, Blue Cab provided information regarding potential taxi customers to drivers who owned and operated their own taxis. *SMF 14-15.* Thomas McFadden ("McFadden") received dispatch information from Blue Cab pursuant to his "Owner-Operator Agreement" with

---

[1] "SMF___" refers to the Statement of Material Facts, submitted simultaneously with this Memorandum in support of Cincinnati's motion for summary judgment.

Blue Cab. *SMF 14-15.*

On September 23, 2007, Rose M. Washington-Sanders ("Sanders") called Blue Cab for a taxi. *SMF 4.* Blue Cab communicated Sanders' information via computer to McFadden, who picked up Sanders at Midway Airport. *SMF 5-6.* While driving Sanders to her home in Oak Park, McFadden lost consciousness. His taxi hit a pole, resulting in injuries to Sanders (the "Accident"). *SMF 7.*

Sanders sued for her damages in *Sanders v. McFadden and Blue Cab Co.,* case no. 07 L 13584 (Circuit Court of Cook County, IL) ("the Sanders Lawsuit"). *SMF 8.* Sanders' Second Amended Complaint alleged that McFadden was negligent in operating the taxi. She claimed that Blue Cab was vicariously liable for McFadden's negligence because he was an "agent or employee" of Blue Cab (the "negligent driving" theory). *SMF 9, 10.* She also claimed that Blue Cab had negligently failed to verify that McFadden was healthy enough to drive a taxi, before "approving" him as a driver under the Owner-Operator Agreement or before sending dispatches to McFadden regarding taxi customers (the "negligent approval" or "negligent dispatch" theory). *SMF 11.* McFadden and Blue Cab denied those allegations.

Blue Cab has $250,000 of liability coverage as an insured under McFadden's auto liability policy. *SMF 16-21.* Sanders rejected a settlement offer of those limits as insufficient. *SMF 21.* Blue Cab (with Sanders' encouragement) seeks additional coverage from Cincinnati. This case addresses whether the policy issued by Cincinnati to Blue Cab (the "Policy") provides coverage for the Sanders Lawsuit.

The parties do not dispute that this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 and venue is proper pursuant to 28 U.S.C. § 1391(a). *SMF 47-52.*

2

## LEGAL STANDARD

The interpretation of an insurance policy is a question of law, which may be addressed on summary judgment. *T.H.E. Ins. Co. v. City of Alton,* 227 F.3d 802, 805 (7th Cir. 2000). An insurance policy should be construed as a whole, pursuant to its plain meaning. *Chicago Bd. Options Exch. v. Connecticut Gen. Life Ins. Co.*, 713 F.2d 254, 257-58 (7th Cir. 1983). To construe the meaning of the policy's language, the court looks to "the risk undertaken, the subject matter that is insured, and the purposes of the entire contract." *Outboard Marine Corp. v. Liberty Mutual Ins. Corp.,* 154 Ill.2d 90, 108, 607 N.E.2d 1204, 1212 (1992). It is Defendants' burden to show that the claims asserted by Sanders fall within the coverage grant of the Policy. *Sokol & Co. v. Atlantic Mut. Ins. Co.,* 430 F.3d 417, 422-23 (7th Cir. 2005); *Addison Ins. Co. v. Fay,* 232 Ill.2d 446, 453-54, 905 N.E.2d 747, 752 (IL 2009). Where it relies on a policy exclusion to deny coverage, it is Cincinnati's burden to show that the exclusion applies. *Id.*

## SUMMARY OF ARGUMENT

The Policy contains several coverage parts and insures several different businesses. Defendants assert that Cincinnati owes coverage for the Accident under the Garage coverage part. The Garage Coverage part was included for a different insured. SMF 27. More importantly, the Accident did not result from "garage operations," as required for that type of coverage. A second portion of the Policy, the Commercial General Liability ("CGL") coverage part, provides no coverage here due to the exclusion for auto liability. No other portion of the Policy provides liability coverage for bodily injury. SMF 22. As the claims do not fall within the Policy's coverage, Cincinnati owes neither defense nor indemnity to Blue Cab. Cincinnati has no duty to

defend Blue Cab in the Sanders Lawsuit for two additional reasons: (a) Blue Cab selectively tendered its defense to another insurer, First Chicago Insurance Company ("First Chicago"); and (b) any coverage available to Blue Cab under the Cincinnati Policy is excess to the other insurance available to Blue Cab. As there is no coverage for the Sanders Lawsuit under the Policy, and because Cincinnati has no duty to defend Blue Cab in that lawsuit, Cincinnati is entitled to summary judgment in its favor.

A. **NO COVERAGE UNDER THE GARAGE LIABILITY COVERAGE PART**

To obtain coverage under the Garage coverage part, Defendants must show that the Accident resulted "***from garage operations***." *SMF 25*. "Garage operations" is a defined term. It "means the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations." *SMF 26*. "[G]arage operations" include (a) the ownership, maintenance or use of a "covered auto" or (b) operations that are "necessary or incidental to a garage business." *SMF 26*. None are applicable here.

    1.    Blue Cab itself did not operate a "garage business"

Where a term is not defined in an insurance policy, it is given its plain and ordinary meaning. *Supreme Laundry Serv., L.L.C. v. Hartford Cas. Ins. Co.*, 521 F.3d 743, 747 (7th Cir. 2008). A "garage business" typically involves servicing, towing or selling vehicles to the public. *E.g., Fidelity & Cas. Co. v. Napleton Motor Sales*, 5 Ill.App.3d 705, 284 N.E.2d 26 (Ill. App. 1st Dist. 1972) (car dealership); *Great Central Ins. Co. v. Bennett*, 40 Ill.App.3d 165, 351 N.E.2d 582 (Ill. App. 2d Dist. 1976) (service station); *TIG Ins. Co., Inc. v. Carey's Car & Credit, Inc.*, 2004 WL 546909 (N.D.Ill. March 18, 2004) (sales of new and used trailers).

Blue Cab did none of these. Blue Cab provided dispatch services to independent taxi drivers who wanted help in finding customers. *SMF 15.* Blue Cab did not repair or service taxis, or tow them when they needed repair. *SMF 38.* No case in Illinois – or in any other state – has characterized a similar taxi dispatch service as a "garage business." As Blue Cab did not run a "garage business," the Accident did not result "from garage operations" conducted by Blue Cab.

The Named Insureds on the Policy include M&C Motors, Inc. ("M&C Motors"). *SMF 23.* Although owned and managed by the same people, they are separate corporations with separate employees, providing different services to the public. *SMF 36, 44-46.* Blue Cab ran a taxi dispatch service; M&C Motors ran a garage business. *SMF 2, 24, 36-39.* Blue Cab's business is no mere extension of M&C Motors; both have been in business for a long time. *SMF 37.* Because the Policy was purchased to provide insurance for several different businesses, not every aspect of the Policy applies to Blue Cab. In fact, the Garage coverage was intended to apply to M&C Motors' garage business. *SMF 27.* Because the Accident resulted from a taxicab accident and not from "garage operations," the Garage coverage part of the Policy does not provide coverage to Blue Cab for the Sanders Lawsuit.

2. <u>"Ownership, maintenance or use of locations for garage business"</u>

"Garage operations" means "the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations." *SMF 26.* The Accident occurred when McFadden lost consciousness and crashed into a pole. *SMF 7.* At the time, he was driving at an intersection in Oak Park, approximately one mile from the M&C Motors garage in Forest Park. *SMF 33.* The

5

Accident did not take place at M&C Motors' garage or any adjoining location. Defendants cannot establish coverage under this portion of the Policy.

There is no coverage under the Garage coverage part unless the claim arose from the "ownership, maintenance of use of that location **for garage business**" (emphasis added). Neither the "approval" of drivers for Blue Cab's Owner-Operator agreement, nor any alleged failure to monitor the health of those drivers, can fairly be described as "garage business." As a result, the Sanders Lawsuit does not fall within the Garage coverage grant based on the "location" language of the Policy.

3.   No ownership, maintenance or use of a "covered auto"

The Accident did not involve the ownership, maintenance or use of a "covered auto." "Covered autos" under the Garage coverage part of the Policy were limited to Symbol 22. *SMF 29.* This means only those autos that are owned by "you," *i.e.*, one of the named insureds shown in the Declarations. *SMF 30-31.* The Taxi was owned by McFadden (*SMF 12, 13*), who is not a named insured under the Policy. *SMF 32.* As the Taxi was not a "covered auto," Garage coverage cannot be premised on the "ownership, maintenance or use of a 'covered auto.'"

4.   No operation "necessary or incidental to a garage business"

The Accident did not result from any "operation" that was "necessary or incidental to a garage business." Blue Cab and M&C Motors are separate corporations. *SMF 36, 42, 44-45.* They conduct very different operations: Blue Cab provides taxi dispatch service, M&C Motors repairs autos. *SMF 2, 24, 36-38.* The taxi dispatchers were all full-time employees of Blue Cab. *SMF 40.* Owner-operators such as McFadden dealt only with Blue Cab; they provided no services to M&C Motors. *SMF 41.* No one

6

required Blue Cab Owner-Operators to get their taxis serviced by M&C Motors. *SMF 42.* Significantly, Blue Cab admitted that ***M&C Motors did not need Blue Cab's taxi dispatch services to operate the business of M&C Motors*.** *SMF 43.*

The relevant facts of the Sanders Lawsuit do not even remotely involve M&C Motors' garage business. Sanders called ***Blue Cab*** – not M&C Motors – for a ride home from the airport. *SMF 4.* She alleged that McFadden was an employee or agent of ***Blue Cab***. *SMF 9.* McFadden received the dispatch information about Sanders, as a potential taxi customer, from ***Blue Cab***. *SMF 5.* He received such information pursuant to the "Blue Cab Company Owner Operator Agreement" that was signed by ***Blue Cab***. *SMF 14, 15.* The equipment through which McFadden received dispatches (the computer, the two-way radio and the meter) was owned by ***Blue Cab***. *SMF 39.* Sanders alleged that ***Blue Cab*** should have verified McFadden's health before "approving" him to receive dispatches under the Owner-Operator agreement. *SMF 11.*

The Accident occurred because McFadden lost consciousness. Sanders claims that Blue Cab is legally responsible for the Accident because (1) McFadden was its agent or employee and/or (2) Blue Cab should have verified that McFadden was healthy enough to drive a taxi. *SMF 10-11.* These allegations do not bring the Sanders case into Garage coverage. Sanders' injuries were not caused by an operation that was "*necessary or incidental to a garage business.*" Neither McFadden's driving nor his health was even remotely related to any garage business. Blue Cab's alleged failure to verify his health before signing the "Blue Cab Company Owner Operator Agreement," or before allowing him to accept dispatch information, was not a garage operation. As the

7

Accident did not result from any operation that was "*necessary or incidental to a garage business,*" the Sanders Lawsuit is not covered under the Garage coverage part.

5.  Caselaw supports Cincinnati's coverage position.

The leading Illinois case on the meaning of "necessary or incidental to a garage business" is *Fidelity & Cas. Co. of N.Y. v. Napleton Motor Sales, Inc.*, 5 Ill.App.3d 705, 284 N.E.2d 26 (Ill. App. 1st Dist. 1972). In *Napleton*, the owner of an auto dealership and garage kept ponies in an area at the rear of his business. A pony bit a customer's child and the family sued. Napleton's insurer denied coverage under its garage policy. The Appellate Court affirmed summary judgment to the insurer.

> The trial court ruled as a matter of law that the policy did not cover pony biting. We agree. Clearly the maintenance of a horse barn on these premises was not incidental to the maintenance or use of the premises for purposes of a garage.
> \* \* \*
> It is of no consequence that both operations were carried on on the same plot of ground. The plaintiff insured only garage-related activities, and the knowledge that there were other operations going on does not extend the coverage of the policy.

5 Ill.App.3d at 707, 284 N.E.2d at 27-28. As explained in *Am. Liberty Ins. Co. v. City of Joliet*, 711 F.Supp. 455 (N.D. Ill.1989), the activity in *Napleton* "bore no close relationship to the primary (or at least declared primary) use of the [insured dealership] site." *Id.* at 462. The Accident does not meet the standard of "necessary or incidental" under *Napleton*, and does not qualify for coverage within the Garage part of the Policy.

*Great Central Ins. Co. v. Bennett*, 40 Ill.App.3d 165, 351 N.E.2d 582 (Ill. App. 2d Dist. 1976), took a different turn. The insured in *Great Central* operated a service station and supervised a car wash at the same location. A customer slipped and fell at the car wash. The insured sought coverage under his garage liability policy, claiming

that the car wash was "incidental" to his operation of the garage. Finding it unclear whether the policy was intended to cover the car wash, the Court looked to extrinsic evidence. The Court concluded that the policy should be interpreted to cover the customer's injury.

> ... we believe Great Central's policy must be interpreted to apply to both the service station and the car wash, in view of Bennett's evident need [for coverage], his request for coverage of "the whole thing", his expectation, [his insurance agent's] apparent understanding, and Great Central's receipt of premiums based on salaries of employees used in both operations.

40 Ill.App.3d at 172, 351 N.E.2d at 588. No court has ever cited *Great Central* for this ruling, perhaps because of the stinging dissent written by Justice Rechenmacher:

> The operation of a car wash facility is not necessary or incidental to the operation of a service station merely because they are on the same premises and owned by the same person. They are separate and independent of each other and neither has anything to do with the necessary operation of the other. They are associated merely because it is economically attractive to operate the two businesses on the same premises. The two operations are associated with but not incidental to each other. Many, if not most, service stations do not operate a car wash facility.

40 Ill.App.3d at 173, 351 N.E.2d at 589.

Although construing the same policy language, *Great Central* bears little factual resemblance to this case. First, the *Great Central* injury occurred on the same premises that the car wash shared with the garage. In contrast, the Accident here took place on a public street a mile away from M&C Motors' garage. *SMF 7, 33.* McFadden's loss of consciousness was unrelated to the premises or operation of M&C Motors' garage. Second, the Garage premiums were not based on Blue Cab's dispatch service, but instead on payroll associated with M&C Motors. *SMF 28.*

Third, *Great Central* looked to the insured's apparent "need" for insurance and his specific "request for coverage of 'the whole thing'" in deciding to extend the garage coverage to that lawsuit. *Great Central*, 40 Ill.App.3d at 172, 351 N.E.2d at 588. In contrast, Cincinnati was not asked to issue any auto liability coverage for Blue Cab. *SMF 35.* Blue Cab already had obtained insurance coverage from McFadden's auto insurer, First Chicago Insurance Company ("First Chicago"). Pursuant to the Owner-Operator agreement, McFadden obtained $250,000 in auto liability coverage and named Blue Cab as an additional insured on that policy. *SMF 16-18.* This coverage fully satisfied the statutory requirements for taxicab liability in Illinois. *See* 625 ILCS 5/8-103, 5/8-104, 5/8-108 and 5/8-109 ("persons who operate motor vehicles in transportation of passengers for hire" must maintain either a bond or an insurance policy providing liability coverage of at least $250,000 per auto).

A perceived "need" for coverage cannot change the wording or intent of the Policy. *Great Central*, 40 Ill.App.3d at 173, 351 N.E.2d at 589. Even if it was a legitimate factor, it does not apply here because Blue Cab already has significant liability coverage for the Taxi from First Chicago. The risk of an auto accident caused by McFadden's driving properly lies with McFadden's auto policy – not with a policy issued to cover an unrelated garage business. *See Coca-Cola Enterprises v. ATS Enterprises*, 670 F.3d 771, 775-76 (7th Cir. 2012).

Garage coverage applies only where liability is based on conduct that is logically related to the operation of a garage. For example, *Hartford Ins. Group v. Rubinshteyn*, 488 N.E.2d 98 (N.Y. 1985), held that providing dealer plates for a customer's use until that customer could obtain his or her own plates was "necessary or incidental" to

dealership business because it was a mutually beneficial customer service. "[A]n act is 'necessary or incidental' to a business only when it is both causally related to the business *and* is essential or indispensible to the business." *Id.* at 102.

In contrast, there is no causal relationship between Blue Cab's taxi dispatch services and the business of M&C Motors. As Blue Cab admits, M&C Motors did not need Blue Cab's taxi dispatch service for the M&C Motors garage business. *SMF 43.* This case fits the pattern of those which found a legally <u>insufficient</u> connection to any garage business. *E.g., Automobile Underwriters v. Hitch,* 349 N.E.2d 271 (Ind. App. 1st Dist. 1976) ("incidental to" garage operations cannot reasonably be extended to cover sale of reloaded shotgun shells, even though the sale occurred in the garage); *Landers Auto Group v. Continental Western Ins. Co.,* 621 F.3d 810, 814 (8th Cir. 2010 (improper repossession of auto is "not an activity associated with operation of a garage" and thus not covered under a garage policy); *Southeastern Fidelity Ins. Co. v. Sintros,* 409 So.2d 521 (Fla. App. 1982) (conducting car rental operations on same premises as service station was not "necessary or incidental" to garage operations). The language of the Policy should not be tortured to create Garage coverage here.

6. <u>Cincinnati Did Not Intend to Write Auto Liability Coverage for Blue Cab</u>

It was never Cincinnati's intent to provide auto-related liability coverage for Blue Cab – through the Garage coverage part or otherwise. Cincinnati was told Blue Cab had auto liability coverage elsewhere, and issued the Policy on that basis. Cincinnati's underwriting file contains consistent notations reflecting the fact that Cincinnati was <u>not</u> writing any auto coverage for Blue Cab, and did not want to do so. *SMF 35.*

The Policy provided Garage coverage due to the business of M&C Motors, not because of the business of Blue Cab. *SMF 27, 28.* The Garage premium is based only on information relating to M&C Motors. *SMF 28.* James Bennett himself represented that the Garage coverage in the Policy applied only to M&C Motors. *SMF 27.* It would be inappropriate to rewrite the Policy by finding coverage under these facts.

Based on the law and the facts, Defendants cannot meet their burden of showing that Sanders' Lawsuit falls within the Garage coverage of the Policy.

### B. NO COVERAGE UNDER THE CGL COVERAGE PART

The CGL coverage part generally provides coverage for bodily injury caused by an accident. However, it specifically excludes coverage for bodily injury "arising out of the ownership, maintenance, use or entrustment to others" of any auto (the "Auto Exclusion"). *SMF 34.* The Auto Exclusion applies "even if the claims against any insured allege negligence or any wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured ...." *SMF 34.* The Auto Exclusion bars coverage for the Sanders Lawsuit.

Illinois courts have consistently applied auto exclusions to bar CGL coverage for auto liability claims such as the Sanders Lawsuit. *E.g., Northbrook Prop. & Cas. Co. v. Trans. Joint Agreement,* 194 Ill.2d 96, 741 N.E.2d 253 (IL 2000) (auto exclusion precluded CGL coverage where complaints failed to allege injury "wholly independent of any negligent operation" of an auto); *Oakley Transp., Inc. v. Zurich Ins. Co.,* 271 Ill.App.3d 716, 726, 48 N.E.2d 1099, 1107 (Ill. App. 1st Dist. 1995) (auto exclusion precludes CGL coverage for negligent supervision claims because they are "derivative

12

of, and dependent upon, the underlying negligent use of the vehicle" and "cannot be divorced from its employee's negligent driving"). These cases apply here.

In *Northbrook*, a train collided with a school bus and killed several students. Northbrook denied CGL coverage based on the auto exclusion. The Court agreed that Northbrook had no duty to defend the school district.

> Here, the allegations of the underlying complaint utterly fail to state facts which either actually or potentially bring the cases within the policy's coverage. The policy excludes injuries arising from the school districts' use or operation of a motor vehicle. Allegations that the school districts inadequately planned and inspected bus routes or failed to warn bus drivers of potential hazards along the routes are nothing more than rephrasings of the fact that the students' injuries arose from the school districts' use or operation of a motor vehicle. Contrary to the appellate court's holding, the students' complaints failed to allege that the injuries arose from events wholly independent of any negligent operation of the bus. Northbrook therefore has no duty to defend the school districts in the underlying lawsuits.

194 Ill.2d at 98-99, 741 N.E.2d at 254-55.

Like *Northbrook* and *Oakley*, there is no CGL coverage for the Sanders Lawsuit due to the Auto Exclusion. First, Sanders' "negligent driving" theory alleges Blue Cab "owned and operated" the taxi, maintained and controlled the taxi and was legally responsible for McFadden's alleged negligence in driving. *SMF 10*. This claim unquestionably falls within the Auto Exclusion.

In addition, the Auto Exclusion in the Policy is even broader than the one in *Northbrook* and *Oakley*. By its terms, the Auto Exclusion applies "even if the claims against any insured allege negligence or any wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured." *SMF 34*. Sanders' allegations against Blue Cab constitute claims of wrongdoing in the "supervision, hiring, employment ... or monitoring" of McFadden as a taxi driver. Blue Cab's alleged failure

to verify McFadden's health before allowing him to drive Blue Cab customers cannot be separated from McFadden's actual operation of the vehicle. Those claims also fall directly into the language of the Auto Exclusion because they do not result "from events wholly independent of any negligent operation of the" taxi. *Northbrook*, 194 Ill.2d at 99, 741 N.E.2d at 254. Alternatively and in addition, they are "derivative of, and dependent upon, the underlying negligent use of the vehicle" by McFadden and "simply cannot be divorced from" McFadden's alleged negligent driving. *Oakley*, 271 Ill.App.3d at 726-27, 648 N.E.2d at 1107.

Under clear Illinois precedent, the Policy provides no coverage for the Sanders Lawsuit under the CGL coverage part.

## C. <u>CINCINNATI HAS NO DUTY TO DEFEND BLUE CAB</u>

As shown above, the Sanders Lawsuit is not covered under the Policy. As a result, Blue Cab is not entitled to defense or indemnity from Cincinnati for that case. Even if coverage might be available (which Cincinnati denies), Cincinnati has no duty to defend for two additional reasons.

As explained above (*supra* at p.10), Blue Cab already has insurance coverage for the Accident from McFadden's auto insurer, First Chicago. The First Chicago policy provides $250,000 in auto liability coverage to Blue Cab as an additional insured. *SMF 16, 17, 18.* First Chicago has offered those entire limits to Sanders. *SMF 21.*

The coverage provided by First Chicago to Blue Cab is primary. The general rule in Illinois is that the vehicle's <u>owner</u> provides primary coverage for auto liability. *See Coca-Cola Enterprises,* 670 F.3d at 775-76. Any other coverage would be excess, and the excess insurer would have no duty to defend. *See Liberty Mut. Ins. Co. v. American*

*Home Assur. Co.*, 348 F.Supp.2d 940, 953 (N.D. Ill. 2004). Further, Blue Cab "target tendered" its defense to First Chicago. *SMF 19; see also John Burns Constr. v. Indiana Ins. Co.*, 189 Ill.2d 570, 727 N.E.2d 211 (IL 2000) (insured may "target" one of several insurers to provide its defense). First Chicago accepted that tender; it has provided a defense to Blue Cab in the Sanders Lawsuit. *SMF 20*. For both these reasons, any coverage provided by Cincinnati for the Sanders Lawsuit would be excess only. To the extent that the Policy provides any coverage at all for this case – which it did not, as shown below – Cincinnati had no duty to defend Blue Cab in the Sanders Lawsuit.

## CONCLUSION

The facts and the law support Cincinnati's position that it has no duty under the Policy to defend, indemnify, or reimburse Blue Cab with respect to the Sanders Lawsuit. Cincinnati is entitled to judgment in its favor.

DATED: May 25, 2012

Respectfully submitted on behalf of
Cincinnati Insurance Company,

/S/ <u>Hope G. Nightingale</u>
By One of Its Attorneys

Hope G. Nightingale (ARDC # 6184864)
Kathleen L. Bianco (ARDC # 6283357)
LITCHFIELD CAVO LLP
303 West Madison Street, Suite 300
Chicago, IL 60606
(312) 781-6614 (Nightingale)
(312) 781-6621 (Bianco)
(312) 781-6630 Fax

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2012, I served the foregoing **CINCINNATI INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** on the following:

| | |
|---|---|
| Larry R. Rogers<br>Carolyn S. Daley<br>Powers, Rogers & Smith<br>70 West Madison Street<br>Suite 5500<br>Chicago, IL 60602<br>(312) 236-9381<br>Email: lrogers@prslaw.com<br>Email: cdaley@prslaw.com | Stephen Sloan Weiss<br>Tribler Orpett and Meyer, P.C.<br>225 West Washington Street<br>Suite 1300<br>Chicago, IL 60606<br>(312) 201-6400<br>Email: ssweiss@tribler.com |

by email and by placing a true and correct copy of same in the U. S. Mail at 303 W. Madison Street, Chicago, IL 60606.

Cincinnati Insurance Company

By: /s/ Hope G. Nightingale

Hope G. Nightingale (ARDC # 6229150)
Kathleen Bianco (ARDC # 6283357)
Litchfield Cavo LLP
303 W. Madison Street, Suite 300
Chicago, Illinois 60606
312/781-6614 (Nightingale)
312/781-6621 (Bianco)
312-781-6630 (fax)