# EXHIBIT 6

# DEPOSITION OF THOMAS MCFADDEN

## (Owner-Operator of taxi involved in Accident; defendant in underlying auto liability lawsuit)

## taken May 19, 2010



Page 1

```
 1    STATE OF ILLINOIS )
                        ) SS:
 2    COUNTY OF COOK    )

 3        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                 COUNTY DEPARTMENT - LAW DIVISION

 4
      ROSE M. WASHINGTON-SANDERS,    )
 5                                   )
              Plaintiff,             )
 6                                   )
         vs.                         )  No. 07 L 13584
 7                                   )
      THOMAS McFADDEN, Individually  )
 8    and as an Agent and/or Employee)
      of BLUE CAB CO., INC.; and BLUE)
 9    CAB CO., INC., an Illinois     )
      corporation,                   )
10                                   )
              Defendants.            )
11            The Discovery Deposition of THOMAS

12    McFADDEN, taken under oath on the 19th day of May

13    2010, at 1801 35th Street, Oak Brook, Illinois,

14    pursuant to the Rules of the Supreme Court of

15    Illinois and the Code of Civil Procedure, before

16    Steven T. Stefanik, a notary public in and for the

17    County of DuPage and State of Illinois, pursuant to

18    notice.

19        APPEARANCES:

20            POWER, ROGERS & SMITH, PC, by
              MS. CAROLYN DALEY SCOTT
21            Three First National Plaza
              70 West Madison Street, Suite 5500
22            Chicago, Illinois 60602-4212
              (312) 236-9381
23                for the Plaintiff;

24
```

RECEIVED

JUN 0 9 2010

POWER ROGERS & SMITH P C

EXHIBIT

A

Page 2

1    APPEARANCES: (CONT'D)
2    CONDON & COOK, LLC, by
     MS. LAUREN A. ROZICH
3    745 North Dearborn Street
     Chicago, Illinois 60654
4    (312) 266-1313
         for the Defendant Thomas McFadden;
5
     TRIBLER, ORPETT & MEYER, PC, by
6    MR. STEPHEN S. WEISS
     225 West Washington Street, Suite 1300
7    Chicago, Illinois 60606
     (312) 201-6400
8        for the Defendant Blue Cab Co.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1         I N D E X
     WITNESS:              PAGE
2
     THOMAS McFADDEN
3
     Examination by:
4       Ms. Daley Scott      4
        Mr. Weiss            92
5
6
7
8
9         E X H I B I T S
     NUMBER               FOR IDENTIFICATION
10
     McFadden No. 1        68
11
     McFadden No. 2        88
12
     McFadden No. 3        94
13
     McFadden No. 4        97
14
15
16
17
18
19
20
21
22
23
24

Page 4

1         (Witness sworn.)
2         THOMAS McFADDEN,
3    called as a witness herein, having been first duly
4    sworn, was examined and testified as follows:
5         EXAMINATION
6         BY
7         MS. DALEY SCOTT:
8    Q.  Mr. McFadden, could you state your name and
9    spell it for the record.
10   A.  Thomas McFadden, M-c-F-a-d-d-e-n.
11   MS. DALEY SCOTT:  Let the record reflect this is
12   the discovery deposition of Thomas McFadden taken
13   pursuant to notice and agreement of the parties,
14   pursuant to the rules of the Illinois Supreme Court
15   and any local applicable rules.
16   BY MS. DALEY SCOTT:
17   Q.  Mr. McFadden, have you ever given a
18   deposition before?
19   A.  Once.
20   Q.  When did you give a deposition?
21   A.  About five years ago.
22   Q.  And why did you give a deposition?
23   A.  I was asked some questions about my -- what
24   time I drove my cab.

Page 5

1    Q.  Were you a party to a lawsuit?
2    A.  No.
3    Q.  Oh, okay.  Well, since it's been a few
4    years since you've given a deposition, I will go
5    over the basics of a deposition.
6         I represent Rose Washington-Sanders in
7    this matter who's the plaintiff who was a passenger
8    in your taxi.
9         There are a few ground rules for a
10   deposition.  The court reporter will be taking down
11   everything that is being said in this room.  To
12   make his job a little bit easier and to make the
13   record clear, I ask that you wait until I finish
14   asking my question to answer my question, and I
15   will wait until you're done answering to ask you
16   additional questions.
17        If we talk over one another, it makes
18   for a very messy record and it makes his job quite
19   difficult, okay?
20   A.  Yes.
21   Q.  Okay.  Also, since he's taking down
22   everything that is being said in this room, I ask
23   that all responses be verbal.  A nod of the head, a
24   shrug of the shoulders cannot be recorded.  An

**Page 6**

1 "uh-huh," "uhm-uhm" or "uhn-uhn" doesn't make for a
2 clear record either.
3      So if you answer along those lines, I'm
4 going to ask for a verbal response, okay?
5    A. Okay.
6    Q. If you do not understand a question I ask
7 you, please let me know and I'm happy to rephrase
8 it.
9      If you do answer a question, I'm going
10 to assume that you understood the question. Okay?
11   A. Okay.
12   Q. At any time you would like to take a break,
13 you're free to do so. Just -- I ask that if
14 there's a question pending, that you answer that
15 question prior to taking a break, okay?
16   A. Okay.
17   Q. What is your date of birth?
18   A. ▮▮▮▮▮▮▮
19   Q. And your Social Security number?
20   A. ▮▮▮▮▮▮▮
21   Q. And where do you currently reside?
22   A. 1759 West 35th Street, Apartment 4314,
23 Oak Brook, Illinois.
24   Q. How long have you lived here?

**Page 7**

1    A. Six months.
2    Q. Where did you live before here?
3    A. 1618 Home, H-o-m-e.
4    Q. How -- okay.
5    A. Berwyn, Illinois.
6    Q. How long did you live there?
7    A. 36 years.
8    Q. Okay. And with who do you currently
9 reside?
10   A. Pardon me?
11   Q. With who do you currently reside?
12   A. I live alone.
13   Q. And this 1759 address, is this part of the
14 senior --
15   A. Yes.
16   Q. -- residence?
17      Okay. And are you -- I didn't -- this
18 question is not meant to offend. It's a question
19 that's asked routinely.
20      Have you ever been convicted of a
21 felony?
22   A. No.
23   Q. Have you ever been convicted of a crime of
24 dishonesty?

**Page 8**

1    A. No.
2    Q. Okay. Are you currently taking any
3 medication?
4    A. Yes.
5    Q. What medication are you on?
6    A. Metformin for diabetes; Plavix for -- I
7 have a clogged artery in my neck. I'm taking
8 aspirin, a routine for, you know, heart.
9    Q. Hm-hmm.
10   A. Taking other things. I just can't remember
11 what they are.
12   Q. Are there any medications that you're
13 taking today that could affect your memory or
14 recall?
15   A. No. No.
16   Q. Could you please give me your -- briefly,
17 your educational background.
18   A. Four years of high school, and I took one
19 class while I was in the service at North Carolina.
20 Sociology.
21   Q. Okay. Where did you graduate from high
22 school?
23   A. De La Salle, Chicago.
24   Q. What year did you graduate from

**Page 9**

1 De La Salle?
2    A. '62.
3    Q. And you went into the military, correct?
4    A. (Nodding.)
5    Q. What years did you go into the military?
6    A. June of '65 to June of '67.
7    Q. And what branch of the military were you?
8    A. Army.
9    Q. And what was your role in the army?
10   A. I was a paratrooper.
11   Q. And were you honorably discharged?
12   A. Yes.
13   Q. Okay. Could you give me an overview of
14 your employment background. And you don't have to
15 go all the way back to '67.
16      Let's say in the last 15 years, what
17 have you been doing?
18   A. 15 years ago, I was working -- I was
19 self-employed, a roofer.
20   Q. Okay.
21   A. And shortly after that, '95, I started
22 working for Bare Assets at 1400 South Cicero. I
23 worked there six years till 201.
24   Q. What do you do there?

Page 10

1  A.  I was a clerk in a bookstore.  After that,
2  I was driving cabs for different companies.
3  Q.  Okay.  So in '01, who did you begin driving
4  for?
5  A.  Brookfield Cab.
6  Q.  How long were you a cabdriver with
7  Brookfield?
8  A.  Four, maybe five months.
9  Q.  And why did you leave Brookfield?
10  A.  No business.  I was -- bad company to work
11  with.
12  Q.  Okay.  Then where did you go?
13  A.  Express Cab in Cicero.
14  Q.  And how long were you with Express?
15  A.  Same thing.  About nine months.
16  Q.  Nine months?
17  A.  Roughly.
18  Q.  Why did you leave Express?
19  A.  Why did I leave?  I wasn't making enough
20  money.  There just weren't enough fares.
21  Q.  Okay.  Where did you go after Express?
22  Back -- we would be into 2002, roughly,
23  about, or the beginning of 2002?
24  A.  Somewhere in there.

Page 11

1  Q.  Okay.
2  A.  And then I started for Blue Cab.
3  Q.  Okay.  And when -- and when did you cease
4  working for Blue Cab?
5  A.  The day of the accident, September 23rd,
6  207.
7  Q.  Have you worked since September 23rd, 2007?
8  A.  No.
9  Q.  Okay.  From 2001 until the date of the
10  accident, did you have any other employment other
11  than driving a taxicab for --
12  A.  No.
13  Q.  Do you have any -- or strike that.
14  Do you currently hold a valid driver's
15  license, sir?
16  A.  Yes.
17  Q.  Do you have it with you?
18  A.  Yes.
19  Q.  May I see it?
20  If you can pull it out of your?
21  MS. ROZICH:  Can you take it out?
22  THE WITNESS:  Okay.
23  BY MS. DALEY SCOTT:
24  Q.  Thanks.

Page 12

1  His driver's -- I'm just going to read
2  some information in the record.  His driver's
3  license number is M213-8304-4023 issued
4  January 25th, 2007.  Expires January 23rd, 2011.
5  No restrictions.  Class D.
6  Thank you, sir.
7  So that was the driver's license you had
8  on the date of this accident, correct?
9  A.  Correct.
10  Q.  Sir, have you ever had a suspended or
11  revoked driver's license?
12  A.  No.
13  Q.  Have you ever failed a driver's test or
14  renewal test?
15  A.  No.
16  Q.  Do you wear eyeglasses?
17  A.  I wear reading glasses.
18  Q.  What is your prescription?
19  A.  I just wear them to read.  They are
20  store-boughts.
21  Q.  Oh, they're store-bought?
22  A.  Yeah.
23  Q.  So they're not something that --
24  A.  They're not prescription.

Page 13

1  Q.  They're not something that an optometrist
2  has prescribed to you?
3  A.  No.
4  Q.  When did you start wearing reading glasses?
5  A.  15 years ago.
6  Q.  What doctors have you gone to to have your
7  eyes checked in the past ten years?
8  A.  I haven't.
9  Q.  Okay.  All right.  Now, I want to talk to
10  you a little bit about your health, sir, and I'm
11  interested right now in before the accident.
12  So the questions that I'm about to ask
13  you all deal with prior to the accident.  Okay?
14  A.  Okay.
15  Q.  It's my understanding that you had some
16  heart issues prior to the accident, correct?
17  A.  Yes.
18  Q.  Could you please explain to me what those
19  were.
20  A.  I had a -- I had chest pains once.  And I
21  went to MacNeal Hospital and they put a stent in
22  me.
23  Q.  Do you know when that was?
24  A.  Good Lord.

Page 14

1        About 203.
2     Q.   After that stent was placed in -- you think
3   it was about 203, did you -- have you ever had
4   chest pains since then?
5     A.   No.
6     Q.   Since the date of the -- and now I'm going
7   to jump forward on you.
8        Since the date of the accident, do you
9   continue to have heart issues?
10    A.   Well, I'm on medication for -- a blood
11  thinner, Plavix.
12    Q.   Have you had any complications with the
13  Plavix?
14    A.   No.
15    Q.   Okay.  Prior to the accident, you were
16  diagnosed with diabetes, correct?
17    A.   Correct.
18    Q.   When were you diagnosed?
19    A.   July 6th of that year, 207.
20    Q.   Who diagnosed you?
21    A.   Dr. Gradinski (phonetic).
22    Q.   Who is Dr. Gradinski?
23    A.   Hines Veteran doctor that I --
24    Q.   Would he be your primary care physician?

Page 15

1     A.   Yes, he was at that time.
2     Q.   Is he still currently?
3     A.   I haven't seen him in years.
4     Q.   When was the last time you saw
5   Dr. Gradinski?
6     A.   Shortly after the accident.  A month or
7   two.
8     Q.   Why have you not seen him in years?
9     A.   I have a different doctor.
10    Q.   Who is your current doctor?
11    A.   She has a difficult name to remember,
12  but -- okay.  Medina Lucy Munoz, M-u-n-o-z.
13    Q.   Could I --
14    A.   Sure.
15    Q.   If you wouldn't mind.  So -- just see.
16    A.   Right up there.
17    Q.   M-e-d-i-n-a L-u-c-y M-u-n-o-z is the last
18  name.
19        Thank you, sir.
20        How long have you been seeing Dr. Munoz?
21    A.   Four or five years.
22    Q.   And where is Dr. Munoz located?
23    A.   Hines.
24    Q.   At Hines?

Page 16

1        So she became your primary care
2   physician after Dr. Gradinski, correct?
3     A.   Yes.
4     Q.   And what is Dr. Munoz currently treating
5   you for?
6     A.   Well, diabetes.  I have high cholesterol.
7   MS. ROZICH:  I'm sorry.
8        What was the last question asked?
9   MS. DALEY SCOTT:  What is she currently treating
10  him for?
11    THE WITNESS:  Hypertension.  She got me on --
12  oh, high cholesterol.  That's it, I guess.
13  BY MS. DALEY SCOTT:
14    Q.   Okay.  When was the last time you saw
15  Dr. Munoz?
16    A.   A year ago.
17    Q.   Okay.  Back to your diagnosis of diabetes
18  before the accident.
19        What type of diabetes were you diagnosed
20  with?
21    A.   II.
22    Q.   Are you insulin-dependent, sir?
23    A.   No.
24    Q.   Have you ever been insulin-dependent?

Page 17

1     A.   No.
2     Q.   And back in 2007, prior to the accident,
3   what medication were you taking, if any, for your
4   diabetes?
5     A.   Metformin.
6     Q.   Have you ever taken any other medication
7   for your diabetes?
8     A.   No.
9     Q.   And have you ever had any complications
10  with Metformin?
11    A.   No.
12    Q.   Have you ever had any comp- -- before the
13  date of the accident, have you ever -- did you ever
14  have any hypoglycemic events?
15    A.   I don't understand.
16    Q.   Are you aware of what a hypoglycemic event
17  is --
18    A.   No.
19    Q.   -- in accordance with diabetes?
20    A.   No.
21    Q.   Okay.  Have you ever had -- prior to the
22  date of the accident, did you ever have any
23  complications with your diabetes?
24    A.   No.

Page 18

1    Q.   How is it that your doctor came about the
2  diagnosis of diabetes for you?
3    A.   Blood tests.  I was shocked when he told me
4  that I had diabetes.  I had no idea.
5    Q.   So you weren't feeling any ill effects?
6    A.   No.
7    Q.   Since going on the Metformin in 2007, did
8  you -- did that change the way you felt at all
9  physically?
10   A.   No.
11   Q.   What was the treatment plan for your
12 diabetes back in 2007?
13   A.   Metformin.  That's it.
14   Q.   Did they put you on a restricted diet?
15   A.   No.
16   Q.   Didn't talk to you about changing your diet
17 at all?
18   A.   They talked to me about eating sweets and
19 that, but I'm not a big sweet-eater to begin with.
20 So...
21   Q.   Okay.  Do you -- in 2007, before the day of
22 the accident, did you monitor your blood glucose
23 levels?
24   A.   Yes -- prior to 207?  No.

Page 19

1    Q.   Prior to the date of the accident.
2    A.   Oh, yes.  Yes.
3    Q.   So from -- you know, I know you were
4  diagnosed a little over two months before the date
5  of the accident.
6    A.   Right.
7    Q.   So from the time of the diagnosis to the
8  date of the accident, did you monitor your --
9    A.   Yes.
10   Q.   -- glucose levels?
11   A.   Yes.
12   Q.   How often did you monitor your glucose
13 levels?
14   A.   Every -- three -- three times a week.
15   Q.   Okay.  Were there set days that you did
16 that?
17   A.   I made set days, Monday, Wednesday and
18 Friday.
19   Q.   So every week from the time you were
20 diagnosed at least up until the day of the
21 accident, every Monday, Wednesday and Friday, you
22 tested your blood glucose level, correct?
23   A.   Yes.  Yes.
24   Q.   Okay.  Did you keep a log of your blood

Page 20

1  glucose levels?
2    A.   Yes.
3    Q.   Did you -- you wouldn't happen to have
4  stored those logs by chance?
5    A.   No.
6    Q.   I thought I'd ask.
7         On the date of the accident -- or strike
8  that.
9         What time of day would you test your
10 blood glucose levels?
11   A.   In the morning.
12   Q.   First thing in the morning before you woke
13 up -- or when you woke up?
14   A.   After I woke up.  After -- after I woke up,
15 because you take it before you eat.
16   Q.   Okay.  So it was every Monday, Wednesday
17 and Friday morning after you woke up --
18   A.   When I woke up.
19   Q.   Let me finish real quick.
20        After you woke up before you ate
21 anything --
22   A.   Yes.
23   Q.   -- correct?
24   A.   Correct.

Page 21

1    Q.   Okay.  And after you went on the Metformin,
2  were your -- from, let's say, the date of diagnosis
3  to the day of the accident, were your blood glucose
4  levels fairly consistent?
5    A.   Fairly, yes.  110, 120.  Sometimes they go
6  to 150.  Rarely higher than that.
7    Q.   Do you know what the range is for normal
8  blood glucose levels?
9    A.   They say if it's below 130, you're okay.
10   Q.   Okay.  On occasion, does your blood --
11 from -- before the date of the accident, did your
12 blood glucose level go above 130?
13   A.   I don't know.
14   Q.   Has your doctor ever discussed going on
15 insulin with you?
16   A.   No.
17   Q.   Did you ever inform Blue Cab of this
18 diagnosis?
19   A.   That I was diabetic?
20   Q.   Correct.
21   A.   No.
22   Q.   Did Blue Cab Company ever ask you about
23 your health?
24   A.   No.

Page 22

1  Q.  At any time?
2  A.  No.
3  Q.  So Blue Cab Company never asked you about
4  your health history before you were hired?
5  A.  No.
6  Q.  And at no time after you were hired did
7  Blue Cab ask you about your health history,
8  correct?
9  A.  Correct.
10  Q.  Okay.  And then, it's my understanding,
11  prior to the date of the accident, you had some
12  syncopal episodes, some fainting episodes?
13  A.  One.
14  Q.  When did that occur?
15  A.  When I worked at Bare Assets, '99, 2000,
16  somewhere in there.
17  Q.  And tell me what happened.
18  A.  I fainted at work.  I woke up on the floor.
19  Q.  Okay.  And so was that the only episode
20  that you recall?
21  A.  Yes.
22  Q.  Have you had one since then?
23  A.  No.
24  Q.  Sir, do you currently use alcohol?

Page 23

1  A.  No.
2  Q.  Have you used alcohol in the past?
3  A.  Yes.
4  Q.  When was the last time you used alcohol?
5  A.  I quit drinking in '95, '96, somewhere in
6  there.
7  Q.  So from '95, '96, to the date of the
8  accident, you didn't drink alcohol at all?
9  A.  No.
10  Q.  Prior to the day of the accident, you were
11  diagnosed with hypertension, correct?
12  A.  Yes.
13  Q.  Okay.  Do you know when you were diagnosed?
14  Roughly, the year.
15  A.  No, because Dr. Gradinski, when he's doing
16  these tests, then they prescribe pills for you, you
17  know.
18  So I would see him and the next thing I
19  knew, I'm on a new medication.  That's...
20  Q.  Okay.  So have you been put on medication
21  for blood pressure for at least a year?
22  A.  Probably.
23  Q.  What medication prior to the date of the
24  accident were you on for your high blood pressure?

Page 24

1  A.  That's why I carry this thing.
2  Here it is.  Lisinopril.
3  MR. WEISS:  It's l-i-s-i-n-o-p-r-i-l.
4  BY MS. DALEY SCOTT:
5  Q.  And are you still currently on that
6  medication?
7  A.  Yes.
8  Q.  Okay.  Do you know -- has your dosage
9  changed since 2007?
10  A.  No.
11  Q.  Do you mind if I look at your card --
12  A.  Go ahead.
13  Q.  -- to see what your dosage is?
14  According to this prescription printout,
15  it says -- it's a 20-milligram tab, one half tablet
16  by mouth every day for hypertension.
17  Thank you, sir.
18  Are you aware of the side effects
19  associated with lisinopril?
20  A.  No.
21  Q.  Did Dr. Gradinski ever discuss those side
22  effects with you?
23  A.  I'm not sure.  Probably.
24  Q.  And have you experienced any side

Page 25

1  effects --
2  A.  No.
3  Q.  -- since being on the lisinopril?
4  A.  (Shaking head.)
5  Q.  It's my understanding, on the date of the
6  accident, you were also on atenolol?
7  A.  Yes.
8  Q.  Okay.  What were you on atenolol for?
9  A.  It doesn't say, but -- I don't know.
10  MS. ROZICH:  That's okay.
11  BY MS. DALEY SCOTT:
12  Q.  Are you still currently on atenolol?
13  A.  Yes.
14  Q.  Has your dosage, to your knowledge, changed
15  since the date of the accident --
16  A.  No.
17  Q.  -- to today's date for atenolol?
18  A.  No.
19  Q.  And could I see that for your dosage?
20  And just remember to wait until I finish
21  my question completely just -- it'll make his job a
22  lot easier.
23  So according to the prescription
24  printout, it's atenolol, 25 milligram tab, take

Page 26

1  three tablets by mouth every day.
2      All right. Thank you, sir.
3      When did you start seeing Dr. Gradinski
4  again?
5      A. Probably 1990.
6      Q. And --
7      A. Somewhere in there.
8      Q. Okay. In the early '90s?
9      A. Yeah.
10     Q. And he is the one that diagnosed you with
11  high blood pressure, high cholesterol, diabetes and
12  a heart issue, correct?
13     A. The first three.
14     The heart -- the heart issue just came
15  lately after that. I don't know when, but... He
16  had me on the -- which one was for the heart thing,
17  the pills? I forget.
18     Q. The lisinopril -- or, no, that was for my
19  blood pressure.
20     A. The hypertension. He had -- he did that.
21     Q. Do you know when the last time before the
22  date of the accident you saw Dr. Gradinski was?
23     A. June. The day he told me that I had
24  diabetes -- July. July. It was July 6th. I

Page 27

1  remember it was two days after the accident, after
2  the 4th of July.
3      Q. And he made the diagnosis of diabetes that
4  day and put -- prescribed Metformin, correct?
5      A. Correct.
6      Q. Did he have you go to any diabetes
7  educational programs or anything along those lines?
8      A. He sent me to Hines to get the testing kit.
9      Q. Okay.
10     A. And they have a class there.
11     Q. Did you attend that class?
12     A. Yes, of course.
13     Q. And what did they discuss in that class?
14     A. What -- how to -- how to test for diabetes,
15  you know, your blood sugar and...
16     Q. All right. And was he the one that just
17  talked to you about staying away from sweets and
18  stuff for your diabetes?
19     A. Of course.
20     Q. And did they also discuss that in that
21  class?
22     A. Yes.
23     Q. Prior to the date of the accident, did you
24  see any other physicians at Hines besides

Page 28

1  Dr. Gradinski?
2      A. No.
3      Q. Did Dr. Gradinski ever discuss any
4  potential vision problems associated --
5      A. No.
6      Q. -- with diabetes?
7      A. No.
8      Q. And you never had an eye exam at Hines
9  Hospital in the past ten years?
10     A. No.
11     Q. Okay. And did Dr. Gradinski ever recommend
12  that you go get your eyes checked at any time --
13     A. No.
14     Q. -- in the past ten years?
15     A. (Shaking head.)
16     Q. All right. Are you aware, sir, that
17  lisinopril potential side effects include
18  dizziness, lightheadedness or fainting?
19     A. Am I aware of that?
20     Q. Yes.
21     A. No.
22     Q. Were you given a printout -- when you pick
23  up your prescriptions, are you generally -- are you
24  given a printout with drug information on it?

Page 29

1      A. Yes.
2      Q. Do you read that printout?
3      A. No.
4      Q. Are you aware that atenolol can cause
5  dizziness and drowsiness and lightheadedness, sir?
6      A. No.
7      Q. And I take it that the insert that came --
8  comes with your atenolol prescription prior to the
9  date of the accident, you had never read that,
10  correct?
11     A. Correct.
12     Q. And, to your knowledge, Dr. Gradinski did
13  not discuss the side effects of these drugs with
14  you, correct?
15     A. Correct.
16     Q. Did Dr. Gradinski ever discuss any concern
17  with your driving prior to the day of this
18  accident?
19     A. No.
20     Q. And Dr. Gradinski, prior to the date of the
21  accident, did he ever express concern with any of
22  the medication that you were on causing -- or
23  strike that.
24     Did -- prior to the date of the

Page 30

1 accident, did Dr. Gradinski ever express concern
2 that any of the medication that you were on could
3 impair your ability to operate a motor vehicle?
4    A.   No.
5    Q.   Why did you start using reading glasses,
6 sir?
7    A.   My arms.  My arms weren't long enough.  You
8 know how -- when you read the newspaper?  I'm
9 farsighted.
10    Q.   Okay.
11    A.   You know, I don't get closer.  I read -- my
12 arms just weren't long enough.  So...
13    Q.   So you have trouble seeing things that are
14 close to you; is that --
15    A.   No.
16    Q.   No?
17    A.   Trying to read something -- it used to be
18 before I -- now it's -- now it's blurred when I
19 read close; but before, you know, I could go like
20 this and read it.
21    Q.   Okay.  So you could read something the
22 further it was away from you --
23    A.   Exactly.
24    Q.   -- before?

Page 31

1    A.   Right.
2    Q.   And your arms weren't long enough, so you
3 got reading glasses to help you out?
4    A.   Yes.
5    Q.   All right.  Did you tell Dr. Gradinski that
6 you were wearing reading glasses?
7    A.   Yes.
8    Q.   And did he ever suggest to go get your eyes
9 checked?
10    A.   No.
11    Q.   Have you ever had any -- have you ever worn
12 glasses, sir?
13    A.   No.
14    Q.   And when I say "glasses," I mean that to
15 include contacts or other corrective form of --
16    A.   I know.  It's still no.
17    Q.   Okay.  And have you ever had your eyes
18 examined?
19    A.   Yes.
20    Q.   When did you have your eyes examined last?
21    A.   God.  Probably 30 years ago.
22    Q.   So since you -- do you ever wear your
23 glasses for operating a motor vehicle?
24    A.   No.

Page 32

1    Q.   So on the date of the accident, you were
2 not wearing your glasses, correct?
3    A.   Correct.
4    Q.   Did you have your glasses with you?
5    A.   My reading glasses, yes.
6    Q.   Do you always keep your reading glasses
7 with you?
8    A.   Yes.
9    Q.   Sir, according to your medical records from
10 Hines, on January 22nd, 2007, you called
11 Dr. Gradinski's office to tell them you failed your
12 vision test for renewal of the driver's license a
13 week before.
14       Do you recall that?
15    A.   I called Dr. Gradinski?  No, I don't recall
16 that.
17    Q.   So you don't recall ever failing your
18 vision test for the renewal of your driver's
19 license?
20    A.   No.
21    Q.   And do you ever recall requesting from
22 Dr. Gradinski's office a location of where you
23 could get your vision tested?
24    A.   No.

Page 33

1    Q.   The vehicle involved in this accident of
2 September 23rd, 2007, did you own that motor
3 vehicle, sir?
4    A.   Yes.
5    Q.   All right.  And I'm correct it was a 2004
6 Crown Victoria -- or it was 2000.  Excuse me.
7    A.   Correct.
8    Q.   Did you own any other vehicles at the time?
9    A.   Yes.
10    Q.   What other vehicle did you own?
11    A.   A Ford Explorer.  '96.
12    Q.   And was that your personal vehicle?
13    A.   Yes.
14    Q.   And was that only used for personal use?
15    A.   Yes.
16    Q.   And the 2000 Crown Victoria, was that used
17 for business purposes?
18    A.   Yes.
19    Q.   And what purpose was that used for?
20    A.   It was a taxicab.
21    Q.   And when did you purchase this vehicle?
22    A.   I believe the year before.
23    Q.   So if the records showed that you purchased
24 it in March of 2006, would that refresh your

Page 34

1 memory?
2   A.  I believe that could be correct.
3   Q.  Do you know who you purchased it for --
4 from?  Excuse me.
5   A.  The cab company.
6   Q.  And when you say "the cab company," are you
7 referring to Blue Cab Company?
8   A.  Yes.
9   Q.  Okay.  Do you know who, in particular, you
10 worked with at Blue Cab to purchase this vehicle?
11   A.  I can't remember his name.  I can't
12 remember his name.
13   Q.  Does the name Jim Bennett --
14   A.  That's it.
15   Q.  -- ring a bell?
16   A.  That's the one.
17   Q.  Who is Jim Bennett?
18   A.  As far as I know, he's the owner of
19 Blue Cab.
20   Q.  And that's who you purchased --
21   A.  Yes.
22   Q.  -- the vehicle from in 2006, correct?
23   A.  I believe it was 2006.  I believe it was
24 the year before I had the accident.

Page 35

1   Q.  Okay.  All right.  Regardless of when you
2 purchased the vehicle, you did, in fact, purchase
3 the vehicle from Jim Bennett, correct?
4   A.  Correct.
5   Q.  Okay.  Did you -- how did you pay for the
6 vehicle?
7   A.  Cash.
8   Q.  Do you know how much you paid for the
9 vehicle?
10   A.  3,000.
11   Q.  And how did you decide you were going to
12 purchase this vehicle?
13   A.  I just purchased.  I needed a cab and I
14 purchased it.
15   Q.  Did you purchase the cab prior to beginning
16 your employment with Blue Cab?
17   A.  No.
18   Q.  Okay.
19   MR. WEISS:  Object to form.
20 BY MS. DALEY SCOTT:
21   Q.  From time to time, counsel may make
22 objections for the record.  If your attorney
23 instructs you to, you can go ahead and answer the
24 question over the objection.

Page 36

1       The objections are simply made for the
2 record for -- if need be, for our purposes later.
3 BY MS. DALEY SCOTT:
4   Q.  Do you remember what date you began
5 employment -- or strike that.
6       What day did you begin working for
7 Blue Cab?
8   A.  I don't remember.
9   Q.  Did Blue Cab ever provide you with a
10 taxicab to drive when you were working for
11 Blue Cab?
12   A.  Yes.
13   MS. ROZICH:  What do you mean by provide a cab?
14 I'm confused by the question.
15   MS. DALEY SCOTT:  Well, he clearly understood
16 it.
17   MS. ROZICH:  You mean -- I just want to clarify
18 for the record, what do you mean "provide"?
19 Because I think --
20 BY MS. DALEY SCOTT:
21   Q.  Prior to you owning that taxicab -- the
22 taxicab that was involved in this vehicle -- or
23 involved in this accident, did you drive a
24 different taxicab for Blue Cab Company that was

Page 37

1 provided by Blue Cab Company?
2   A.  Yes.
3   Q.  How long did you drive a cab for Blue Cab
4 Company?
5   A.  A couple years.
6   Q.  Prior to you purchasing the vehicle?
7   A.  Correct.
8   Q.  So you began working for Blue Cab in 2002
9 and you purchased this vehicle sometime in 2006.
10 And from -- so, according to your testimony, from
11 2002 to 2006, you drove a taxicab provided by
12 Blue Cab Company?
13   A.  2002, that sounds early.  I don't think I
14 started that early.
15   Q.  Okay.
16   A.  But when I first started for Blue Cab --
17   Q.  Hm-hmm.
18   A.  -- they would assign me a cab.  I would go
19 in and they would give me a cab that was available.
20       Sometimes there would not be a cab
21 available.  So I wouldn't work.
22   Q.  Okay.
23   A.  Then after that, there was a driver who
24 owned his own cab that I would drive his cab.

Page 38

1  Rather than go into the Blue Cab depot, I would go
2  to his house in Cicero, pick up his cab and drive
3  his cab. It was a Blue Cab, naturally.
4      Q.  Okay. Okay.
5      A.  And then I bought my own cab.
6      Q.  Okay. Did Blue Cab Company have a fleet of
7  cabs that they owned?
8      A.  Yes.
9      Q.  And then did they have various drivers who
10 owned their own cabs as well?
11     A.  Yes.
12     Q.  Was there any difference in the taxis that
13 Blue -- was there any difference between the taxis
14 that Blue Cab owned and the taxis that were owned
15 by the drivers?
16     A.  No, not that I know of.
17     Q.  Okay. So, visually, if you looked at a
18 taxi, was the paint on all the taxis that Blue Cab
19 owned as well as any taxi that was owned
20 individually by a driver that drove for Blue Cab,
21 was the paint the same on the outside --
22     A.  Yes.
23     Q.  -- of the taxis?
24         Were any -- were there -- strike that.

Page 39

1          What -- what did the taxi that you drove
2  for Blue Cab -- that was owned by Blue Cab, what
3  did that taxi look like?
4      A.  A normal taxicab.
5      Q.  Could you describe for me the color, the
6  paint?
7      A.  Two-tone blue.
8      Q.  Did it have any decals on the outside?
9      A.  Yes. Yes.
10     Q.  What were those decals?
11     A.  It said Blue Cab and had the phone number,
12 had the light on top.
13     Q.  Okay. And inside the cab, could you
14 describe the inside of the cab to me?
15         And we're talking about the cab that you
16 would drive that Blue Cab owned, not the one that
17 you owned later.
18     A.  I'm at a loss here.
19     Q.  Okay.
20     A.  Describe the inside of a car is what...
21     Q.  Did it have a radio inside?
22     A.  Yes.
23     Q.  Dispatch radio?
24     A.  Yes.

Page 40

1      Q.  Did it have a meter?
2      A.  Yes.
3      Q.  Were the dispatch -- strike that.
4          Did it have any decals inside?
5      A.  Price lists, decals on the back windows.
6  Yes.
7      Q.  Okay. Can you talk to me about what the
8  price list said inside?
9      A.  Oh, pickup from O'Hare, from Midway to, you
10 know, Brookfield or Forest Park or, you know...
11 different fares.
12     Q.  Okay. Did it say "Blue Cab" on that --
13     A.  Yes.
14     Q.  -- price sheet?
15         And was that provided by Blue Cab?
16     A.  Yes.
17     Q.  Okay. And what were the decals on the --
18 you said it was on -- on the passenger's rear seat
19 in the backseat of the taxi?
20     A.  The rear windows, right.
21     Q.  What were those decals?
22     A.  Fasten seatbelts; no smoking; price list.
23 There were two or three decals on each rear window.
24     Q.  Were those provided by Blue Cab?

Page 41

1      A.  Yes.
2      Q.  Were those on every taxi that you drove
3  that was owned by Blue Cab?
4      A.  Yes.
5      Q.  Okay. Were those on the taxi that you
6  purchased from Blue Cab?
7      A.  Yes.
8      Q.  In regards to the taxi that you purchased
9  from Blue Cab, did it have the same exact painting
10 as the taxis that were owned by Blue Cab on the
11 exterior of the vehicle?
12     A.  Yes.
13     Q.  Were the decals on the exterior of the
14 vehicle that you purchased from Blue Cab the exact
15 same as the vehicle owned by Blue Cab?
16     A.  Yes.
17     Q.  Were the -- strike that.
18         Was there a dispatch radio already in
19 the taxi that you purchased from Blue Cab at the
20 time of purchase?
21     A.  Yes.
22     Q.  Okay. And was that a radio that was linked
23 to Blue Cab's dispatch?
24     A.  Yes.

Page 42

1    Q. Was it linked to any other cab company's --
2    A. No.
3    Q. -- dispatch?
4        Okay. And was that the same dispatch
5    radio that is also in the taxicabs that you drove
6    that were owned by Blue Cab?
7    A. Yes.
8    Q. And then the taxi that you purchased from
9    Blue Cab, the decals that were in the back windows,
10   were those -- or strike that.
11       Were there decals in the back windows of
12   the taxicab that you purchased from Blue Cab?
13   A. Yes.
14   Q. Were those the same decals that were in the
15   windows that -- of the taxis that were owned by
16   Blue Cab?
17   A. Yes.
18   Q. And were those decals placed there by
19   Blue Cab Company?
20   A. Yes.
21   Q. Did you make any modifications to the
22   taxicab that you purchased from Blue Cab from the
23   date of purchase to the time of the accident?
24   A. I just -- I bought new tires. Just

Page 43

1    improvements. Oil change.
2        I didn't change the look of the car at
3    all. Just improvements, you know, driving
4    improvements. And it needed tires. It needed an
5    oil change.
6    Q. So you did things to keep the engine
7    running smoothly and to ensure of the safety of the
8    tires, correct?
9    A. True. Correct.
10   Q. But you did not change anything visually on
11   the taxi, correct?
12   A. No.
13   Q. So if one looked at the exterior of your
14   taxicab that you purchased from Blue Cab on the
15   date you purchased it and on the date of the
16   accident, visually, there would be no difference,
17   correct?
18   A. Correct.
19   Q. And were you able to make changes to the
20   paint, if you so chose to?
21   A. I don't know.
22   Q. If you wanted to continue to work for
23   Blue -- or strike that.
24       Did you -- were you employed by Blue Cab

Page 44

1    on the date of the accident?
2    A. Yeah.
3    MR. WEISS: Let me object to the form and
4    foundation.
5        You can answer. I don't want to tell
6    you you can answer. Sorry.
7    THE WITNESS: Yes.
8    BY MS. DALEY SCOTT:
9    Q. That's okay.
10       And what were the terms of your
11   employment?
12   A. I don't understand.
13   Q. Okay. Did you get -- I'm asking you about
14   the terms of your employment in the sense that did
15   you sign an employment contract? Were you
16   salaried? Did you pay -- you know, how were you
17   paid by Blue Cab, that sort of thing, is what I'm
18   wondering about.
19   A. I paid them so much a week. To drive
20   Blue Cab, you know, I paid for their dispatch
21   services, for the use of their meter.
22   Q. So in regard -- you paid for the use of
23   their dispatch service, the use of their meter.
24       Did you pay an additional amount in

Page 45

1    excess of those two for the ability to drive for
2    Blue Cab?
3    A. I don't know about that. I just don't
4    know.
5    Q. All right. And the dispatch and meter fees
6    that you paid, were those paid on a weekly basis?
7    A. Yes.
8    Q. And if you failed to pay those on a weekly
9    basis, what occurred?
10   A. I don't know. It never happened.
11   Q. Okay. In order -- or strike that.
12       Did you ever receive a W-2 from
13   Blue Cab?
14   A. No.
15   Q. Did you use the taxi that you purchased
16   from Blue Cab Company for personal use?
17   A. No.
18   Q. So the only purpose that you used that
19   motor vehicle was for -- was to drive it for
20   Blue Cab Company, correct?
21   A. Correct.
22   Q. And what did you consider your title to be
23   in 2007 when employed -- when employed by Blue Cab?
24   MR. WEISS: Object to form, foundation.

Page 46

1    THE WITNESS: Cabdriver.
2    BY MS. DALEY SCOTT:
3    Q.   Okay.  Do you recall what the rental fee
4    was for the radio, the dispatch radio?
5    A.   No.
6    Q.   And that's back in 2007 that I'm asking
7    about.
8    A.   (Nodding.)
9    Q.   And so the answer's still no?
10   A.   Correct.
11   Q.   This dispatch service was provided by
12   Blue Cab, correct?
13   A.   Correct.
14   Q.   Did you have a contract with Blue Cab, do
15   you recall?
16   A.   I probably did, but I'm not sure.  I seem
17   to recall that I signed something.  I think I did.
18   Q.   And did you ever have problems with your
19   dispatch radio?
20   A.   No.
21   Q.   Do you know, if you did have problems, who
22   would have addressed those problems with the
23   dispatch radio?
24   A.   I would.  If I had a problem with the cab,

Page 47

1    I would bring it into the cab -- the depot and have
2    it fixed.
3    Q.   Okay.  What is the cab depot?
4    A.   Where the cab company is.
5    Q.   And where is that?
6    A.   I forget the address, but it's like
7    74-something West Roosevelt Road in Forest Park.
8    Q.   And what is there?
9    A.   The Blue cabs, their garage where they'll
10   repair the cabs and change the oil and change the
11   tires and maintenance, whatever, and the dispatch
12   office.
13   Q.   In regards to the garage, Blue Cab
14   company's garage, is that where you took your taxi
15   to get it repaired?
16   A.   No.  Sometimes, if it was minor; but to buy
17   the tires, no.
18   Q.   Okay.  What about for an oil change?
19   A.   No, not there either.
20   Q.   If there -- did you ever have a problem
21   with your meter?
22   A.   No.  In fact, the meter was fairly new.
23   They switched meters to get modern ones.
24   Q.   Okay.  Were the meters installed at

Page 48

1    Blue Cab Company's garage?
2    A.   Yes.
3    Q.   Were the dispatch radios installed at
4    Blue Cab Company's garage?
5    A.   Yes.
6    Q.   If there was a problem with the meters,
7    would you have taken it to Blue Cab Company's
8    garage?
9    A.   Yes.
10   Q.   And, similarly, if there's a problem with
11   the dispatch radio, you would have taken it to
12   Blue Cab Company's garage?
13   A.   Correct.
14   Q.   And if you wanted the dispatch radio
15   removed from your taxi, who could remove that?
16   A.   I don't know why anybody would want that,
17   but, there again, probably Blue Cab.
18   Q.   And if for some reason you wanted the meter
19   removed from your vehicle, you would take that to
20   Blue Cab Company's garage?
21   A.   Yes.
22   Q.   Who chose the paint color on your taxi that
23   you purchased from Blue Cab Company?
24   A.   They did, I guess.

Page 49

1    Q.   And by "they," do you mean Blue Cab?
2    A.   Yes.
3    Q.   Who maintained the paint on your taxi that
4    you purchased from Blue Cab?
5    A.   I maintained the vehicle, the whole
6    vehicle.  Everything.
7    Q.   Did you -- in the year that -- or prior to
8    the accident in the year that you had purchased the
9    vehicle, had you ever had to paint any part of the
10   vehicle?
11   A.   No.
12   Q.   Did you ever have to redo any of the decals
13   on the vehicle?
14   A.   No.
15   Q.   Do you know if you were to take off the
16   decals on your vehicle that said "Blue Cab," if you
17   would have still been allowed to drive for Blue Cab
18   Company?
19   MR. WEISS: Objection.  Speculation.
20   THE WITNESS: I don't know.
21   BY MS. DALEY SCOTT:
22   Q.   Did any of the drivers that you knew
23   personally who drove for Blue Cab Company drive in
24   vehicles that did not say "Blue Cab Company" on

Page 50

1  them?
2  A.  No.
3  Q.  And every taxi driver that you knew that
4  drove for Blue Cab Company drove in a taxi that
5  said "Blue Cab Company" on the side, correct?
6  A.  Correct.
7  Q.  Where did you purchase gas for your
8  vehicle?
9  A.  Wherever it was -- whatever was convenient.
10  Q.  So Blue Cab Company did not have a gas
11  station they liked their drivers to go to?
12  A.  No.
13  Q.  When was the last maintenance done on your
14  vehicle before the date of the accident?
15  A.  I don't know.
16  Q.  Did you have any problems with your vehicle
17  before the date of the accident?
18  A.  No.
19  Q.  Brakes worked fine?
20  A.  Fine.
21  Q.  Accelerator worked fine?
22  A.  Yes.
23  Q.  Now, it's my understanding your vehicle was
24  totaled in this accident, correct?

Page 51

1  A.  That's what I understand myself.  I haven't
2  seen it.  I never saw it after that.
3  Q.  What happened to your vehicle after the
4  date of the accident -- or after the accident, I
5  should say?
6  A.  The police had it towed to some yard on
7  Mannheim Road.
8  Q.  Hm-hmm.
9  A.  And I was in the hospital for weeks and
10  weeks and I left it there.
11  Q.  You don't know what yard it was towed to?
12  A.  Lincoln -- I believe it was Lincoln Towing,
13  and I know it was on Mannheim Road.  I can't recall
14  I can't remember the exact address.
15  Q.  Do you know why it was towed to that yard?
16  A.  The police -- the Oak Park Police told me
17  they towed it there.  I was -- the accident
18  happened six blocks away from Blue Cab.  They could
19  have towed it to Blue Cab's yard, but they didn't.
20  They towed it miles and miles away to -- I'm trying
21  to think.  Stone Park is the town that Lincoln
22  Towing's in on Mannheim Road.
23  Q.  Do you know who paid for the tow?
24  A.  No.

Page 52

1  Q.  Did you ever discuss with Jim Bennett the
2  taxi after the date of the accident?
3  A.  I gave him the title, told him where they
4  towed it.
5  Q.  When did you give him the title?
6  A.  A few days after the accident.
7  Q.  Did he come to see you in the hospital?
8  A.  Pardon me?
9  Q.  Did he come to see you in the hospital?
10  A.  Yes.
11  Q.  And is this when you gave him the title?
12  A.  No, I didn't have it.  I didn't have the
13  title.  He came and saw me the day after the
14  accident.
15  Q.  Okay.
16  A.  I didn't have the title on me.
17  Q.  When did you decide to give the taxi to Jim
18  Bennett?
19  A.  That morning, I discussed it with him that
20  I was going to give him the cab -- the title to the
21  cab because I had no use for it, but, certainly, he
22  could use parts on it.
23       But he needed -- he told me that they
24  wouldn't release the cab to anybody but the owner.

Page 53

1  Q.  Okay.
2  A.  And I'm in the hospital.  I can't get out
3  of the hospital.  So I gave him the title.  Now, he
4  could be the owner and go get the cab, because they
5  charge over $100 a day for every day it's in their
6  yard.
7  Q.  Okay.  What did you discuss with
8  Mr. Bennett when he came to see you at the
9  hospital?
10  A.  He asked me what happened.
11  Q.  And what did you say?
12  A.  I passed out.
13  Q.  Okay.
14  A.  He asked me what I was going to do with the
15  cab.  He told me where it was towed to.  I
16  forgot -- I think he told me.  I forgot how I found
17  out.  I believe he told me that it was towed there.
18  I don't know how he knew.
19  Q.  And did Mr. Bennett, to your knowledge, go
20  and get the taxi from Lincoln Towing?
21  A.  I don't know.
22  Q.  Have you spoken with Mr. Bennett since
23  then?
24  A.  No.

Page 54

1  Q.  So the last time you spoke to Mr. Bennett
2  was when you were in the hospital after the
3  accident?
4  A.  No, no. No. I went -- I went to the yard,
5  to the Blue Cab yard, the day I got out of the
6  hospital and --
7  Q.  Why did you go to Blue Cab yard the day
8  that you got out the hospital?
9  A.  I thought that he would have the cab there.
10  Q.  And did he?
11  A.  No.
12  Q.  What did you do at Blue Cab's yard that
13  day?
14  A.  What did I do what?
15  Q.  What did you do at Blue Cab's yard that
16  day?
17  A.  I went to see the cab. It wasn't there.
18  So I left.
19  Q.  Did you speak to Mr. Bennett that day?
20  A.  Yes.
21  Q.  And what did you say to him?
22  A.  I don't remember.
23  Q.  Do you remember what you discussed?
24  A.  No.

Page 55

1  Q.  Do you recall what he said to you at all?
2  A.  No.
3  Q.  Did you ask him where the taxi was?
4  A.  Probably.
5  Q.  Do you recall what he said?
6  A.  No, I don't remember talking to him, but
7  I'm sure I did. I don't remember what was said.
8  Q.  All right. When you started working --
9  strike that.
10      The time you've worked for Blue Cab, did
11  you have certain shifts you would work?
12  A.  Days. Just mornings, you know, 5:00, 5:30
13  till 4:00 or whatever.
14  Q.  And was that from the time that you started
15  working for Blue Cab?
16  A.  Yes.
17  Q.  And in 2007, at the time of the accident,
18  was that the shift that you were working?
19  A.  Yes.
20  Q.  Okay. And were shifts controlled by
21  Blue Cab Company?
22  A.  No.
23  MR. WEISS: Object to form.
24  BY MS. DALEY SCOTT:

Page 56

1  Q.  Did Blue Cab Company have any control over
2  when you would work on any given day?
3  A.  Is this before or after I owned the cab?
4  Q.  Well, I'll -- thank you. I'll split that
5  up.
6      From the time you purchased the vehicle
7  up to the day of the accident, did Blue Cab Company
8  have any control over when you worked?
9  A.  No.
10  Q.  Prior to you purchasing, did Blue Cab
11  Company have control over when you worked?
12  A.  To a certain degree. It would behoove a
13  driver to go in early in the morning to ensure that
14  he would get a cab.
15  Q.  Okay.
16  A.  If he decided he wanted to start work at
17  9:00 o'clock, there would be no cabs.
18  Q.  How did Blue Cab -- once you owned your
19  vehicle up until the date of the accident, how did
20  you tell or how was Blue Cab aware that you were
21  available to take fares or to pick up a passenger?
22  A.  You would punch in on the computer,
23  the fare -- the meter, that you were available.
24  Q.  And would that let Dispatch know that you

Page 57

1  were available to take a fare?
2  A.  Correct.
3  Q.  The day before the accident, do you know
4  when you worked?
5  A.  I don't recall.
6  Q.  Do you know what time you started working
7  on the day of the accident?
8  A.  5:30.
9  Q.  And were you available the entire time from
10  5:30 a.m. until the accident?
11  A.  Yes.
12  Q.  The day before the accident -- strike that.
13      Did you ever work at night?
14  A.  No.
15  Q.  With Blue Cab Company, can you pick up a
16  person on the side of the road as a fare?
17  A.  Yes.
18  Q.  And you can also -- does dispatch also send
19  you to pick up people?
20  A.  Yes.
21  Q.  What percentage of passengers in 2007
22  before the date of the accident of yours were ones
23  sent to you by Dispatch for you to go pick up
24  versus ones you picked up on the side of the road?

Page 58

1  A.  99 and a half percent.
2  Q.  Were which?
3  A.  Dispatch.
4  Q.  Okay.  Did you have regular customers?
5  A.  No.
6  Q.  Did you ever have to provide your customers
7  receipts?
8  A.  Yes.
9  Q.  And were those receipts provided by
10 Blue Cab?
11 A.  Yes.
12 Q.  And so did the receipts say "Blue Cab
13 Company" on them?
14 A.  Yes.
15 Q.  And -- strike that.
16     What towns did you work in while you --
17 when you owned your cab?
18     Now I'm concerned when you owned your
19 cab up until the date of the accident.
20 A.  Okay.  Blue Cab's in Forest Park.  So I'd
21 go Berwyn, Brookfield; Chicago, the airports, you
22 know, Midway and O'Hare; Stickney.  I drove as far
23 one time with Blue Cab as Elburn.  It's far out on
24 80.  It was a $100 fare.

Page 59

1  Q.  Good fare.
2     Did you have to have licenses in the
3  various towns you worked for?
4  A.  I had to have -- Forest Park, Oak Park, and
5  I believe there's supposed to be one more.  I can't
6  think of it; but I had those two, I know.
7  Q.  Do you recall what your taxi number was?
8  A.  How can you forget that?  No.
9  Q.  Was that a taxi number given to you by
10 Blue Cab?
11 A.  Oh.  No. 7.  No. 7.
12 Q.  Was that taxi number given to you by
13 Blue Cab?
14 A.  Yes.
15 Q.  Could you choose whatever taxi number you
16 wanted to when you purchased your vehicle?
17 A.  No.
18 Q.  Now, I want to talk to you about the date
19 of the accident.
20     Do you recall the weather that day?
21 A.  It was just like this.  Beautiful.
22 Q.  Clear day?
23 A.  Sunny.
24 Q.  No rain?

Page 60

1  A.  No rain.
2  Q.  Roads dry?
3  A.  Yes.
4  Q.  You previously testified that you started
5  work at 5:30 that morning?
6  A.  Correct.
7  Q.  What time did you wake up that day?
8  A.  4:30.
9  Q.  Do you recall what time you went to bed the
10 night before?
11 A.  No.
12 Q.  Back in 2007, generally, do you -- did you
13 go to bed at a regular time?
14 A.  If I was working the next day, if I knew I
15 was going to work and, you know, get up early, yes.
16 Q.  Generally, when you were working the next
17 day, what time did you go to bed the night before?
18 A.  10:00 o'clock.
19 Q.  And did you generally sleep through the
20 night?
21 A.  Yes.
22 Q.  Do you recall what time of day the accident
23 occurred?
24 A.  1:00 o'clock or so.

Page 61

1  Q.  Do you recall where you picked up this
2  fare?
3  A.  Midway Airport.
4  Q.  How many fares that day did you have before
5  picking up this fare?
6  A.  It was Sunday.  Sunday's generally seven or
7  eight.
8  Q.  Do you remember that specifically or are
9  you just saying that based upon your general custom
10 and practice?
11 A.  General practice.
12 Q.  Okay.  All right.  Do you recall that day
13 if you had a busy day?
14 A.  I recall it wasn't busy.
15 Q.  Did you test your blood glucose level that
16 day?
17 A.  Yes.  Wait.  No.  No.  Pardon me.  No.
18 Q.  And you -- you earlier testified that you
19 tested your blood glucose levels on Monday,
20 Wednesday and Friday.
21     So would that mean the last time you
22 tested your glucose prior to the date of this
23 accident was that Friday?
24 A.  Correct.

1  Q.  Okay.  And that would have been the 21st,
2  correct, if the day of the accident was the 23rd?
3  A.  Correct.
4  Q.  All right.  What did you have to eat that
5  morning before starting work, if anything?
6  A.  A McDonald's sandwich and a coffee.
7  Q.  Did you generally have a McDonald's
8  sandwich and coffee for breakfast most mornings?
9  A.  Yes.
10  Q.  What time did you eat that?
11  A.  5:00 o'clock.
12  Q.  And from 5:00 a.m. until roughly 1:00 p.m.
13  when this accident occurred, did you have anything
14  else to eat?
15  A.  No.
16  Q.  Did you have anything else to drink?
17  A.  I might have had water with me.  I'm not
18  sure.
19  Q.  Do you recall where Miss Washington-Sanders
20  was going that day?
21  A.  Oak Park.  I believe on Lake Street.  She
22  was going home.  She was...
23  Q.  So it was to Oak Park somewhere?  To her
24  home in Oak Park, correct?

1  A.  Right.  Correct.
2  Q.  And do you recall what route you took that
3  day?
4  A.  Yes.
5  Q.  What route did you take?
6  A.  55th Street to Central.  Central to
7  Roosevelt, and that's where I had the accident on
8  Roosevelt Road.
9  Q.  Okay.  Now, on Roosevelt Road, you were
10  headed westbound, correct?
11  A.  Correct.
12  Q.  And on Roosevelt Road, the date of the
13  accident just prior to the accident, how was
14  traffic?
15  A.  It was light.  Sunday afternoon, it's
16  light.
17  Q.  Westbound Roosevelt Road at the location of
18  the accident, can you describe the roadway to me?
19  How many lanes of traffic, that sort of thing.
20  A.  It was two lanes each way.
21  Q.  Is there a median?
22  A.  No.
23  Q.  Okay.  And what lane were you driving in
24  just prior to the accident, if you recall?

1  A.  The one closest to the middle.
2  Q.  So the left-hand lane --
3  A.  Yes.
4  Q.  -- on west -- do you know the speed limit
5  there on Roosevelt Road.
6  A.  I believe it's 25.
7  Q.  Do you know how fast you were driving just
8  prior to the accident?
9  A.  Probably 20, 25.
10  Q.  Was there construction on Roosevelt Road at
11  or near the site of the accident on the day of the
12  accident that you recall?
13  A.  I don't recall.
14  Q.  Tell me what your memory is of the
15  accident.
16  A.  I passed out.  When I woke up, the
17  windshield was all smashed, you know, my seat had
18  slid forward all the way and hit -- I had a
19  seatbelt, the one across my chest and one across my
20  waist.
21  Q.  Hm-hmm.
22  A.  The air bag popped out and I was squashed
23  up against the steering wheel.  My two knees had
24  rammed the dashboard.  And, apparently, my hand hit

1  the dashboard because I broke two bones in the
2  wrist.
3  When I woke up, a passenger -- not a
4  passenger -- a pedestrian was trying to get me to
5  move my seat back.  He was reaching under and
6  looking for the handle and slide the seat back.
7  And I told him I couldn't breathe.  Then the fire
8  department got there.  So I don't know how long
9  this went on.  It's -- off we went to the hospital.
10  Q.  Prior to the accident, do you recall -- you
11  recall being on Roosevelt Road, correct?
12  A.  Correct.
13  Q.  Okay.  Where on Roosevelt Road do you
14  recall being?
15  A.  I was -- where the accident happened, on
16  the left-hand side, the Berwyn side.
17  Roosevelt Road is the dividing line between Berwyn
18  and Oak Park.  The left-hand side is a Burger King.
19  The right-hand side is a bank.  I can't recall the
20  name of the bank.
21  Q.  All right.  So you recall seeing the Burger
22  King?
23  A.  Yes, I was going to -- I was approaching
24  Oak Park Avenue.  That was the next light.  And I

Page 66

1  was going to turn right to -- you know, I was
2  entering Oak Park there --
3      Q.  Yeah.
4      A.  -- and proceed down Oak Park to whatever
5  street she lived on.  I can't recall her address,
6  but something says Lake Street.
7      Q.  So you -- do you recall passing Wesley
8  Street?
9      A.  No.
10     Q.  Do you recall seeing the Burger King?  The
11 bank?
12     A.  Yes.
13     Q.  And you did not make it to Oak Park,
14 correct -- Boulevard, correct?
15     A.  Correct.
16     Q.  Just prior to the accident occurring --
17 actually, strike that.
18         The day of the accident, how were you
19 feeling that morning?
20     A.  Fine.
21     Q.  The days leading up to the accident, had
22 you had any illnesses?
23     A.  No.
24     Q.  When you picked up Miss Washington-Sanders

Page 67

1  at Midway, how were you feeling?
2      A.  Fine.
3      Q.  No dizziness?
4      A.  No.
5      Q.  Okay.  When you were driving Miss Sand- --
6  Washington-Sanders, did you have any dizziness or
7  lightheadedness at any time?
8      A.  No.
9      Q.  Just prior to the accident occurring, do
10 you recall feeling dizzy or lightheaded?
11     A.  No.
12     Q.  Do you recall accelerating just prior to
13 the accident?
14     A.  No.
15     Q.  Do you recall speaking to
16 Miss Washington-Sanders that day prior to the
17 accident?
18     A.  I probably did, but I don't remember what I
19 said.  You know, just, How are you, or whatever.
20     Q.  Do you recall having any conversation with
21 her or her saying anything just prior to the
22 accident occurring?
23     A.  No.
24     Q.  What is your very last memory before the

Page 68

1  accident occurred?
2      A.  Nothing.  Just I was driving down
3  Roosevelt Road.  The weather was clear, and I knew
4  I was going to turn on Oak Park.
5      Q.  Did you ever see the Traffic Crash Report
6  on this case?
7      A.  (Shaking head.)  No.
8      Q.  No?
9          Prior to today -- to today's deposition,
10 did you ever review any -- did you review any
11 documents?
12     A.  I didn't see any -- I haven't seen any
13 documents, no.
14         (Whereupon, McFadden Deposition
15          Exhibit No. 1 was
16          marked for identification
17          as of this date.)
18 BY MS. DALEY SCOTT:
19     Q.  All right.  Sir, I'm going to show you
20 what -- we can mark this McFadden 1 -- what has
21 been marked as McFadden Exhibit No. 1.  It's the
22 Illinois Traffic Crash Report.
23         Take a minute to look at that, please.
24     A.  Did not recall having...

Page 69

1  MS. ROZICH:  Yeah.  That would be just like what
2  the police officer was saying at the time of the
3  accident.
4  BY MS. DALEY SCOTT:
5      Q.  Okay.  Have you ever seen this document
6  prior to today?
7      A.  No.
8      Q.  And according to the Illinois Traffic Crash
9  Report, you were given various citations, correct?
10     A.  Yes.
11     Q.  What were those citations for?
12     A.  Oh, Lord.
13     Q.  If you recall.  If you don't recall, that's
14 okay.
15     A.  I don't.
16     Q.  Do you recall what happened with those
17 tickets?
18     A.  One -- I remember one of them was having no
19 insurance.  Obviously, the policeman didn't look
20 around the squad car for the insurance papers.
21     Q.  Okay.  You were, in fact, insured at the
22 time of the accident --
23     A.  Of course.
24     Q.  -- is that correct?

Page 70

```
1      A.  We got to have the insurance.  We can't --
2   the cab company won't let you drive without it and
3   it's -- it's there.  It's just he didn't look for
4   it or didn't find it.
5      Q.  The -- did you have to provide proof of
6   insurance to the cab company prior to driving for
7   them?
8      A.  Sure.
9      Q.  Was that even true once you owned the taxi?
10     A.  Yes.
11     Q.  Before you owned your taxi, when you drove
12  one of Blue Cab's taxis, did you have to purchase
13  insurance for the vehicle?
14     A.  No.
15     Q.  So Blue Cab would purchase the insurance
16  for the vehicle?
17     A.  Yes.
18     Q.  All right.  But once you drove the vehicle
19  for Blue Cab that you personally owned, you had to
20  purchase insurance, correct?
21     A.  Correct.
22     Q.  And you had to show proof of insurance to
23  Blue Cab?
24     A.  Correct.
```

Page 71

```
1      Q.  Did you have to show, you know, proof of
2   renewal every year?
3          How often did you have to show them
4   proof of insurance?
5      A.  When you renewed.
6      Q.  So, yearly, you showed them your insurance,
7   correct?
8      A.  Correct.
9      Q.  Okay.  And if you did not have insurance,
10  would Blue Cab allow you to drive?
11     A.  No.
12     Q.  Okay.  Even if you owned the vehicle
13  yourself?
14     A.  No.  I'm sure.  I never had that happen to
15  me.  So I don't know what they would do.
16     Q.  But that was the terms of the agreement
17  that you had with Blue Cab, correct?
18     A.  I'm sure it was.
19     Q.  All right.  Did Blue Cab specify how much
20  insurance you needed to have for your taxi?
21     A.  I don't recall.
22     Q.  Do you know how you decided how much
23  insurance to carry for your taxi?
24     A.  I took whatever was standard.
```

Page 72

```
1      Q.  And with that -- with being -- strike that.
2          The insurance company that you purchased
3   your insurance from, was that an insurance company
4   Blue Cab referred you to?
5      A.  Yes, because not every insurance company
6   will insure cabs.
7          So there's -- it's very limited to how
8   many -- I mean, like there's only two or three
9   companies that insure cabs.
10     Q.  Okay.  Did Blue Cab Company give you the
11  name of a specific insurance company they'd like
12  you to use --
13     A.  I don't know where I got it --
14     Q.  -- or they wanted you to use, I should say?
15     A.  I don't know where I got it, but it
16  probably came from Blue Cab.  Maybe I asked another
17  driver.
18     Q.  Was that -- do you recall ever having a
19  conversation about insurance with Jim Bennett?
20     A.  No.
21     Q.  And in the narrative section of this, it
22  states that you did not recall having a fare after
23  the accident?
24     A.  I seen that, and I don't -- I don't recall
```

Page 73

```
1   not recalling having a fare.
2      Q.  Do you recall speaking to a police officer
3   at the scene of the accident?
4      A.  No.
5      Q.  Do you recall speaking to anyone at the
6   scene of the accident?
7      A.  Just the pedestrian that was trying to help
8   me get out of the cab -- trying to move my seat
9   back, rather.
10     Q.  And what did you say to him?
11     A.  Well, he was trying with me, you know, to
12  move the seat.  I could hardly talk.  I could
13  hardly breathe.
14     Q.  Okay.  Do you recall ever speaking to
15  Miss Washington-Sanders after the accident --
16     A.  No.
17     Q.  -- occurred?
18         Do you recall speaking to the paramedics
19  when they arrived at the scene?
20     A.  No.
21     Q.  All right.  You were transported to Loyola
22  Hospital, correct?
23     A.  Correct.
24     Q.  Do you recall being transported to Loyola?
```

Page 74

1    A.  Yes.
2    Q.  Were you conscious, to your knowledge, the
3  entire time you were transported to Loyola?
4    A.  I'm fairly sure I was conscious the whole
5  time.
6    Q.  Do you recall talking to the paramedics in
7  the ambulance on the way to Loyola?
8    A.  No.
9    Q.  Do you know if the police officers ever
10  came to Loyola Hospital to talk to you?
11    A.  I know they were there.  I don't recall
12  talking to them.
13    Q.  So you don't recall ever giving a statement
14  to any police officers; is that correct?
15    A.  Correct.
16    Q.  Did I cut you off or are you --
17    A.  I'm trying to -- I'm picturing this police
18  officer in the emergency room.  Oh, he asked me
19  emergency number to call my family.
20    Q.  Okay.  Did he ask you about what occurred
21  at the accident?
22    A.  I don't recall.
23    Q.  When you arrived at the hospital, do you
24  know what they diagnosed you with that day?

Page 75

1    A.  No.
2    Q.  Do you know what your blood glucose level
3  was that day?
4    A.  No.
5    Q.  Were you ever told what caused the accident
6  by the doctors?
7    A.  I don't recall.  A lot of guesses.  That's
8  all.
9    Q.  Guesses by who?
10    A.  Anybody that I talked to that was -- you
11  know, whether it be nurses.  Just people.  Could
12  have been my family.
13    Q.  Well, did any medical professional give you
14  any reason as to what the cause of the accident
15  was?
16    A.  No.
17    Q.  What do you believe the cause of the
18  accident to be?
19    A.  I believe I had a stroke, a minor stroke.
20    Q.  Why do you believe that?
21    A.  Because a few days later, I had a stroke at
22  my sister's house, and they removed five blood
23  clots from my left leg.
24    Q.  When did that occur?

Page 76

1    A.  I believe it was -- I know it was early --
2    Q.  October 4th sound correct to you?
3    A.  Yes, it does.
4    Q.  And your --
5    A.  It was that late?  Wait a minute.  Wait a
6  minute.
7       The accident happened on the 23rd.  I
8  was in Loyola probably three or four days.  I was
9  at -- yeah, it was about a week.  A week later.
10  Yeah, that sounds about right.
11    Q.  Okay.  Are you a smoker, sir?
12    A.  No.
13    Q.  Okay.  Have you ever been a smoker?
14    A.  Yes.
15    Q.  When was the last time you smoked?
16    A.  '95, '96.
17    Q.  Okay.
18    A.  I quit smoking and I quit drinking in the
19  same time.
20    Q.  What were your injuries that you sustained
21  in the accident?
22    A.  I smashed both my knees into the dashboard.
23  There was nothing broken, but it was sore, very
24  sore; made it difficult to walk.  I broke two bones

Page 77

1  in my wrist, my right wrist.
2       I had black-and-blue bruises from the
3  seatbelt.  And my sternum, it felt like somebody
4  smashed me right in the smack in the middle of the
5  chest.  Nothing broken again, but...
6       What else?
7    Q.  In regards to your insurance, was that with
8  Curcio Services that you got your -- and
9  First Chicago that you got your insurance for your
10  taxicab through?
11    A.  I don't recall the name of it.  On
12  22nd Street, far west.
13    Q.  Did you cancel your insurance after this
14  accident?
15    A.  Sure.
16    Q.  When did you cancel your insurance?
17    A.  It was months after I got out of the
18  hospital.
19    Q.  Did you notify your insurance company of
20  the accident?
21    A.  I don't know.  I don't recall.
22    Q.  Do you know if someone from Blue -- off the
23  record a second.
24       (Discussion off the record.)

Page 78

1           (Recess taken.)
2           (Record read as requested.)
3       THE WITNESS: I don't know. I did or Blue Cab
4   did.
5   BY MS. DALEY SCOTT:
6       Q.   So there's a possibility that Blue Cab
7   might have been the one to notify your insurance
8   company after the accident, correct?
9       A.   Correct.
10      Q.   Loyola -- strike that.
11          You were admitted to Loyola on the date
12   of the accident, September 23rd, 2007, correct?
13      A.   Correct.
14      Q.   And you were discharged, according to your
15   medical records, on September 27th, 2007?
16      A.   Correct.
17      Q.   At any time during that admission, were you
18   diagnosed as having had a stroke?
19      A.   I don't know.
20      Q.   Would you have any reason to disagree with
21   your medical records from Loyola from that
22   admission?
23      A.   No.
24      Q.   Have you ever seen your medical records

Page 79

1   from Loyola?
2       A.   No.
3       Q.   Did any -- to your knowledge, did any
4   physician ever tell you that you had a stroke on
5   the date of the accident?
6       A.   No.
7       Q.   And your belief that you may have had a
8   small stroke the day of the accident was something
9   that is based upon your belief and the stroke that
10   you had on October 4th, correct?
11      A.   Correct.
12      Q.   Do you have any medical training?
13      A.   No.
14      Q.   Earlier, sir, I asked you about the
15   notation in your medical records from Dr. Gradinski
16   from January 27th, I believe it was, 2007, where --
17   strike that.
18          Earlier, I asked you about a
19   January 22nd, 2007 notation in your medical records
20   from Hines VA Hospital from Dr. Gradinski's office
21   that stated that you called to tell them that you
22   failed your vision test for renewal of the driver's
23   license a week before and you wanted to get your
24   vision tested. And according to the medical

Page 80

1   record, they told you to go to a private clinic.
2       Q.   Would you have any reason to dispute
3   that medical record?
4       A.   No.
5       Q.   And you have no recollection of that
6   conversation --
7       A.   I don't recall -- I don't remember calling
8   him --
9       Q.   -- correct?
10      A.   -- Dr. Gradinski, but I remember not -- not
11   passing the visual part of the driver's test. I
12   remember that.
13          So I might have called him. I just
14   don't recall calling him.
15      Q.   Okay. When you -- so you do recall now --
16   this refreshes your memory about not passing the
17   visual test of the -- part of the driver's renewal
18   test, correct?
19      A.   Right. So I went -- I didn't pass the
20   one -- that one on Mannheim Road.
21      Q.   Okay.
22      A.   So I went over to Van Buren Street, passed
23   it over there.
24      Q.   Okay. Did you wear your reading glasses

Page 81

1   when taking the visual test?
2       A.   No. That's what's weird. You look in
3   there and you think you should, but it looks worse
4   with the reading glasses. I don't know why.
5       Q.   Did you try to take the test with your
6   reading glasses?
7       A.   I didn't know whether I should or not. So
8   I tried and I liked it better without.
9       Q.   Okay. When you tried, was that the day
10   that you failed the vision test or was that
11   subsequent to failing the vision test?
12      A.   On the 22nd, the first time I failed.
13      Q.   Right.
14      A.   The second time, I passed.
15      Q.   Correct. And I'm asking you, you said that
16   you tried looking with your reading glasses at one
17   point, correct?
18      A.   Correct.
19      Q.   When was that?
20      A.   I don't -- I don't know which one.
21      Q.   Okay. And according to your medical
22   record, you had requested -- or you wanted to get
23   your vision tested.
24          Did you ever go and get your vision

Page 82

1  tested, sir?
2  A. No.
3  Q. Do you recall what you did the night before
4  the accident, sir?
5  A. No.
6  Q. Okay. And you had no alcoholic beverages
7  within 24 hours of the accident?
8  A. Correct.
9  Q. And did you take any other drugs, whether
10  prescription or not prescription, besides the ones
11  we've already discussed today within 24 hours of
12  the accident?
13  A. No.
14  Q. Was Blue Cab required to be on your
15  insurance, sir?
16  A. On my automobile insurance?
17  Q. Correct.
18  A. Are they required to be on it?
19  Q. As an additional insured.
20  A. I don't understand that.
21  Q. Okay. Did you have -- was anyone else
22  insured under your insurance policy for your
23  Blue Cab -- and I'm talking about your Blue Cab,
24  your taxicab.

Page 83

1  Was anyone else insured under that
2  policy besides yourself, to your knowledge?
3  A. The passengers.
4  Q. But, you know, I guess what -- I'm not --
5  I'm not being clear.
6  On an insurance policy, you can list
7  like multiple drivers as insured under a policy or
8  different people insured under the policy. For
9  that policy for your Blue Cab, your taxicab, who
10  was listed as an insured?
11  A. Me. Just me.
12  Q. Okay. Did you have a separate insurance
13  policy for your Ford Explorer, sir?
14  A. Yes.
15  Q. And was that through the same insurance
16  service?
17  A. No.
18  Q. Why did you not have it through the same
19  insurance company?
20  A. Because I had the insurance for the Ford
21  Explorer before I started working for Blue Cab.
22  Q. And when you went to go get insurance for
23  the taxi, the -- could you not have gone to the
24  same insurance company that insured your Ford

Page 84

1  Explorer?
2  A. No. Like I said earlier, very few
3  insurance companies insure cab companies.
4  Q. So the insurance company that insured --
5  insures your Ford Explorer did not insure your
6  taxi?
7  A. Probably wouldn't. I didn't ask, but I'm
8  sure they wouldn't have.
9  Q. Why did you not ask?
10  A. It was my intention to go with the
11  insurance company that everybody else did at
12  Blue Cab.
13  Q. To your knowledge, did all of the taxi
14  drivers at Blue Cab have the same -- have insurance
15  through the same insurance company?
16  A. Yes, because they sent the representative
17  to the company. Their insurance -- that insurance
18  company came to Blue Cab on Roosevelt Road.
19  Q. And is that how they signed you up for your
20  insurance?
21  A. Not then. I didn't own the cab then. But
22  I did ask about them later when I bought the cab.
23  Q. Okay. So when -- when did this insurance
24  representative come to Blue Cab?

Page 85

1  A. I don't know. I don't recall exactly, no.
2  Q. Do you know what year?
3  A. Probably 206.
4  Q. Do you know for what purpose?
5  A. To sign up drivers.
6  Q. Do you know if Blue Cab's drivers did, in
7  fact, sign up that day?
8  A. Sure.
9  Q. Okay. But you had not purchased your
10  vehicle at that time, correct?
11  A. I don't think so.
12  Q. Okay. So when you did purchase your
13  vehicle, you inquired as to that company for your
14  insurance purposes, correct?
15  A. Right.
16  Q. Give me one minute.
17  Sir, did you need a different license
18  than a regular-issued driver's license for driving
19  a taxicab --
20  A. Not.
21  Q. -- in the State of Illinois?
22  A. No.
23  Q. Do you recall filling out renewal forms
24  whenever you would renew your taxi or your driver's

Page 86

1  license from the State of Illinois?
2     A.  Renewal forms?
3     Q.  Well, when you go to renew your driver's
4  license at the State of Illinois, are there certain
5  forms that you have to fill out?
6     A.  Yes.
7     Q.  Do you recall filling out those forms from
8  time to time?
9     A.  Every time I needed a new driver's license,
10  yes.
11     Q.  Okay.  And do you recall -- did any of your
12  physicians ever express any concern at any point in
13  time with you driving a motor vehicle?
14     A.  No.
15     Q.  Did any of your physicians ever express
16  concern with the drugs that you were on affecting
17  your ability to operate a motor vehicle?
18     A.  No.
19     Q.  When you had your fainting episode back
20  in -- I think it was 2000, 2001, did your physician
21  at that point in time say that you should not be
22  driving a motor vehicle?
23     A.  No.
24     Q.  What did your physician say was the cause

Page 87

1  of that fainting episode?
2     A.  He didn't know.  He didn't have a cause.
3     Q.  But he did not restrict your driving?
4     A.  No.
5     Q.  Had you ever driven Miss Washington-Sanders
6  prior to the date of the accident?
7     A.  No.
8     Q.  Had you ever spoken to her prior to the
9  date of the accident?
10     A.  No.
11     Q.  Have you -- since the accident occurred,
12  have you ever spoken to Miss Washington-Sanders?
13     A.  No.
14     Q.  And I believe your earlier testimony was
15  that you did not speak to her in the taxi once the
16  accident occurred, correct?
17     A.  Correct.
18     Q.  Sir, do you not recall answering
19  interrogatories in this matter?
20        Certain written questions that were
21  presented to you from -- probably from your
22  counsel?
23     MS. ROZICH:  The questions I mailed to you.
24     THE WITNESS:  Yes.

Page 88

1  BY MS. DALEY SCOTT:
2     Q.  Did you review those prior to today's
3  deposition?
4     MS. ROZICH:  What do you mean?  At the time he
5  signed them?
6  BY MS. DALEY SCOTT:
7     Q.  No.  Have you reviewed those recently?
8     A.  No.
9     Q.  Okay.  I'm going to -- there were a
10  couple -- couple supplemental ones as well, so I'm
11  just going to do them as a group exhibit.
12        (Whereupon, McFadden Deposition
13        Group Exhibit No. 2 was
14        marked for identification
15        as of this date.)
16  BY MS. DALEY SCOTT:
17     Q.  I have what is going to be labeled as
18  McFadden Group Exhibit No. 2.  And it's your
19  answers to our initial motor vehicle
20  interrogatories and the -- your response to our
21  supplemental motor vehicle interrogatories.
22        Could you take a look at those, please.
23  Do you need a copy?
24     MR. WEISS:  No.  Thanks.

Page 89

1  BY MS. DALEY SCOTT:
2     Q.  Will you please review those.
3        Sir, on the last page of the
4  interrogatories, as well as the last page of the
5  supplemental interrogatories -- sorry -- there's
6  signatures.  Are those both your signatures?
7     A.  Yes.
8     Q.  Okay.  Upon your review of these documents,
9  do you find everything to be true and correct as
10  contained within those documents, to the best of
11  your knowledge?
12     A.  Yes.
13     Q.  Is there anything you'd like to add to any
14  of those questions?
15     A.  No.
16     MS. ROZICH:  I mean, he only had a brief second.
17        Do you think these were -- do you recall
18  seeing these?
19        Maybe that's -- I mean, he didn't really
20  have a chance to really read them to -- at this
21  moment.
22  BY MS. DALEY SCOTT:
23     Q.  Do you recall seeing these questions?
24     A.  Yes.

Page 90

1  Q. Do you recall answering these questions?
2  A. Yes.
3  Q. Okay. Okay. And besides Dr. Gradinski,
4  you were not treating with anyone else, correct?
5  A. Correct.
6  Q. And in regards to the hospitals where you
7  were examined for the two years preceding the
8  occurrence, you had Hines and Loyola. You also
9  were treated at MacNeal?
10  A. Correct.
11  Q. And that was for the stent that was placed?
12  A. Yes.
13  Q. And in addition to the atenolol,
14  lisinopril, Avastin, and Metformin, you also take
15  aspirin, correct?
16  A. Correct.
17  Q. One more second.
18  Do you have any plans on moving anytime
19  soon, sir?
20  A. No.
21  Q. What was the outcome of those two citations
22  you were issued?
23  A. The insurance one was dismissed.
24  Q. Okay.

Page 91

1  A. And the other one was dismissed also.
2  Q. Okay. So you did not have to pay a fine
3  for either?
4  A. No.
5  Q. Would you have considered Blue Cab to be
6  your employer on the date of the accident?
7  A. Yes.
8  MR. WEISS: Form, foundation.
9  MS. ROZICH: You can answer.
10  THE WITNESS: Yes.
11  BY MS. DALEY SCOTT:
12  Q. And in your taxicab, was there a number if,
13  you know, a person wanted to call and either
14  complaint or give you compliments, that sort of
15  thing?
16  A. Yes.
17  Q. And was that a number that would lead to
18  Blue Cab Company?
19  A. Yes.
20  Q. And was a number required to be in all
21  taxis?
22  A. I don't know.
23  MS. DALEY SCOTT: All right. I think that's all
24  I have for you.

Page 92

1  Thank you. The other counsel may have
2  questions for you.
3  MR. WEISS: I do.
4  EXAMINATION
5  BY
6  MR. WEISS:
7  Q. Sir, my name's Steve Weiss. I represent
8  Blue Cab. I'm going to try to be quick so that we
9  get out of here. So if I'm going too fast, let me
10  know, all right?
11  A. (Nodding.)
12  Q. You had to have a chauffeur license to
13  drive a cab in Oak Park and Forest Park, true?
14  A. I had to have some sort of a license, but
15  they -- it wasn't a driver's license. It was like
16  a business license or something.
17  Q. And you displayed that in the cab, right?
18  A. No.
19  Q. Okay. The -- you had to get that on your
20  own?
21  A. Yes.
22  Q. And you had to pay for that?
23  A. Yes.
24  Q. You paid that out of your own pocket?

Page 93

1  A. Yes.
2  Q. And there were also background checks
3  performed by the Village on you to allow you to be
4  a cabdriver to get that license, right?
5  A. I think so. I'm not sure.
6  Q. And, again, you paid for that or you took
7  care of that on your own --
8  A. Yes.
9  Q. -- with the Village?
10  Blue Cab did not test your driving
11  ability, right?
12  A. Correct.
13  Q. Blue Cab did not give you a written test or
14  a road test, am I right?
15  A. Correct.
16  Q. You did not receive any manuals or books or
17  instructions, written instructions, from Blue Cab
18  as to how to operate your cab; is that true?
19  A. No, they had a -- a policy, an employee
20  policy. Nothing about driving a cab, but just to
21  make sure you keep your cab clean and act like a
22  human being to the passengers and stuff like that.
23  Q. Right. And you considered those types of
24  things to be common sense?

Page 94

1    A.   Yes.
2    Q.   Okay.  But as far as telling you how to
3  operate or how to drive your cab, Blue Cab did not
4  tell you how to do that, true?
5    A.   Correct.
6    Q.   Did you have to wear any sort -- certain
7  type of uniform?
8    A.   No.
9    Q.   Let me show you what I've marked or what
10  will be marked as Exhibit No. 3.
11              (Whereupon, McFadden Deposition
12              Exhibit No. 3 was
13              marked for identification
14              as of this date.)
15  BY MR. WEISS:
16    Q.   Just flip to the back of that, sir.
17  There's signatures on the last two pages, right?
18    A.   Correct.
19    Q.   Are those your signatures?
20    A.   Yes.
21    Q.   Do you remember this document?  It's
22  entitled Blue Cab Company Owner-Operator Agreement.
23    A.   I don't remember it, but that's what it
24  says.

Page 95

1    Q.   Okay.  Do you remember -- those are your
2  signatures, right?
3    A.   Yes.
4    Q.   Okay.  Do you have any reason to believe
5  that, at some point in time, you signed this
6  document and you read it and signed it at some
7  point?
8    A.   Yes.
9    Q.   Okay.  But, as you sit here today, you
10  don't remember what it's all about; is that fair?
11    A.   That's fair.
12    Q.   Okay.  Now, on the first page of that
13  document -- by the way, you're not a lawyer, right?
14    A.   Right.
15    Q.   Thank God, right?
16        Do you appreciate or understand the
17  difference legally in terms of who's an employee or
18  who's an independent contractor or who's an agent?
19        Do those names mean anything to you?
20    A.   Well, I know that I was an independent
21  contractor --
22    Q.   Okay.
23    A.   -- underneath them.
24    Q.   You were an independent contractor

Page 96

1  underneath Blue Cab?
2    A.   Yes.
3    Q.   And that's what the agreement that you
4  signed says, true?
5    A.   Right.
6    Q.   Okay.  Most times, when -- I'm an employee,
7  for example -- strike that.  I'm not actually,
8  but, usually, employees don't have to pay their
9  employer, right?
10    A.   Right.
11    Q.   Usually, it goes the other way, right?
12    A.   Right.
13    Q.   But you paid Blue Cab, right?
14    A.   Yes, I did.
15    Q.   And the reason you -- why did you pay them?
16  What were you getting out of the deal?
17    A.   The dispatch service.
18    Q.   99-point -- 99.5 percent of your business
19  came from dispatches, right?
20    A.   Correct.
21    Q.   So you paid Blue Cab so that they would
22  tell you when people needed to be picked up?
23    A.   Right.
24    Q.   Without Blue Cab providing that service,

Page 97

1  you wouldn't have made much money as an independent
2  cabdriver, would you?
3    A.   Correct.
4    Q.   So you affiliated yourself with Blue Cab so
5  you could enjoy the benefits of their dispatch
6  service, true?
7    A.   Correct.
8    Q.   Okay.  Let me show you another document
9  that we'll mark as Exhibit No. 4.
10              (Whereupon, McFadden Deposition
11              Exhibit No. 4 was
12              marked for identification
13              as of this date.)
14  BY MR. WEISS:
15    Q.   This is a two-page document.  It's entitled
16  Stipulation and Waiver.  Again, look at the back
17  page, the second page.
18        Does that have your signature on it?
19    A.   Yes.
20    Q.   And that signature's dated March 8th -- or
21  March 12th of 2008?
22    A.   Yes.
23    Q.   Okay.  And, again, on the first page -- do
24  you remember signing this document?

Page 98

1   A. No.

2   Q. Do you have any reason to doubt that you

3 did read it and sign it at some point in time?

4   A. No.

5   Q. Paragraph No. 3 says, At the time of the

6 accident -- and we're talking about the

7 Washington-Sanders accident -- McFadden was not an

8 employee or agent of Blue Cab.

9     You signed that agreeing to that, true?

10   A. Wait a minute. I signed this document.

11   Q. Okay.

12   A. I see that. But I don't understand -- did

13 I sign this after the accident? It says, 12

14 March of '08. And this says, McFadden was not an

15 employee or agent of Blue Cab.

16     But I was an agent.

17   Q. Well, again, do you understand the

18 difference legally between an independent

19 contractor or an agent?

20     Does that mean anything to you?

21   A. No.

22   Q. Okay. That's all I wanted know. That's

23 fine.

24     You were not paid a salary by Blue Cab,

Page 99

1 true?

2   A. No.

3   Q. Is that --

4   A. That's true.

5   Q. It's true?

6     Did you receive a W-2 form from

7 Blue Cab?

8   A. No.

9   Q. Did Blue Cab withhold any taxes from you?

10   A. No.

11   Q. The radio and the meter inside the car, do

12 you understand that they were owned by you or they

13 were owned by Blue Cab?

14   A. They were owned by Blue Cab.

15   Q. And you had to have a meter and a radio in

16 your car in order to operate a cab in the various

17 villages, true?

18   A. Correct.

19   Q. That was a municipal ordinance. It wasn't

20 a Blue Cab rule, right?

21   A. I don't know.

22   Q. Okay. Insurance for a cabdriver, that's

23 something that's required by law, right?

24   A. Correct.

Page 100

1   Q. In fact, no driver can drive in Illinois

2 legally without insurance, right?

3   A. Correct.

4   Q. And that's certainly true for cabdrivers?

5   A. Right.

6   Q. So regardless of whether Blue Cab told you

7 you needed insurance, you knew you needed

8 insurance --

9   A. Yeah.

10   Q. -- to drive?

11     You paid for your own gas?

12   A. Yes.

13   Q. You selected what station you were going to

14 get gas at?

15   A. Yes.

16   Q. If you got caught speeding while driving

17 your cab, you would be responsible for the ticket,

18 true?

19   A. Correct.

20   Q. And if you got in an accident, you would be

21 responsible for the damage, if it was your fault;

22 is that true?

23   A. Me or the insurance company. Sure.

24   Q. Right. You paid your own license and

Page 101

1 registration for the car, true?

2   A. Yes.

3   Q. Again, you paid for your own chauffeur's

4 license?

5   A. Yes.

6   Q. You did not store your cab at Blue Cab

7 Company, true?

8   A. True.

9   Q. You stored it at your own home --

10   A. Yes.

11   Q. -- or wherever you decided to --

12   A. Correct.

13   Q. You were responsible for keeping your own

14 cab clean, true?

15   A. Correct.

16   Q. You were responsible for maintaining the

17 cab, true?

18   A. True.

19   Q. Okay. If the oil needed changing or you

20 needed new tires, you made that decision and then

21 you paid for it out of your own pocket, true?

22   A. True.

23   Q. Did the -- in your opinion, did the

24 physical or mechanical condition of the car play

Page 102

1  any role in this accident?
2      A.  No.
3      Q.  Okay.  You paid -- according to the
4  agreement, you paid $195 per week to Blue Cab.
5  Does that sound right?
6      A.  Yes.
7      Q.  Okay.  You then -- your goal, obviously,
8  was to get as many fares as you could in any given
9  day, right?
10     A.  Correct.
11     Q.  And you were the one who decided you wanted
12  to work from 5:30 a.m. to 4:00 p.m., right?
13     A.  Correct.
14     Q.  That was not given to you as a set schedule
15  by Blue Cab, true?
16     A.  Correct.
17     Q.  If you made a thousand dollars in a day or
18  you made $25 in a day, it didn't matter to
19  Blue Cab, right?
20     A.  As far as I know, yes.
21     Q.  Blue Cab didn't make a profit if you picked
22  up seven fares versus two fares, right?
23     A.  Correct.
24     Q.  You kept every dime of every fare you got,

Page 103

1  right?
2      A.  Correct.
3      Q.  The only thing Blue Cab got was the $195
4  per week in dispatch fare, true?
5      A.  Correct.
6      Q.  You did not have to report how much money
7  you made in any given day or week or month to
8  Blue Cab, right?
9      A.  Correct.
10     Q.  That was your own business and you kept
11  yourself as your own information?
12     A.  Yes.
13     Q.  You did not have to keep a record of the
14  fares or your earning from any given fare, true?
15     A.  Correct.
16     Q.  You did not have a fare schedule, the
17  amount that you charged per mile or for a pickup,
18  that was set by a municipality, right?
19     A.  The meter or the company.  I don't know who
20  set it, but somebody else did.  Not me.
21     Q.  You decided how long you wanted to work in
22  a given day, right?
23     A.  Correct.
24     Q.  If you felt sick one day, you could go home

Page 104

1  whenever you decided, right?
2      A.  Correct.
3      Q.  On the flip side, if you wanted to work all
4  night, that was up to you?
5      A.  Correct.
6      Q.  Blue Cab did not determine how much or how
7  little you worked, right?
8      A.  Correct.
9      Q.  You picked up the fares that you wanted to
10  pick up, right?
11     A.  I picked up all the fares that were
12  dispatched to me.  Plus, sometimes I'd pick up, you
13  know, someone on the street, if they flagged me
14  down.  Sometimes.  Not always.
15     Q.  But, hypothetically, if you got a call from
16  Blue Cab saying, Hey, somebody's out in Forest Park
17  that wants to be picked up and you're like, You
18  know what, I want to go home, forget it, I don't
19  want the fare, that was your right?
20     A.  Yes.
21     MS. DALEY SCOTT:  Objection.  Speculation.
22  BY MR. WEISS:
23     Q.  So you had the right to turn down any fare
24  that you wanted to turn down, true?

Page 105

1      A.  As far as I know.  I didn't turn down many.
2      Q.  You --
3      A.  One or two in the whole time I worked
4  there.
5      Q.  But you're a cabdriver.  Obviously, you
6  want to make as much money as you can, right?
7      A.  Right.
8      Q.  But you appreciated the fact that if you
9  didn't like the looks of somebody or you didn't
10  want to pick up a fare, that was your call, right?
11     A.  Correct.
12     Q.  You were never told to be in a certain
13  geographic location at a certain time by Blue Cab,
14  right?
15     A.  No.  Correct.
16     Q.  Okay.  You did not have to keep a trip log,
17  true?
18     A.  Correct.
19     Q.  You did not have to keep Blue Cab advised
20  as to where you were at any point in time?  Like
21  you didn't have to check in at 7:00 o'clock or
22  8:00 o'clock or 9:00 o'clock?
23     A.  Correct.
24     Q.  Once you picked up a customer, you or the

27 (Pages 102 to 105)

Page 106

1  customer decided how you were going to get to the
2  destination, correct?
3     A.  Correct.
4     Q.  You didn't call Blue Cab and say, Hey, how
5  should I get this person to their home, right?
6     A.  Correct.
7     Q.  The cab that you owned was inspected by the
8  Villages (sic), true?
9        They had annual inspections; is that
10  true?
11     A.  Blue Cab inspected it.
12     Q.  Okay.
13     A.  But the Village was there at Blue Cab doing
14  it, I guess.
15     Q.  Okay.  So those were done under the
16  auspices of the Villages, true?
17     A.  True.
18     Q.  Okay.  At any point on the day of the
19  accident, at any point before it occurred, did you
20  ever contact Blue Cab and say that you felt ill?
21     A.  No.
22     Q.  You felt fine before the accident, true?
23     A.  Correct.
24     Q.  You did not expect that you were going to

Page 107

1  pass out before the accident, right?
2     A.  No.
3     Q.  Did you have any problems on the way to
4  Midway when you picked up the plaintiff?
5     A.  No.
6     Q.  The plaintiff was dispatched to you; is
7  that how you got this fare?
8     A.  Yes.
9     Q.  Okay.  And, again, if you wanted to go home
10  at that moment in time, you could have told
11  Blue Cab, I don't want to go pick her up.
12        But you wanted to pick her up because
13  that was your job, correct?
14     A.  Correct.
15     Q.  That's how you earned money?
16     A.  Correct.
17     Q.  I'm getting near the end.
18        You ultimately passed the driver's test
19  in -- on January 27 -- or January 25th of '07?
20     A.  True.
21     Q.  Okay.  You had to, to get your license,
22  right?
23     A.  Correct.
24     Q.  Okay.  And if you didn't have a driver's

Page 108

1  license, obviously, you couldn't be a cabdriver?
2     A.  Correct.
3     Q.  Did you experience any negative side
4  effects from any of the medications you were taking
5  in, say, the six months before the accident?
6     A.  No, no side effects ever.
7     Q.  You took the medication because it was
8  prescribed to you by a doctor, right?
9     A.  Correct.
10     Q.  Okay.  And, to your knowledge, it was --
11  the medication was working?
12     A.  Yes.
13     Q.  Okay.  And you didn't feel sick or ill
14  because of taking the medication, to your
15  knowledge?
16     A.  Correct.
17     Q.  And the only episode of fainting that you
18  had before this accident occurred in 1995 or '96?
19     A.  Correct.
20     Q.  And the accident was in 2007, right?
21     A.  Correct.
22     Q.  The -- you said you didn't use your cab for
23  personal use.  Normally, you used it just for
24  business purposes, right?

Page 109

1     A.  Correct.
2     Q.  But if on the way home you wanted to stop
3  and grab a sandwich or you wanted to go get dinner
4  or you wanted to do something, that's something you
5  could do?
6     A.  Yes.
7     Q.  Okay.  During the course of the night, if
8  you wanted to stop to get something to eat or to
9  drink or you wanted to just take a break, that was
10  your call, right, on any given night?
11     A.  I drove the cab during -- are you talking
12  about when I drove the cab?
13     Q.  Yeah.  Yeah.
14     A.  Yes, I could stop anytime I wanted.
15     Q.  The reason that Bennett was interested in
16  the car after the accident, do you know if it had
17  anything to do with retrieving what was inside the
18  cab, specifically the meter and the radio?
19     A.  I don't believe -- I don't know if he --
20  you would call it he was interested in the cab.  I
21  couldn't get out of the hospital to get to pick it
22  up and it was costing over $100 a day.
23     Q.  Hm-hmm.
24     A.  I was told that the -- only the owner --

**Page 110**

1  that the car would be released only to the owner.
2  I couldn't get out of the hospital. I was the
3  owner.
4      So my idea was to give him the cab --
5  the title. Now, he's the owner. They'll give him
6  the car. I won't have to pay the $100 a day.
7      Q.  I was going to ask about that.
8          Did you ever have to pay --
9      A.  No.
10     Q.  -- for the amount of time it was towed?
11     A.  I never paid.
12     Q.  Okay.
13     A.  So I assume the cab is still there. I
14  don't know if Bill -- or if Bennett ever -- he had
15  the title. Maybe he went and got the cab. I don't
16  know.
17     Q.  Do you have any criticisms of Blue Cab
18  whatsoever as it relates to this accident?
19     A.  No. I'm just happy I'm out of there and
20  it's over with.
21     Q.  All right. Do you still drive today?
22     A.  No -- oh, do I have drive? Yes.
23     Q.  Yeah.
24     A.  I thought you were going to say --

**Page 111**

1      Q.  No, not a cab.
2          Do you still drive your own Explorer
3  or...
4      A.  No, I don't have the Explorer.
5      Q.  What do you got?
6      A.  A '95 Mercury Tracer.
7      Q.  And you -- is that parked here at -- on the
8  premises --
9      A.  Yes.
10     Q.  -- where we're taking this deposition?
11     A.  Yes.
12     Q.  So if you wanted to leave and go get lunch
13  or dinner right now, you could drive -- legally
14  drive to go get whatever you wanted, true?
15     A.  Yes.
16     MR. WEISS:  That's all I have.
17         Thank you.
18     THE WITNESS:  I didn't want to say anything bad
19  about Bill Bennett or Blue Cab, though. I was just
20  glad that I'm not a cabdriver, period.
21     MR. WEISS:  Gotcha.
22     MS. ROZICH:  Just one second. I have no further
23  questions.
24     MS. DALEY SCOTT:  I have no questions.

**Page 112**

1      Signature?
2      MS. ROZICH:  Waived.
3          FURTHER DEPONENT SAYETH NAUGHT. . .

**Page 113**

1      STATE OF ILLINOIS )
2                       ) SS:
2      COUNTY OF DU PAGE )
3          Steven T. Stefanik, being first duly sworn
4  on oath, says that he is a Certified Shorthand
5  Reporter, that he reported in shorthand the
6  testimony given at the taking of said deposition,
7  that the deponent was duly sworn by him and that
8  the deposition is a true record of the testimony
9  given by said deponent.
10         And further, that he is not connected by
11 blood or marriage with any of the parties to this
12 action, nor is he a relative or employee or
13 attorney or counsel of any of the parties, or
14 financially interested directly or indirectly in
15 the matter in controversy.
16
17
18
         Certified Shorthand Reporter
19         No. 084-003298.
20
21
22
23
24

29 (Pages 110 to 113)

**A**

ability 30:3 45:1
86:17 93:11
able 43:19
about 4:21,23 10:15
10:23 13:10,12
14:1,3 18:1,16,18
21:22 22:3,7 27:17
39:15 40:7 44:13
44:18 45:3 46:7
47:18 59:18 72:19
74:20 76:9,10
79:14,18 80:16
82:23 84:22 93:20
95:10 98:6 109:12
110:7 111:19
above 21:12
accelerating 67:12
Accelerator 50:21
accident 11:5,10 12:8
13:11,13,16 14:8,15
15:6 16:18 17:2,13
17:22 18:22 19:1,5
19:8,21 20:7 21:3
21:11 22:11 23:8
23:10,24 25:6,15
26:22 27:1,23 29:9
29:18,21 30:1 32:1
33:1 34:24 36:23
42:23 43:16 44:1
49:8 50:14,17,24
51:4,4,17 52:2,6,14
54:3 55:17 56:7,19
57:3,7,10,12,22
58:19 59:19 60:22
61:23 62:2,13 63:7
63:13,13,18,24 64:8
64:11,12,15 65:10
65:15 66:16,18,21
67:9,13,17,22 68:1
69:3,22 72:23 73:3
73:6,15 74:21 75:5
75:14,18 76:7,21
77:14,20 78:8,12
79:5,8 82:4,7,12
87:6,9,11,16 91:6
98:6,7,13 100:20
102:1 106:19,22
107:1 108:5,18,20
109:16 110:18
accordance 17:19
according 24:14
25:23 32:9 37:10
69:8 78:14 79:24
81:21 102:3
across 64:19,19
act 93:21
action 113:12
actually 66:17 96:7
add 89:13
addition 90:13

additional 5:16 44:24
82:19
address 7:13 47:6
51:14 66:5
addressed 46:22
admission 78:17,22
admitted 78:11
advised 105:19
affect 8:13
affecting 86:16
affiliated 97:4
after 9:21 10:1,21
14:2 15:6 16:2
20:14,14,14,17,20
21:1 22:6 26:15
27:1,1 37:23 51:2,3
51:4 52:2,6,13 54:2
56:3 72:22 73:15
77:13,17 78:8
98:13 109:16
afternoon 63:15
again 26:4 48:17 77:5
93:6 97:16,23
98:17 101:3 107:9
against 64:23
agent 1:8 95:18 98:8
98:15,16,19
ago 4:21 9:18 13:5
16:16 31:21
agreeing 98:9
agreement 4:13
71:16 94:22 96:3
102:4
ahead 24:12 35:23
air 64:22
Airport 61:3
airports 58:21
alcohol 22:24 23:2,4
23:8
alcoholic 82:6
allow 71:10 93:3
allowed 49:17
alone 7:12
along 6:3 27:7
already 41:18 82:11
always 32:6 104:14
ambulance 74:7
amount 44:24 103:17
110:10
and/or 1:8
annual 106:9
another 5:17 72:16
97:8
answer 5:14 6:3,9,14
35:23 44:5,6 91:9
answering 5:15 87:18
90:1
answers 88:19
answer's 46:9
anybody 48:16 52:24
75:10

anyone 73:5 82:21
83:1 90:4
anything 20:21 27:7
43:10 62:5,13,16
67:21 89:13 95:19
98:20 109:17
111:18
anytime 90:18 109:14
Apartment 6:22
apparently 64:24
APPEARANCES
1:19 2:1
applicable 4:15
appreciate 95:16
appreciated 105:8
approaching 65:23
arms 30:7,7,12 31:2
army 9:8,9
around 69:20
arrived 73:19 74:23
artery 8:7
asked 4:23 7:19 16:8
22:3 53:10,14
72:16 74:18 79:14
79:18
asking 5:14 44:13
46:6 81:15
aspirin 8:8 90:15
Assets 9:22 22:15
assign 37:18
associated 24:19 28:4
assume 6:10 110:13
ate 20:20
atenolol 25:6,8,12,17
25:24 29:4,8 90:13
attend 27:11
attorney 35:22
113:13
auspices 106:16
automobile 82:16
available 37:19,21
56:21,23 57:1,9
Avastin 90:14
Avenue 65:24
aware 17:16 24:18
28:16,19 29:4
56:20
away 27:17 30:22
51:18,20
a.m 57:10 62:12
102:12

**B**

B 3:9
back 9:15 10:22
16:17 17:2 18:12
40:5 42:9,11 46:6
60:12 65:5,6 73:9
86:19 94:16 97:16
background 8:17
9:14 93:2

backseat 40:19
bad 10:10 111:18
bag 64:22
bank 65:19,20 66:11
Bare 9:22 22:15
based 61:9 79:9
basics 5:5
basis 45:6,9
became 16:1
bed 60:9,13,17
before 1:15 4:18 7:2
13:11 16:18 17:12
18:21 19:4 20:12
20:15,20 21:11
22:4 26:21 30:18
30:19,24 32:13
33:22 34:24 50:14
50:17 56:3 57:3,12
57:22 60:10,17
61:4 62:5 67:24
70:11 79:23 82:3
83:21 106:19,22
107:1 108:5,18
began 36:4 37:8
begin 10:3 18:19 36:6
beginning 10:23
35:15
behoove 56:12
being 5:11,22 25:3
65:11,14 72:1
73:24 83:5 93:22
113:3
belief 79:7,9
believe 33:22 34:2,23
34:23 51:12 53:17
59:5 62:21 64:6
75:17,19,20 76:1
79:16 87:14 95:4
109:19
bell 34:15
below 21:9
benefits 97:5
Bennett 34:13,17
35:3 52:1,18 53:8
53:19,22 54:1,19
72:19 109:15
110:14 111:19
Berwyn 7:5 58:21
65:16,17
besides 27:24 82:10
83:2 90:3
best 89:10
better 81:8
between 38:13 65:17
98:18
beverages 82:6
big 18:19
Bill 110:14 111:19
birth 6:17
bit 5:12 13:10

black-and-blue 77:2
blocks 51:18
blood 14:10 18:3,22
19:22,24 20:10
21:3,8,10,12 23:21
23:24 26:11,19
27:15 61:15,19
75:2,22 113:11
blue 1:8,8 2:8 11:2,4
21:17,22 22:3,7
34:7,10,19 35:16
36:7,9,11,24 37:1,3
37:8,12,16 38:1,3,6
38:13,14,18,20 39:2
39:2,7,11,16 40:12
40:15,24 41:3,6,9
41:10,14,15,19,23
42:6,9,12,16,19,22
43:14,23,24 44:17
44:20 45:2,13,16,20
45:23 46:12,14
47:9,13 48:1,4,7,12
48:17,20,23 49:1,4
49:16,17,23,24 50:4
50:5,10 51:18,19
54:5,7,12,15 55:10
55:15,21 56:1,7,10
56:18,20 57:15
58:10,12,20,23
59:10,13 70:12,15
70:19,23 71:10,17
71:19 72:4,10,16
77:22 78:3,6 82:14
82:23,23 83:9,21
84:12,14,18,24 85:6
91:5,18 92:8 93:10
93:13,17 94:3,22
96:1,13,21,24 97:4
98:8,15,24 99:7,9
99:13,14,20 100:6
101:6 102:4,15,19
102:21 103:3,8
104:6,16 105:13,19
106:4,11,13,20
107:11 110:17
111:19
blurred 30:18
bones 65:1 76:24
books 93:16
bookstore 10:1
both 76:22 89:6
bought 38:5 42:24
84:22
Boulevard 66:14
Brakes 50:19
branch 9:7
break 6:12,15 109:9
breakfast 82:5
breathe 65:7 73:13
brief 89:16
briefly 8:16

bring 47:1
broke 65:1 76:24
broken 76:23 77:5
Brook 1:13 6:23
Brookfield 10:5,7,9
  40:10 58:21
bruises 77:2
Buren 80:22
Burger 65:18,21
  66:10
business 10:10 33:17
  92:16 96:18 103:10
  108:24
busy 61:13,14
buy 47:16

———————
        C
cab 1:8,9 2:8 4:24
  10:5,13 11:2,4
  21:17,22 22:3,7
  34:5,6,7,10,19
  35:13,15,16 36:7,9
  36:11,13,24 37:1,3
  37:3,8,12,16,18,19
  37:20,24,24 38:1,2
  38:3,3,5,6,14,18,20
  39:2,2,11,13,14,15
  39:16 40:12,15,24
  41:3,6,9,10,14,15
  41:19 42:1,6,9,12
  42:16,19,22 43:14
  43:24 44:17,20
  45:2,13,16,20,23
  46:12,14,24 47:1,3
  47:4,13 48:1,4,7,12
  48:17,20,23 49:1,4
  49:16,17,23,24 50:4
  50:5,10 51:18
  52:20,21,24 53:4,15
  54:5,7,9,17 55:10
  55:15,21 56:1,3,7
  56:10,14,18,20
  57:15 58:10,12,17
  58:19,23 59:10,13
  70:2,6,15,19,23
  71:10,17,19 72:4,10
  72:16 73:8 78:3,6
  82:14,23,23 83:9,21
  84:3,12,14,18,21,22
  84:24 91:5,18 92:8
  92:13,17 93:10,13
  93:17,18,20,21 94:3
  94:3,22 96:1,13,21
  96:24 97:4 98:8,15
  98:24 99:7,9,13,14
  99:16,20 100:6,17
  101:6,6,14,17 102:4
  102:15,19,21 103:3
  103:8 104:6,16
  105:13,19 106:4,7
  106:11,13,20

cabdriver 10:6 46:1
  93:4 97:2 99:22
  105:5 108:1 111:20
cabdrivers 100:4
cabs 10:2 38:7,10
  47:9,10 56:17 72:6
  72:9
Cab's 41:23 51:19
  54:12,15 58:20
  70:12 85:6
call 74:19 91:13
  104:15 105:10
  106:4 109:10,20
called 4:3 32:10,15
  79:21 80:13
calling 80:7,14
came 18:1 26:14 29:7
  52:13 53:8 72:16
  74:10 84:18 96:19
cancel 77:13,16
car 39:20 43:2 69:20
  99:11,16 101:1,24
  109:16 110:1,6
card 24:11
care 14:24 16:1 93:7
Carolina 8:19
CAROLYN 1:20
carry 24:1 71:23
case 68:6
Cash 35:7
caught 100:16
cause 29:4 75:14,17
  86:24 87:2
caused 75:5
causing 29:22
cease 11:3
Central 63:6,6
certain 55:11 56:12
  86:4 87:20 94:6
  105:12,13
certainly 52:21 100:4
Certified 113:4,18
chance 20:4 89:20
change 18:8 43:1,2,5
  43:10 47:10,10,18
changed 24:9 25:14
changes 43:19
changing 18:16
  101:19
charge 53:5
charged 103:17
chauffeur 92:12
chauffeur's 101:3
check 105:21
checked 13:7 28:12
  31:9
checks 93:2

chest 13:20 14:4
  64:19 77:5
Chicago 1:22 2:3,7
  8:23 58:21 77:9
cholesterol 16:6,12
  26:11
choose 59:15
chose 43:20 48:22
Cicero 9:22 10:13
  38:2
CIRCUIT 1:3
citations 69:9,11
  90:21
Civil 1:15
clarify 36:17
class 8:19 12:5 27:10
  27:11,13,21
clean 93:21 101:14
clear 5:13 6:2 59:22
  68:3 83:5
clearly 36:15
clerk 10:1
clinic 80:1
clogged 8:7
close 30:14,19
closer 30:11
closest 64:1
clots 75:23
Co 1:8,9 2:8
Code 1:15
coffee 62:6,8
color 39:5 48:22
come 52:7,9 84:24
comes 29:8
common 93:24
comp 17:12
companies 10:2 72:9
  84:3,3
company 10:10 21:22
  22:3 34:5,6,7 36:24
  37:1,4,12 38:6
  42:19 45:16,20
  47:4 48:23 49:18
  55:21 56:1,7,11
  57:15 58:13 70:2,6
  72:2,3,5,10,11
  77:19 78:8 83:19
  83:24 84:4,11,15,17
  84:18 85:13 91:18
  94:22 100:23 101:7
  103:19
company's 42:1
  47:14 48:1,4,7,12
  48:20
complaint 91:14
completely 25:21
complications 14:12
  17:9,23
compliments 91:14
computer 56:22

concern 29:16,21
  30:1 86:12,16
concerned 58:18
condition 101:24
CONDON 2:2
confused 36:14
connected 113:10
conscious 74:2,4
consider 45:22
considered 91:5
  93:23
consistent 21:4
construction 64:10
contact 106:20
contacts 31:15
contained 89:10
continue 14:9 43:22
contract 44:15 46:14
contractor 95:18,21
  95:24 98:19
control 56:1,8,11
controlled 55:20
controversy 113:15
CONT'D 2:1
convenient 50:9
conversation 67:20
  72:19 80:6
convicted 7:20,23
COOK 1:2,3 2:2
copy 88:23
corporation 1:9
correct 9:3 12:8,9
  13:16 14:16,17
  16:2 19:22 20:23
  20:24 21:20 22:8,9
  23:11 26:12 27:4,5
  29:10,11,14,15 32:2
  32:3 33:5,7 34:2,22
  35:3,4 37:7 43:8,9
  43:11,17,18 45:20
  45:21 46:10,12,13
  48:13 50:5,6,24
  57:2 60:6 61:24
  62:2,3,24 63:1,10
  63:11 65:11,12
  66:14,14,15 69:9,24
  70:20,21,24 71:7,8
  71:17 73:22,23
  74:14,15 76:2 78:8
  78:9,12,13,16 79:10
  79:11 80:9,18
  81:15,17,18 82:8,17
  85:10,14 87:16,17
  89:9 90:4,5,10,15
  90:16 93:12,15
  94:5,18 96:20 97:3
  97:7 99:18,24
  100:3,19 101:12,15
  102:10,13,16,23
  103:2,5,9,15,23
  104:2,5,8 105:11,15

105:18,23 106:2,3,6
  106:23 107:13,14
  107:16,23 108:2,9
  108:16,19,21 109:1
corrective 31:15
costing 109:22
counsel 35:21 87:22
  92:1 113:13
County 1:2,3,3,17
  113:2
couple 37:5 88:10,10
course 27:12,19
  69:23 109:7
court 1:3,14 4:14
  5:10
Crash 68:5,22 69:8
crime 7:23
criticisms 110:17
Crown 3:6,16
Curcio 77:8
current 15:10
currently 6:21 7:8,11
  8:2 11:14 15:2 16:4
  16:9 22:24 24:5
  25:12
custom 61:9
customer 105:24
  106:1
customers 58:4,6
cut 74:16

———————
        D
D 3:1 12:5
Daley 1:20 3:4 4:7,11
  4:16 11:23 16:9,13
  24:4 25:11 35:20
  36:3,15,20 44:8
  46:2 49:21 55:24
  68:18 69:4 78:5
  88:1,6,16 89:1,22
  91:11,23 104:21
  111:24
damage 100:21
dashboard 64:24
  65:1 76:22
date 6:17 11:9 12:8
  14:6,8 17:13,22
  19:1,4,8 20:7 21:2
  21:11 22:11 23:7
  23:23 25:5,15,17
  26:22 27:23 29:9
  29:20,24 32:1 36:4
  42:23 43:15,15
  44:1 50:14,17 51:4
  52:2 56:19 57:22
  58:19 59:18 61:22
  63:12 68:17 78:11
  79:5 87:6,9 88:15
  91:6 94:14 97:13
dated 97:20
day 1:12 11:5 18:21

19:20 20:9 21:3
23:10 24:16 26:1
26:23 27:4 29:17
36:6 52:13 53:5,5
54:5,7,13,16,19
56:2,7 57:3,7,12
59:20,22 60:7,14,17
60:22 61:4,12,13,16
62:2,20 63:3 64:11
66:18 67:16 74:24
75:3 79:8 81:9 85:7
102:9,17,18 103:7
103:22,24 106:18
109:22 110:6
**days** 19:15,17 27:1
52:6 55:12 66:21
75:21 76:8
**De** 8:23 9:1
**deal** 13:13 96:16
**Dearborn** 2:3
**decals** 39:8,10 40:4,5
40:17,21,23 41:13
42:9,11,14,18 49:12
49:16
**decide** 35:11 52:17
**decided** 56:16 71:22
101:11 102:11
103:21 104:1 106:1
**decision** 101:20
**Defendant** 2:4,8
**Defendants** 1:10
**degree** 56:12
**department** 1:3 65:8
**deponent** 112:3 113:7
113:9
**deposition** 1:11 4:12
4:18,20,22 5:4,5,10
68:9,14 88:3,12
94:11 97:10 111:10
113:6,8
**depot** 38:1 47:1,3
**describe** 39:5,14,20
63:18
**destination** 106:2
**determine** 104:6
**diabetes** 8:6 14:16
16:6,17,19 17:4,7
17:19,23 18:2,4,12
26:11,24 27:3,6,14
27:18 28:6
**diabetic** 21:19
**diagnosed** 14:16,18
14:20 16:19 19:4
19:20 23:11,13
26:10 74:24 78:18
**diagnosis** 16:17 18:2
19:7 21:2,18 27:3
**diet** 18:14,16
**difference** 38:12,13
43:16 95:17 98:18
**different** 10:2 15:9

36:24 40:11 83:8
85:17
**difficult** 5:19 15:11
76:24
**dime** 102:24
**dinner** 109:3 111:13
**directly** 113:14
**disagree** 78:20
**discharged** 9:11
78:14
**discovery** 1:11 4:12
**discuss** 24:21 27:13
27:20 28:3 29:13
29:16 52:1 53:7
**discussed** 21:14
52:19 54:23 82:11
**Discussion** 77:24
**dishonesty** 7:24
**dismissed** 90:23 91:1
**dispatch** 39:23 40:3
41:18,23 42:3,4
44:20,23 45:5 46:4
46:11,19,23 47:11
48:3,11,14 56:24
57:18,23 58:3
96:17 97:5 103:4
**dispatched** 104:12
107:6
**dispatches** 96:19
**displayed** 92:17
**dispute** 80:2
**dividing** 65:17
**DIVISION** 1:3
**dizziness** 28:18 29:5
67:3,6
**dizzy** 67:10
**doctor** 14:23 15:9,10
18:1 21:14 108:8
**doctors** 13:6 75:6
**document** 69:5 94:21
95:6,13 97:8,15,24
98:10
**documents** 68:11,13
89:8,10
**doing** 9:17 23:15
106:13
**dollars** 102:17
**done** 5:15 50:13
106:15
**dosage** 24:8,13 25:14
25:19
**doubt** 98:2
**down** 5:10,21 66:4
68:2 104:14,23,24
105:1
**Dr** 14:21,22 15:5,20
15:22 16:2,4,15
23:15 24:21 26:3
26:22 28:1,3,11
29:12,16,20 30:1
31:5 32:11,15,22

79:15,20 80:10
90:3
**drink** 23:8 62:16
109:9
**drinking** 23:5 76:18
**drive** 36:10,23 37:3
37:24 38:2 39:16
44:19 45:1,19
49:17,23 70:2
71:10 92:13 94:3
100:1,10 110:21,22
111:2,13,14
**driven** 87:5
**driver** 37:23 38:20
50:3 56:13 72:17
100:1
**drivers** 38:9,15 49:22
50:11 83:7 84:14
85:5,6
**driver's** 11:14 12:1,2
12:7,11,13 22:18
79:22 80:11,17
85:18,24 86:3,9
92:15 107:18,24
**driving** 10:2,3 11:11
29:17 43:3 63:23
64:7 67:5 68:2 70:6
85:18 86:13,22
87:3 93:10,20
100:16
**drove** 4:24 37:11
38:20 39:1 41:2
42:5 49:23 50:4,4
58:22 70:11,18
109:11,12
**drowsiness** 29:5
**drug** 28:24
**drugs** 29:13 82:9
86:16
**dry** 60:2
**DU** 113:2
**duly** 4:3 113:3,7
**DuPage** 1:17
**during** 78:17 109:7
109:11

                E

**E** 3:1,9
**each** 40:23 63:20
**earlier** 61:18 79:14
79:18 84:2 87:14
**early** 26:8 37:13,14
56:13 60:15 76:11
**earned** 107:15
**earning** 103:14
**easier** 5:12 25:22
**eat** 20:15 62:4,10,14
**eating** 18:18 '
**educational** 17:27:7
**effects** 18:5 24:18,22

25:1 28:17 29:13
108:4,6
**eight** 61:7
**either** 6:2 47:19 91:3
91:13
**Elburn** 58:23
**emergency** 74:18,19
**employed** 43:24
45:23,23
**employee** 1:8 93:19
95:17 96:6 98:8,15
113:12
**employees** 96:8
**employer** 91:6 96:9
**employment** 9:14
11:10 35:16 36:5
44:11,14,15
**end** 107:17
**engine** 43:6
**enjoy** 97:5
**enough** 10:19,20 30:7
30:12 31:2
**ensure** 43:7 56:13
**entering** 66:2
**entire** 57:9 74:3
**entitled** 94:22 97:15
**episode** 22:19 86:19
87:1 108:17
**episodes** 22:12,12
**even** 70:9 71:12
**event** 17:16
**events** 17:14
**ever** 4:17 7:20,23
12:10,13 14:3
16:24 17:6,9,12,13
17:13,21,22 21:14
21:17,22 24:21
28:3,11 29:16,21
30:1 31:8,11,11,17
31:22 32:17,21
36:9 45:12 46:18
47:20 49:9,12 52:1
57:13 58:6 68:5,10
69:5 72:18 73:14
74:9,13 75:5 76:13
78:24 79:4 81:24
86:12,15 87:5,8,12
106:20 108:6 110:8
110:14
**every** 19:14,19,21
20:16 24:16 26:1
41:2 50:3 53:5 71:2
72:5 86:9 102:24
102:24
**everybody** 84:11
**everything** 5:11,22
49:6 89:9
**exact** 41:9,14 51:14
**exactly** 30:23 85:1
**exam** 28:8
**Examination** 3:3 4:5

'92:4
**examined** 4:4 31:18
31:20 90:7
**example** 96:7
**excess** 45:1
**Excuse** 33:6 34:4
**exhibit** 68:15,21
88:11,13,18 94:10
94:12 97:9,11
**expect** 106:24
**experience** 108:3
**experienced** 24:24
**Expires** 12:4
**explain** 13:18
**Explorer** 33:11 83:13
83:21 84:1,5 111:2
111:4
**express** 10:13,14,18
10:21 29:21 30:1
86:12,15
**exterior** 41:11,13
43:13
**eye** 28:8
**eyeglasses** 12:16
**eyes** 13:7 28:12 31:8
31:17,20

                F

**fact** 35:2 47:22 69:21
85:7 100:1 105:8
**failed** 12:13 32:11
45:8 79:22 81:10
81:12
**failing** 32:17 81:11
**fainted** 22:18
**fainting** 22:12 28:18
86:19 87:1 108:17
**fair** 95:10,11
**fairly** 21:4,5 47:22
74:4
**family** 74:19 75:12
**far** 34:18 58:22,23
77:12 94:2 102:20
105:1
**fare** 56:23 57:1,16
58:24 59:1 61:2,5
72:22 73:1 102:24
103:4,4,16 104:19
104:23 105:10
107:7
**fares** 10:20 40:11
56:21 61:4 102:8
102:22,22 103:14
104:9,11
**farsighted** 30:9
**fast** 64:7 92:9
**Fasten** 40:22
**fault** 100:21
**fee** 46:3
**feel** 108:13
**feeling** 18:5 66:19

67:1,10
fees 45:5
felony 7:21
felt 18:8 77:3 103:24,
  106:20,22
few 5:3,9 52:6 75:21
  84:2
fill 86:5
filling 85:23 86:7
financially 113:14
find 70:4 89:9
fine 50:19,20,21
  66:20 67:2 91:2
  98:23 106:22
finish 5:13 20:19
  25:20
fire 65:7
first 1:21 4:3 20:12
  26:13 37:16 77:9
  81:12 95:12 97:23
  113:3
five 4:21 10:8 15:21
  75:22
fixed 47:2
flagged 104:13
fleet 38:6
flip 94:16 104:3
floor 22:18
follows 4:4
Ford 33:11 83:13,20
  83:24 84:5
Forest 40:10 47:7
  58:20 59:4 92:13
  104:16
forget 26:17 47:6
  59:8 104:18,
forgot 53:16,16
form 31:15 35:19
  44:3 45:24 55:23
  91:8 99:6
forms 85:23 86:2,5,7
forward 14:7 64:18
found 53:16
foundation 44:4
  45:24 91:8
four 8:18 10:8 15:21
  76:8
free 6:13
Friday 19:18,21
  20:17 61:20,23
from 8:21,24 11:9
  19:3,7,19 21:2,11
  23:7 27:17 30:22
  32:9,21 34:4,22
  35:3,21 37:10,10
  40:9,9 41:6,9,14,19
  42:8,12,22,22 43:14
  45:12,16 48:15,19
  48:23 49:4 51:18
  53:20 55:14 56:6
  57:9 62:12 72:3,16

75:23 77:2,22
78:21,21 79:1,15,16
79:20,20 86:1,7
87:21,21 93:17
96:19 99:6,9
102:12 103:14
104:15 108:4
further 30:22 111:22,
  112:3 113:10

G
garage 47:9,13,14
  48:1,4,8,12,20
gas 50:7,10 100:11,14
gave 52:3,11 53:3
general 61:9,11
generally 28:23 60:12
  60:16,19 61:6 62:7
geographic 105:13
getting 96:16 107:17
give 4:20,22 8:16
  9:13 37:19 52:5,17
  52:20 72:10 75:13
  85:16 91:14 93:13
  110:4,5
given 4:17 5:4 28:22
  28:24 56:2 59:9,12
  69:9 102:8,14
  103:7,14,22 109:10
  113:6,9
giving 74:13
glad 111:20
glasses 12:17 13:4
  30:5 31:3,6,12,14
  31:23 32:2,4,5,6
  80:24 81:4,6,16
glucose 18:22 19:10,
  19:12,22 20:1,10
  21:3,8,12 61:15,19
  61:22 75:2
go 5:4 9:5,15 10:12
  10:21 21:5,12
  24:12 27:6 28:12
  30:19 31:8 35:23
  37:18 38:1,1 50:11
  53:4,19 54:7 56:13
  57:23 58:21 60:13
  60:17 80:1 81:24
  83:22 84:10 86:3
  103:24 104:18
  107:9,11 109:3
  111:12,14
goal 102:7
God 31:21 95:15
goes 96:11
going 6:4,9 12:1 14:6
  18:7 21:14 35:11
  52:20 53:14 60:15
  62:20,22 65:23
  66:1 68:4,19 88:9
  88:11,17 92:8,9

100:13 106:1,24
  110:7,24
gone 13:6 83:23
Good 13:24 59:1
Gotcha 111:21
grab 109:3
Gradinski 14:21,22
  15:5 16:2 23:15
  24:21 26:3,22 28:1
  28:3,11 29:12,16,20
  30:1 31:5 32:15
  79:15 80:10 90:3
Gradinski's 32:11,22
  79:20
graduate 8:21,24
ground 5:9
group 88:11,13,18
guess 16:12 48:24
  83:4 106:14
guesses 75:7,9

H
H 3:9
half 24:15 58:1
hand 64:24
handle 65:6
happen 20:3 71:14
happened 22:17
  45:10 51:3,18
  53:10 65:15 69:16
  76:7
happy 6:7 110:19
hardly 73:12,13
having 4:3 67:20
  68:24 69:18 72:18
  72:22 73:1 78:18
head 5:23 25:4 28:15
  68:7
headed 43:10
health 13:10 21:23
  22:4,7
heart 8:8 13:16 14:9
  26:12,14,14,16
help 31:3 73:7
her 62:23 66:5 67:21
  67:21 87:8,15
  107:11,12
Hey 104:16 106:4
high 8:18,21 16:6,12
  23:24 26:11,11
higher 21:6
him 15:3,8 16:10
  23:18 52:3,3,5,11
  52:19,20 53:3
  54:21 55:3,6 65:7
  73:10 80:8,13,14
  110:4,5 113:7
Hines 14:23 15:23,24
  27:8,24 28:8 32:10
  40:4,8 99:11
hired 22:4,6

history 22:4,7
hit 64:18,24
Hm-hmm 8:9 37:17
  51:8 64:21 109:23
hold 11:14
home 7:3 62:22,24
  101:9 103:24
  104:18 106:5 107:9
  109:2
honorably 9:11
hospital 13:21 28:9
  51:9 52:7,9 53:2,3
  53:9 54:2,6,8 65:9
  73:22 74:10,23
  77:18 79:20 109:21
  110:2
hospitals 90:6
hours 82:7,11
house 38:2 75:22
human 93:22
hypertension 16:11
  23:11 24:16 26:20
hypoglycemic 17:14
  17:16
hypothetically
  104:15
H-o-m-e 7:3

I
idea 18:4 110:4
identification 3:9
  68:16 88:14 94:13
  97:12
II 16:21
ill 18:5 106:20 108:13
Illinois 1:1,3,9,13,15
  1:17,22 2:3,7 4:14
  6:23 7:5 68:22 69:8
  85:21 86:1,4 100:1
  113:1
illnesses 66:22
impair 30:3
improvements 43:1,3
  43:4
INC 1:8,9
include 28:17 31:15
independent 95:18
  95:20,24 97:1
  98:18
indirectly 113:14
individually 1:7
  38:20
inform 21:17
information 12:2
  28:24 103:11
initial 88:19
injuries 76:20
inquired 85:13
insert 29:7
inside 39:13,14,20,21
  40:4,8 99:11

109:17
inspected 106:7,11
inspections 106:9
installed 47:24 48:3
instructions 93:17,17
instructs 35:23
insulin 21:15
insulin-dependent
  16:22,24
insurance 69:19,20
  70:1,6,13,15,20,22
  71:4,6,9,20,23 72:2
  72:3,3,5,11,19 77:7
  77:9,13,16,19 78:7
  82:15,16,22 83:6,12
  83:15,19,20,22,24
  84:3,4,11,14,15,17
  84:17,20,23 85:14
  90:23 99:22 100:2
  100:7,8,23
insure 72:6,9 84:3,5
insured 69:21 82:19
  82:22 83:1,7,8,10
  83:24 84:4
insures 84:5
intention 84:10
interested 13:11
  109:15,20 113:14
interrogatories 87:19
  88:20,21 89:4,5
involved 33:1 36:22
  36:23
issue 26:12,14
issued 12:3 90:22
issues 13:16 14:9
it'll 25:21

J
January 6:18 12:4,4
  32:10 79:16,19
  107:19,19
Jim 34:13,17 35:3
  52:1,17 72:19
job 5:12,18 25:21
  107:13
July 14:19 26:24,24
  26:24 27:2
jump 14:7
June 9:6,6 26:23
just 6:13 8:10 10:20
  12:1,19 15:15
  25:20,21 26:14
  27:16 30:12 35:13
  36:17 42:24,24
  43:3 45:3 55:12
  59:21 61:9 63:13
  63:24 64:7 66:16
  67:9,12,19,21 68:2
  69:1 70:3 73:7
  75:11 80:13 83:11
  88:11 93:20 94:16

108:23 109:9
110:19 111:19,22

**K**

keep 19:24 32:6 43:6
93:21 103:13
105:16,19 .
keeping 101:13
kept 102:24 103:10
King 65:18,22 66:10
kit 27:8
knees 64:23 76:22
knew 23:19 49:22
50:3 53:18 60:14
68:3 100:7
know 6:7 8:8 13:23
19:3,3 21:7,13
23:13,17 24:8 25:9
26:15,21 27:15
30:8,11,19 31:16
34:3,9,18 35:8
38:16 40:10,10
43:3,21 44:16,20
45:3,4,10 46:21
48:16 49:15,20
50:15 51:11,13,15
51:23 53:18,21
55:12 56:24 57:3,6
58:22 59:6 60:15
64:4,7,17 65:8 66:1
67:19 71:1,15,22
72:13,15 73:11
74:9,11,24 75:2,11
76:1 77:21,22 78:3
78:19 81:4,7,20
83:4 85:1,2,4,6
87:2 91:13,22
92:10 95:20 98:22
99:21 102:20
103:19 104:13,18
105:1 109:16,19
110:14,16
knowledge 25:14
29:12 53:19 74:2
79:3 83:2 84:13
89:11 108:10,15

**L**

L 1:6
La 8:23 9:1
labeled 88:17
Lake 62:21 66:6
lane 63:23 64:2
lanes 63:19,20
last 9:16 15:4,17 16:8
16:14 23:4 26:21
31:20 50:13 54:1
61:21 67:24 76:15
89:3,4 94:17
late 76:5
lately 26:15

later 36:2 39:17
75:21 76:9 84:22
**LAUREN** 2:2
law 1:3 99:23
lawsuit 5:1
lawyer 95:13
lead 91:17
leading 66:21
least 19:20 23:21
leave 10:9,18,19
111:12
left 51:10 54:18 75:23
left-hand 64:2 65:16
65:18
leg 75:23
legally 95:17 98:18
100:2 111:13
let 4:11 6:7 20:19
44:3 56:24 70:2
92:9 94:9 97:8
let's 9:16 21:2
level 19:22 21:12
61:15 75:2
levels 18:23 19:10,13
20:1,10 21:4,8
61:19
license 11:15 12:3,7
12:11 32:12,19
79:23 85:17,18
86:1,4,9 92:12,14
92:15,16 93:4
100:24 101:4
107:21 108:1
licenses 59:2
light 39:12 63:15,16
65:24
lightheaded 67:10
lightheadedness
28:18 29:5 67:7
like 6:12 30:19 39:3
47:6 59:21 69:1
72:8,11 77:3 83:7
84:2 89:13 92:15
93:21,22 104:17
105:9,20
liked 50:11 81:8
limit 64:4
limited 72:7
Lincoln 51:12,12,21
53:20
line 65:17
lines 6:3 27:7
linked 41:22 42:1
lisinopril 24:2,19
25:3 26:18 28:17
90:14
list 40:8,22 83:6
listed 83:10
lists 40:5
little 5:12 13:10 19:4
104:7

live 7:2,6,12
lived 6:24 66:5
**LLC** 2:2
local 4:15
located 15:22
location 32:22 63:17
105:13
log 19:24 105:16
logs 20:4
long 6:24 7:6 10:6,14
15:20 30:7,12 31:2
37:3 65:8 103:21
look 24:11 39:3 43:2
68:23 69:19 70:3
81:2 88:22 97:16
looked 38:17 43:13
looking 65:6 81:16
looks 81:3 105:9
Lord 13:24 69:12
loss 39:18
lot 25:22 75:7
Loyola 73:21,24 74:3
74:7,10 76:8 78:10
78:11,21 79:1 90:8
Lucy 15:12
lunch 111:12
l-i-s-i-n-o-p-r-i-l 24:3
L-u-c-y 15:17

**M**

M 1:4
MacNeal 13:21 90:9·
made 19:17 27:3 36:1
76:24 97:1 101:20
102:17,18 103:7
Madison 1:21
mailed 87:23
maintained 49:3,5
maintaining 101:16
maintenance 47:11
50:13
make 5:12,12 6:1
25:21 35:21 42:21
43:19 66:13 93:21
102:21 105:6
makes 5:17,18
making 10:19
Mannheim 51:7,13
51:22 80:20
manuals 93:16
many 61:4 63:19 72:8
102:8 105:1
March 33:24 97:20
97:21 98:14
mark 68:20 97:9
marked 68:16,21
88:14 94:9,10,13
97:12
marriage 113:11
matter 5:7 87:19
102:18 113:15

may 1:12 11:19 35:21
79:7 92:1
maybe 10:8 72:16
89:19 110:15
McDonald's 62:6,7
McFADDEN 1:7,12
2:4 3:2,10,11,12,13
4:2,8,10,12,17
68:14,20,21 88:12
88:18 94:11 97:10
98:7,14
mean 31:14 36:13,17
36:18 49:1 61:21
72:8 88:4 89:16,19
95:19 98:20
meant 7:18
mechanical 101:24
median 63:21
medical 32:9 75:13
78:15,21,24 79:12
79:15,19,24 80:3
81:21
medication 8:3,5
14:10 17:3,6 23:19
23:20,23 24:6
29:22 30:2 108:7
108:11,14
medications 8:12
108:4
Medina 15:12
memory 8:13 34:1
64:14 67:24 80:16
Mercury 111:6
messy 5:18
meter 40:1 44:21,23
45:5 47:21,22
48:18 56:23 99:11
99:15 103:19
109:18
meters 47:23,24 48:6
Metformin 8:6 17:5
17:10 18:7,13 21:1
27:4 90:14
MEYER 2:5
middle 64:1 77:4
Midway 40:9 58:22
61:3 67:1 107:4
might 62:17 78:7
80:13
mile 103:17
miles 51:20,20
military 9:3,5,7
milligram 25:24
mind 15:15 24:11
minor 47:16 75:19
minute 68:23 76:5,6
85:16 98:10
Miss 62:19 66:24
67:5,16 73:15 87:5
87:12 ·
modern 47:23

modifications 42:21
moment 89:21 107:10
Monday 19:17,21
20:16 61:19
money 10:20 97:1
103:6 105:6 107:15
monitor 18:22 19:8
19:12
month 15:6 103:7
months 7:1 10:8,15
10:16 19:4 77:17
108:5
more 59:5 90:17
morning 20:11,12,17
52:19 56:13 60:5
62:5 66:19
mornings 55:12 62:8
most 62:8 96:6
motor 30:3 31:23
33:2 45:19 86:13
86:17,22 88:19,21
mouth 24:16 26:1
move 65:5 73:8,12
moving 90:18
much 35:8 44:19 .
71:19,22 97:1
103:6 104:6 105:6
multiple 83:7
municipal 99:19
municipality 103:18
Munoz 15:12,20,22
16:4,15
myself 51:1
M-c-F-a-d-d-e-n 4:10
M-e-d-i-n-a 15:17
M-u-n-o-z 15:12,17
M213-8304-4023
12:3

**N**

N 3:1
name 4:8 15:11,18
34:11,12,13 65:20
72:11 77:11
names 95:19
name's 92:7
narrative 72:21
National 1:21
naturally 38:3
NAUGHT 112:3
near 64:11 107:17
neck 8:7
need 36:2 85:17
88:23
needed 35:13 43:4,4
52:23 71:20 86:9
96:22 100:7,7
101:19,20
negative 108:3
never 22:3 28:8 29:9
45:10 51:2 71:14

105:12 110:11
new 23:19 42:24
 47:22 86:9 101:20
newspaper 30:8
next 23:18 60:14,16
 65:24
night 57:13 60:10,17
 60:20 82:3 104:4
 109:7,10
nine 10:15,16
nod 5:23
Nodding 9:4 46:8
 92:11
normal 21:7 39:4
Normally 108:23
North 2:3 8:19
notary 1:16
notation 79:15,19
nothing 68:2 76:23
 77:5 93:20
notice 1:18 4:13
notify 77:19 78:7
number 3:9 6:19 12:3
 39:11 59:7,9,12,15
 74:19 91:12,17,20
nurses 75:11

**O**

Oak 1:13 6:23 51:16
 59:4 62:21,23,24
 65:18,24 66:2,4,13
 68:4 92:13
oath 1:12 113:4
object 35:19 44:3
 45:24 55:23
objection 35:24 49:19
 104:21
objections 35:22 36:1
obviously 69:19
 102:7 105:5 108:1
occasion 21:10
occur 22:14 75:24
occurred 45:9 60:23
 62:13 68:1 73:17
 74:20 87:11,16
 106:19 108:18
occurrence 90:8
occurring 66:16 67:9
 67:22
October 76:2 79:10
off 49:15 65:9 74:16
 77:22,24
offend 7:18
office 32:11,22 47:12
 79:20
officer 69:2 73:2
 74:18
officers 74:9,14
often 19:12 71:3
oh 5:3 12:21 16:12
 19:2 40:9 59:11

69:12 74:18 110:22
oil 43:1,5 47:10,18
 101:19
okay 5:3,19,21 6:4,5
 6:10,11,15,16 7:4,8
 7:17 8:2,21 9:13,20
 10:3,12,21 11:1,3,9
 11:22 13:9,13,14
 14:15 15:12 16:14
 16:17 17:21 18:21
 19:15,24 20:16
 21:1,9,10 22:10,19
 23:13,20 24:8 25:8
 25:10 26:8 27:9
 28:11 30:10,21
 31:17 34:9 35:1,5
 35:18 37:15,22
 38:4,4,6,17 39:13
 39:19 40:7,12,17
 41:5,22 42:4 44:9
 44:13 45:11 46:3
 47:3,18,24 52:15
 53:1,7,13 55:20
 56:15 58:4,20
 61:12 62:1 63:9,23
 65:13 67:5 69:5,14
 69:21 71:9,12
 72:10 73:14 74:20
 76:11,13,17 80:15
 80:21,24 81:9,21
 82:6,21 83:12
 84:23 85:9,12
 86:11 88:9 89:8
 90:3,3,24 91:2
 92:19 94:2 95:1,4,9
 95:12,22 96:6 97:8
 97:23 98:11,22
 99:22 101:19 102:3
 102:7 105:16
 106:12,15,18 107:9
 107:21,24 108:10
 108:13 109:7
 110:12
once 4:19 13:20
 56:18 70:9,18
 87:15 105:24
one 5:17 8:18 22:13
 22:22 24:15 26:10
 26:16 27:16 34:16
 39:16 43:13 58:23
 59:5 64:1,19,19
 69:18,18 70:12
 78:7 80:20,20
 81:16,20 85:16
 90:17,23 91:1
 102:11 103:24
 105:3 111:22
ones 47:23 57:22,24
 82:10 88:10
only 22:19 33:14
 45:18 72:8 89:16

103:3 108:17
 109:24 110:1
operate 30:3 86:17
 93:18 94:3 99:16
operating 31:23
opinion 101:23
optometrist 13:1
order 45:11 99:16
ordinance 99:19
ORPETT 2:5
other 8:10 11:10,10
 17:6 27:24 31:15
 33:8,10 42:1 82:9
 91:1 92:1 96:11
out 11:20,21 31:3
 53:2,12,17 54:5,8
 58:23 64:16,22
 73:8 77:17 85:23
 86:5,7 92:9,24
 96:16 101:21
 104:16 107:1
 109:21 110:2,19
outcome 90:21
outside 38:21 39:8
over 5:5,17 19:4
 35:24 53:5 56:1,8
 56:11 80:22,23
 109:22 110:20
overview 9:13
own 33:2,8,10 37:24
 38:5,10 84:21
 92:20,24 93:7
 100:11,24 101:3,9
 101:13,21 103:10
 103:11 111:2
owned 37:24 38:7,10
 38:14,14,19,19 39:2
 39:16,17,17 41:3,10
 41:15 42:6,15 56:3
 56:18 58:17,18
 70:9,11,19 71:12
 99:12,13,14 106:7
owner 34:18 52:24
 53:4 109:24 110:1
 110:3,5
Owner-Operator
 94:22
owning 36:21
o'clock 56:17 60:18
 60:24 62:11 105:21
 105:22,22
O'Hare 40:9 58:22

**P**

page 3:1 89:3,4 95:12
 97:17,17,23 113:2
pages 94:17
paid 35:8 44:17,19,20
 44:22 45:6,6 51:23
 92:24 93:6 96:13
 96:21 98:24 100:11

100:24 101:3,21
 102:3,4 110:11
pains 13:20 14:4
paint 38:18,21 39:6
 43:20 48:22 49:3,9
painting 41:9
papers 69:20
Paragraph 98:5
paramedics 73:18
 74:6
paratrooper 9:10
Pardon 7:10 52:8
 61:17
Park 40:10 47:7
 51:16,21 58:20
 59:4,4 62:21,23,24
 65:18,24 66:2,4,13
 68:4 92:13,13
 104:16
parked 111:7
part 7:13 49:9 80:11
 80:17
particular 34:9
parties 4:13 113:11
 113:13
parts 52:22
party 5:1
pass 80:19 107:1
passed 53:12 64:16
 80:22 81:14 107:18
passenger 5:7 56:21
 65:3,4
passengers 57:21
 83:3 93:22
passenger's 40:18
passing 66:7 80:11,16
past 13:7 23:2 28:9
 28:14
pay 35:5 44:16,24
 45:8 91:2 92:22
 96:8,15 110:6,8
PC 1:20 2:5
pedestrian 65:4 73:7
pending 6:14
people 57:19 75:11
 83:8 96:22
per 102:4 103:4,17
percent 58:1 96:18
percentage 57:21
performed 93:3
period 111:20
person 57:16 91:13
 · 106:5
personal 33:12,14
 45:16 108:23
personally 49:23
 70:19
phone 39:11
phonetic 14:21
physical 101:24
physically 18:9

100:24 101:3,21
102:3,4 110:11
physician 14:24 16:2
 79:4 86:20,24
physicians 27:24
 86:12,15
pick 28:22 38:2 56:21
 57:15,19,23 104:10
 104:12 105:10
 107:11,12 109:21
picked 57:24 61:1
 66:24 96:22 102:21
 104:9,11,17 105:24
 107:4
picking 61:5
pickup 40:9 103:17
picturing 74:17
pills 23:16 26:17
placed 14:2 42:18
 90:11
plaintiff 1:5,23 5:7
 107:4,6
plan 18:11
plans 90:18
Plavix 8:6 14:11,13
play 101:24
Plaza 1:21
please 6:7 8:16 13:18
 68:23 88:22 89:2
Plus 114:12
pocket 92:24 101:21
point 81:17 86:12,21
 95:5,7 98:3 105:20
 106:18,19
police 51:6,16,16
 69:2 73:2 74:9,14
 74:17
policeman 69:19
policy 82:22 83:2,6,7
 83:8,9,13 93:19,20
popped 64:22
possibility 78:6
potential 28:4,17
POWER 1:20
practice 61:10,11
preceding 90:7
premises 111:8
prescribe 23:16
prescribed 13:2 27:4
 108:8
prescription 12:18,24
 24:14 25:23 29:8
 82:10,10
prescriptions 28:23
presented 87:21
pressure 23:21,24
 26:11,19
previously 60:4
price 40:5,8,11,22
primary 14:24 16:1
printout 24:14 25:24
 28:22,24 29:2
prior 6:15 13:13,16

14:15 17:2,21
18:24 19:1 22:11
23:10,23 27:23
29:8,17,20,24 35:15
36:21 37:6 49:7
56:10 61:22 63:13
63:24 64:8 65:10
66:16 67:9,12,16,21
68:9 69:6 70:6 87:6
87:8 88:2
private 80:1
probably 23:22 24:23
26:5 31:21 46:16
48:17 55:4 64:9
67:18 72:16 76:8
84:7 85:3 87:21
problem 46:24 47:20
48:6,10
problems 28:4 46:18
46:21,22 50:16
107:3
Procedure 1:15
proceed 66:4
professional 75:13
profit 102:21
programs 27:7
proof 70:5,22 71:1,4
provide 36:9,13,18
58:6 70:5
provided 37:1,11
40:15,24 46:11
58:9
providing 96:24
public 1:16
pull 11:20
punch 56:22
purchase 33:21 34:10
35:2,12,15 41:20
42:23 50:7 70:12
70:15,20 85:12
purchased 33:23 34:3
34:20 35:2,13,14
37:9 41:6,8,14,19
42:8,12,22 43:14,15
45:15 48:23 49:4,8
56:6 59:16 72:2
85:9
purchasing 37:6
56:10
purpose 33:19 45:18
85:4
purposes 33:17 36:2
85:14 108:24
pursuant 1:14,17
4:13,14
put 13:21 18:14
23:20 27:4
p.m 62:12 102:12

_____ Q _____

question 5:14,14 6:6

6:9,10,14,15 7:18
7:18 16:8 25:21
35:24 36:14
questions 4:23 5:16
13:12 87:20,23
89:14,23 90:1 92:2
111:23,24
quick 20:19 92:8
quit 23:5 76:18,18
quite 5:18

_____ R _____

radio 39:21,23 41:18
41:22 42:5 46:4,4
46:19,23 48:11,14
99:11,15 109:18
radios 48:3
rain 59:24 60:1
rammed 64:24
range 21:7
Rarely 21:6
rather 38:1 73:9
reaching 65:5
read 12:1,19 29:2,9
30:8,11,17,19,20,21
78:2 89:20 95:6
98:3
reading 12:17 13:4
30:5 31:3,6 32:5,6
80:24 81:4,6,16
real 20:19
really 89:19,20
rear 40:18,20,23
reason 48:18 75:14
78:20 80:2 95:4
96:15 98:2 109:15
recall 8:14 22:20
32:14,15,17,21 46:3
46:15,17 51:13
55:1,5 57:5 59:7,20
60:9,22 61:1,12,14
62:19 63:2,24
64:12,13 65:10,11
65:14,19,21 66:5,7
66:10 67:10,12,15
67:20 68:24 69:13
69:13,16 71:21
72:18,22,24 73:2,5
73:14,18,24 74:6,11
74:13,22 75:7
77:11,21 80:7,14,15
82:3 85:1,23 86:7
86:11 87:18 89:17
89:23 90:1
recalling 73:1
receipts 58:7,9,12
receive 45:12 93:16
99:6
recently 88:7
Recess 78:1
recollection 80:5

recommend 28:11
record 4:9,11 5:13,18
6:2 12:2 35:22 36:2
36:18 77:23,24
78:2 80:1,3 81:22
103:13 113:8
recorded 37:6
records 32:9 33:23
78:15,21,24 79:15
79:19
redo 49:12
referred 72:4
referring 34:7
reflect 4:11
refresh 33:24
refreshes 80:16
regard 44:22
regardless 35:1 100:6
regards 41:8 47:13
77:7 90:6
registration 101:1
regular 58:4 60:13
regular-issued 85:18
relates 110:18
relative 113:12
release 52:24
released 110:1
remember 8:10 15:11
25:20 27:1 34:11
34:12 36:4,8 51:14
54:22,23 55:6,7
61:8 67:18 69:18
80:7,10,12 94:21,23
95:1,10 97:24
remove 48:15
removed 48:15,19
75:22
renew 85:24 86:3
renewal 12:14 32:12
32:18 71:2 79:22
80:17 85:23 86:2
renewed 71:5
rental 46:3
repair 47:10
repaired 47:15
rephrase 6:7
report 68:5,22 69:9
103:6
reported 113:5
reporter 5:10 113:5
113:18
represent 5:6 92:7
representative 84:16
84:24
requested 78:2 81:22
requesting 32:21
required 82:14,18
91:20 99:23
reside 6:21 7:9,11
residence 7:16
response 6:4 88:20

responses 5:23
responsible 100:17
100:21 101:13,16
restrict 87:3
restricted 18:14
restrictions 12:5
retrieving 109:17
review 68:10,10 88:2
89:2,8
reviewed 88:7
revoked 12:11
right 13:9,11 15:16
19:6 26:2 27:16
28:16 31:1,5 33:5
35:1 40:20 45:5
55:8 61:12 62:4
63:1 65:21 66:1
68:19 70:18 71:19
73:21 76:10 77:1,4
80:19 81:13 85:15
91:23 92:10,17
93:4,11,14,23 94:17
95:2,13,14,15 96:5
96:9,10,11,12,13,19
96:23 99:20,22
100:2,5,24 102:5,9
102:12,19,22 103:1
103:8,18,22 104:1,7
104:10,19,23 105:6
105:7,10,14 106:5
107:1,22 108:8,20
108:24 109:10
110:21 111:13
right-hand 65:19
ring 34:15
road 47:7 51:7,13,22
57:16,24 63:8,9,12
63:17 64:5,10
65:11,13,17 68:3
80:20 84:18 93:14
Roads 60:2
roadway 63:18
ROGERS 1:20
role 9:9 102:1
roofer 9:19
room 5:11,22 74:18
Roosevelt 47:7 63:7,8
63:9,12,17 64:5,10
65:11,13,17 68:3
84:18
Rose 1:4 5:6
roughly 10:17,22
23:14 62:12
route 63:2,5
routine 8:8
routinely 7:19
ROZICH 2:2 11:21
16:7 25:10 36:13
36:17 69:1 87:23
88:4 89:16 91:9
111:22 112:2

rule 99:20
rules 1:14 4:14,15 5:9
running 43:7

_____ S _____

S 2:6 3:9
safety 43:7
salaried 44:16
salary 98:24
Salle 8:23 9:1
same 10:15 38:21
41:9,15 42:4,14
76:19 83:15,18,24
84:14,15
Sand 67:5
sandwich 62:6,8
109:3
saw 15:4 16:14 26:22
51:2 52:13
SAYETH 112:3
saying 61:9 67:21
69:2 104:16
says 24:15 66:6 94:24
96:4 98:5,13,14
113:4
scene 73:3,6,19
schedule 102:14
103:16
school 8:18,22
Scott 1:20 3:4 4:7,11
4:16 11:23 16:9,13
24:4 25:11 35:20
36:3,15,20 44:8
46:2 49:21 55:24
68:18 69:4 78:5
88:1,6,16 89:1,22
91:11,23 104:21
111:24
seat 40:18 64:17 65:5
65:6 73:8,12
seatbelt 64:19 77:3
seatbelts 40:22
second 77:23 81:14
89:16 90:17 97:17
111:22
section 72:21
Security 6:19
see 11:19 15:15 23:18
24:13 25:19 27:24
52:7,9 53:8 54:17
68:5,12 98:12
seeing 15:20 26:3
30:13 65:21 66:10
89:18,23
seem 46:16
seen 15:3,8 51:2
68:12 69:5 72:24
78:24
selected 100:13
self-employed 9:19
send 57:18

senior 7:14
sense 44:14 93:24
sent 27:8 57:23 84:16
separate 83:12
September 11:5,7
  33:2 78:12,15
service 8:19 44:23
  46:11 83:16 96:17
  96:24 97:6
services 44:21 77:8
set 19:15,17 102:14
  103:18,20
seven 61:6 102:22
Shaking 25:4 28:15
  68:7
sheet 40:14
shift 55:18
shifts 55:11,20
shocked 18:3
shorthand 113:4,5,18
shortly 9:21 15:6
shoulders 5:24
show 68:19 70:22
  71:1,3 94:9 97:8
showed 33:23 71:6
shrug 5:24
sic 106:8
sick 103:24 108:13
side 24:18,21,24
  28:17 29:13 50:5
  57:16,24 65:16,16
  65:18,19 104:3
  108:3,6
sign 44:15 85:5,7
  98:3,13
signature 97:18
  112:1
signatures 89:6,6
  94:17,19 95:2
signature's 97:20
signed 46:17 84:19
  88:5 95:5,6 96:4
  98:9,10
signing 97:24
similarly 48:10
simply 36:1
since 5:3,4,21 11:7
  14:4,6,8 18:7 22:22
  24:9 25:3,15 31:22
  53:22 87:11
sir 11:15 12:6,10
  13:10 15:19 16:22
  22:24 24:17 26:2
  28:16 29:5 30:6
  31:12 32:9 33:3
  68:19 76:11 79:14
  82:1,4,15 83:13
  85:17 87:18 89:3
  90:19 92:7 94:16
sister's 75:22
sit 95:9

site 64:11
six 7:1 9:23 51:18
  108:5
sleep 60:19
slid 64:18
slide 65:6
smack 77:4
small 79:8
smashed 64:17 76:22
  77:4
SMITH 1:20
smoked 76:15
smoker 76:11,13
smoking 40:22 76:18
smoothly 43:7
Social 6:19
Sociology 8:20
some 4:23 12:2 13:15
  22:11,12 48:18
  51:6 92:14 95:5,6
  98:3
somebody 77:3
  103:20 105:9
somebody's 104:16
someone 77:22
  104:13
something 12:23 13:1
  30:17,21 46:17
  66:6 79:8 92:16
  99:23 109:4,4,8
sometime 37:9
sometimes 21:5 37:20
  47:16 104:12,14
somewhere 10:24
  22:16 23:5 26:7
  62:23
soon 90:19
sore 76:23,24
sorry 16:7 44:6 89:5
sort 44:17 63:19
  91:14 92:14 94:6
sound 76:2 102:5
sounds 37:13 76:10
South 9:22
speak 54:19 87:15
speaking 67:15 73:2
  73:5,14,18
specific 72:11
specifically 61:8
  109:18
specify 71:19
Speculation 49:19
  104:21
speed 64:4
speeding 100:16
spell 4:9
split 56:4
spoke 54:1
spoken 53:22 87:8,12
squad 69:20
squashed 64:22

SS 1:1 113:1
standard 71:24
start 13:4 26:3 30:5
  56:16
started 9:21 11:2
  37:14,16 55:8,14
  57:6 60:4 83:21
starting 62:5
state 1:1,17 4:8 85:21
  86:1,4 113:1
stated 79:21
statement 71:24
states 72:22
station 50:11 100:13
staying 27:17
steering 64:23
Stefanik 1:16 113:3
stent 13:21 14:2
  90:11
STEPHEN 2:6
sternum 77:3
Steve 92:7
Steven 1:16 113:3
Stickney 58:22
still 15:2 24:5 25:12
  31:16 46:9 49:17
  110:13,21 111:2
Stipulation 97:16
Stone 51:21
stop 109:2,8,14
store 101:6
store-bought 12:21
store-boughts 12:20
street 1:13,21 2:3,6
  6:22 62:21 63:6
  66:5,6,8 77:12
  80:22 104:13
strike 11:13 20:7
  29:23 36:5 38:24
  40:3 41:17 42:10
  43:23 45:11 55:9
  57:12 58:15 66:17
  72:1 78:10 79:17
  96:7
stroke 75:19,19,21
  78:18 79:4,8,9
stuff 27:18 93:22
subsequent 81:11
sugar 27:15
suggest 31:8
Suite 1:21 2:6
Sunday 61:6 63:15
Sunday's 61:6
Sunny 59:23
supplemental 88:10
  88:21 89:5
supposed 59:5
Supreme 1:14 4:14
sure 15:14 24:23
  46:16 55:7 62:18

70:8 71:14,18 74:4
  77:15 84:8 85:8
  93:5,21 100:23
suspended 12:10
sustained 76:20
sweets 18:18 27:17
sweet-eater 18:19
switched 47:23
sworn 4:1,4 113:3,7
syncopal 22:12

────── T ──────

T 1:16 3:9 113:3
tab 24:15 25:24
tablet 24:15
tablets 26:1
take 6:12 11:21 20:15
  25:24 29:7 48:19
  49:15 56:21 57:1
  63:5 68:23 81:5
  82:9 88:22 90:14
  109:9
taken 1:12 4:12 17:6
  48:7,11 78:1
taking 5:10,21 6:15
  8:2,7,10,13 17:3
  81:1 108:4,14
  111:10 113:6
talk 5:17 13:9 18:16
  40:7 59:18 73:12
  74:10
talked 18:18 27:17
  75:10
talking 39:15 55:6
  74:6,12 82:23 98:6
  109:11
taxes 99:9
taxi 5:8 38:18,19 39:1
  39:3 40:19 41:2,5,8
  41:19 42:8 43:11
  45:15 47:14 48:15
  48:22 49:3 50:3,4
  52:2,17 53:20 55:3
  59:7,9,12,15 70:9
  70:11 71:20,23
  83:23 84:6,13
  85:24 87:15
taxicab 11:11 33:20
  36:10,21,22,24
  37:11 39:4 42:12
  42:22 43:14 77:10
  82:24 83:9 85:19
  91:12
taxicabs 42:5
taxis 38:12,13,14,18
  38:23 41:10 42:15
  70:12 91:21
tell 22:17 31:5 32:11
  44:5 56:20 64:14
  79:4,21 94:4 96:22
telling 94:2

ten 13:7 28:9,14
terms 44:10,14 71:16
  95:17
test 12:13,14 20:9
  27:14 32:12,18
  61:15 79:22 80:11
  80:17,18 81:1,5,10
  81:11 93:10,13,14
  107:18
tested 19:22 32:23
  61:19,22 79:24
  81:23 82:1
testified 4:4 60:4
  61:18
testimony 37:10
  87:14 113:6,8
testing 27:8
tests 18:3 19:18
thank 12:6 15:19
  24:17 26:2 56:4
  92:1 95:15 111:17
Thanks 11:24 88:24
their 38:10 44:20,21
  44:23,23 47:9
  50:11 53:5 84:17
  96:8 97:5 106:5
they'd 72:11
thing 10:15 20:12
  23:18 24:1 26:16
  44:17 63:19 91:15
  103:3
things 8:10 30:13
  43:6 93:24
think 14:2 36:19
  37:13 46:17 51:21
  53:16 59:6 81:3
  85:11 86:20 89:17
  91:23 93:5
thinner 14:11
Thomas 1:7,11 2:4
  3:2 4:2,10,12
though 111:19
thought 20:6 54:9
  110:24
thousand 102:17
three 1:21 19:14,14
  26:1,13 40:23 72:8
  76:8
through 60:19 77:10
  83:15,18 84:15
ticket 100:17
tickets 69:17
till 9:23 55:13
time 4:24 6:12 15:1,4
  16:14 19:7,19 20:9
  22:1,6 23:4 26:21
  28:12 33:8 35:21
  35:21 41:20 42:23
  54:1 55:10,14,17,
  56:6 57:6,9 58:23
  60:7,9,13,17,22

61:21 62:10 67:7
69:2,22 74:3,5
76:15,19 78:17
81:12,14 85:10
86:8,8,9,13,21 88:4
95:5 98:3,5 105:3
105:13,20 107:10
110:10
times 19:14 96:6
tires 42:24 43:4,8
47:11,17 101:20
title 45:22 52:3,5,11
52:13,16,20 53:3
110:5,15
today 8:13 68:9 69:6
82:11 95:9 110:21
today's 25:17 68:9
88:2
told 18:3 26:23 51:16
52:3,23 53:15,16,17
65:7 75:5 80:1
100:6 105:12
107:10 109:24
top 39:12
totaled 50:24
tow 51:23
towed 51:6,11,15,17
51:19,20 52:4
53:15,17 110:10
Towing 51:12 53:20
Towing's 51:22
town 51:21
towns 58:16 59:3
Tracer 111:6
traffic 63:14,19 68:5
68:22 69:8
training 79:12
transported 73:21,24
74:3
treated 90:9
treating 16:4,9 90:4
treatment 18:11
TRIBLER 2:5
tried 81:8,9,16
trip 105:16
trouble 30:13
true 43:9 70:9 89:9
92:13 93:18 94:4
96:4 97:6 98:9 99:1
99:4,5,17 100:4,18
100:22 101:1,7,8,14
101:17,18,21,22
102:15 103:4,14
104:24 105:17
106:8,10,16,17,22
107:20 111:14
113:8
try 81:5 92:8
trying 30:17 51:20
65:4 73:7,8,11
74:17

turn 66:1 68:4 104:23
104:24 105:1
two 15:7 19:4 27:1
40:23 45:1 59:6
63:20 64:23 65:1
72:8 76:24 90:7,21
94:17 102:22 105:3
two-page 97:15
Two-tone 39:7
type 16:19 94:7
types 93:23

U

uhm-uhm 6:1
uhn-uhn 6:1
uh-huh 6:1
ultimately 107:18
under 1:12 65:5
82:22 83:1,7,8
106:15
underneath 95:23
96:1
understand 6:6 17:15
44:12 51:1 82:20
95:16 98:12,17
99:12
understanding 13:15
22:10 25:5 50:23
understood 6:10
36:15
uniform 94:7
until 5:13,15 11:9
19:20 25:20 56:19
57:10 58:19 62:12
use 22:24 33:14 44:21
44:22,23 45:15,16
52:21,22 72:12,14
108:22,23
used 23:2,4 30:17
33:14,16,19 45:18
108:23
using 30:5
usually 96:8,11

V

VA 79:20
valid 11:14
Van 80:22
various 38:9 59:3
69:9 99:16
vehicle 30:3 31:23
33:1,3,10,12,21
34:10,22 35:2,3,6,9
35:12 36:22 37:6,9
44:19 49:5,6,9,10
49:13,16 50:8,14,16
50:23 51:3 56:6,19
59:16 70:13,16,18
71:12 85:10,13
86:13,17,22 88:19

88:21
vehicles 33:8 49:24
verbal 5:23 6:4
versus 57:24 102:22
very 5:18 67:24 72:7
76:23 84:2
Veteran 14:23
Victoria 33:6,16
Village 93:3,9 106:13
villages 99:17 106:8
106:16
vision 28:4 32:12,18
32:23 79:22,24
81:10,11,23,24
visual 80:11,17 81:1
visually 38:17 43:10
43:16
vs 1:6

W

waist 64:20
wait 5:13,15 25:20
61:17 76:5,5 98:10
Waived 112:2
Waiver 97:16
wake 60:7
walk 76:24
want 13:9 36:17 44:5
48:16 59:18 104:18
104:19 105:6,10
107:11 111:18
wanted 43:22 48:14
48:18 56:16 59:16
72:14 79:23 81:22
91:13 98:22 102:11
103:21 104:3,9,24
107:9,12 109:2,3,4
109:8,9,14 111:12
111:14
wants 104:17
Washington 2:6
Washington-Sanders
1:4 5:6 62:19 66:24
67:6,16 73:15 87:5
87:12 98:7
wasn't 10:19 54:17
61:14 92:15 99:19
water 62:17
way 9:15 18:8 63:20
64:18 74:7 95:13
96:11 107:3 109:2
wear 12:16,17,19
31:22 80:24 94:6
wearing 13:4 31:6
32:2
weather 59:20 68:3
Wednesday 19:17,21
20:16 61:20
week 19:14,19 32:13
44:19 76:9,9 79:23
102:4 103:4,7

weekly 45:6,8
weeks 51:9,10
weird 81:2
Weiss 2:6 3:4 24:3
35:19 44:3 45:24
49:19 55:23 88:24
91:8 92:3,6,7 94:15
97:14 104:22
111:16,21
well 5:3 14:10 16:6
36:15 38:10,19
56:4 73:11 75:13
86:3 88:10 89:4
95:20 98:17
went 9:3 13:21 21:1
54:4,4,17 60:9 65:9
65:9 80:19,22
83:22 110:15
were 5:1 9:7,11 10:6
10:14 13:19 14:15
14:18 16:19 17:3
19:3,15,19 21:2,3
22:4,6 23:10,13,24
25:6,8 28:22 29:22
30:2 31:6 32:1
35:11 36:10 38:14
38:24,24 39:10
40:3,17,21,23,24
41:2,5,10,13,17
42:6,9,10,11,14,14
42:15,18 43:19,24
44:10,15,16 45:6
47:24 48:3 49:15
54:2 55:18,20
56:20,23 57:1,9,22
58:2,9 60:16 63:9
63:23 64:7 66:18
67:1,5 69:9,11,21
73:21 74:2,3,11
75:5 76:20 78:11
78:14,17 86:16
87:20 88:9 89:17
90:4,7,9,22 93:2
95:24 96:16 98:24
99:12,13,14 100:13
101:13,16 102:11
104:11 105:12,20
106:1,15,24 108:4
110:24
weren't 10:20 18:5
30:7,12 31:2
Wesley 66:7
west 1:21 2:6 6:22
47:7 64:4 77:12
westbound 63:10,17
we'll 97:9
we're 39:15 98:6
111:10
we've 82:11
whatsoever 110:18
wheel 64:23

while 8:19 58:16
100:16
whole 49:5 74:4
105:3
window 40:23
windows 40:5,20
42:9,11,15
windshield 64:17
withhold 99:9
witness 3:1 4:1,3
11:22 16:11 44:7
46:1 49:20 78:3
87:24 91:10 111:18
woke 20:12,13,14,14
20:17,18,20 22:18
64:16 65:3
wondering 44:18
work 10:10 22:18
37:21 43:22 55:11
56:2,16 57:13
58:16 60:5,15 62:5
102:12 103:21
104:3
worked 9:23 11:7
22:15 34:10 50:19
50:21 55:10 56:8
56:11 57:4 59:3
104:7 105:3
working 9:18,22 11:4
36:6,10 37:8 55:8
55:15,18 57:6
60:14,16 83:21
108:11
worn 31:11
worse 81:3
wouldn't 15:15 20:3
37:21 52:24 84:7,8
97:1
wrist 65:2 77:1,1
written 87:20 93:13
93:17
W-2 45:12 99:6

X

X 3:1,9

Y

yard 51:6,11,15,19
53:6 54:4,5,7,12,15
yeah 12:22 26:9 44:2
66:3 69:1 76:9,10
100:9 109:13,13
110:23
year 8:24 14:19 16:16
23:14,21 33:22
34:24 49:7,8 71:2
85:2
yearly 71:6
years 4:21 5:4 7:7
8:18 9:5,16,18,23
13:5,7 15:3,8,21

28:9,14 31:21 37:5
  90:7

**$**

$100 53:5 58:24
  109:22 110:6
$195 102:4 103:3
$25 102:18

**0**

01 10:3
07 1:6 107:19
08 98:14
084-003298 113:19

**1**

1 3:10 68:15,20,21
1:00 60:24 62:12
10:00 60:18
110 21:5
12 98:13
12th 97:21
120 21:5
130 21:9,12
1300 2:6
13584 1:6
1400 9:22
15 9:16,18 13:5
150 21:6
1618 7:3
1759 6:22 7:13
1801 1:13
19th 1:12
1944 6:18
1990 26:5
1995 108:18

**2**

2 3:11 88:13,18
20 64:9
20-milligram 24:15
2000 22:15 33:6,16
  86:20
2001 11:9 86:20
2002 10:22,23 37:8
  37:11,13
2004 33:5
2006 33:24 34:22,23
  37:9,11
2007 11:7 12:4 17:2
  18:7,12,21 24:9
  32:10 33:2 45:23
  46:6 55:17 57:21
  60:12 78:12,15
  79:16,19 108:20
2008 97:21
201 9:23
201-6400 2:7
2010 1:13
2011 12:4
203 14:1,3

206 85:3
207 11:6 14:19 18:24
21st 62:1
22nd 32:10 77:12
  79:19 81:12
225 2:6
23rd 6:18 11:5,7 12:4
  33:2 62:2 76:7
  78:12
236-9381 1:22
24 82:7,11
25 25:24 64:6,9
25th 12:4 107:19
266-1313 2:4
27 107:19
27th 78:15 79:16

**3**

3 3:12 94:10,12 98:5
3,000 35:10
30 31:21
312 1:22 2:4,7
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 6:20
35th 1:13 6:22
36 7:7

**4**

4 3:4,13 97:9,11
4th 27:2 76:2 79:10
4:00 55:13 102:12
4:30 60:8
4314 6:22

**5**

5:00 55:12 62:11,12
5:30 55:12 57:8,10
  60:5 102:12
55th 63:6
5500 1:21

**6**

6th 14:19 26:24
60602-4212 1:22
60606 2:7
60654 2:3
62 9:2
65 9:6
67 9:6,15
68 3:10

**7**

7 59:11,11
7:00 105:21
70 1:21
74-something 47:7
745 2:3

**8**

8th 97:20
8:00 105:22
80 58:24

88 3:11

**9**

9:00 56:17 105:22
90s 26:8
92 3:4
94 3:12
95 9:21 23:5,7 76:16
  111:6
96 23:5,7 33:11 76:16
  108:18
97 3:13
99 22:15 58:1
99-point 96:18
99.5 96:18

# ILLINOIS TRAFFIC CRASH REPORT

Sheet 1 of 1 Sheets

**INVESTIGATING AGENCY:** OAK PARK

**INVESTIGATING AGENCY:** OAK PARK

**AGENCY CRASH REPORT NO.:** 07 30375

**DATE OF CRASH:** 9/23/07 **TIME:** 1:14

**HIGHWAY or STREET NAME:** ROOSEVELT RD

**COUNTY:** Cook

**NAME (LAST, FIRST, M.I.):** McFADDEN, THOMAS
**STREET ADDRESS:** 1618 S. Home
**CITY:** BERWYN **STATE:** IL **ZIP:** 60402
**TELEPHONE:** 708 749 3323
**DRIVER LICENSE NO.:** M213 834 4023
**CLASS:** A
**SEX:** M **HGT:** 2 **WGT:** 11
**TAKEN TO:** Loyola

**MAKE:** FORD **MODEL:** CROWN VIC **YEAR:** 2000
**PLATE NO.:** 12153-27X **STATE:** IL **YEAR:** 07
**VIN:** 2FAFP71W6YX146916
**VEHICLE OWNER (LAST, FIRST M.I.):** SAME
**OWNER ADDRESS (STREET, CITY, STATE, ZIP):** SAME

CIRCLE NUMBER(S)
00 – NONE
01 – UNDER CARRIAGE
12 – TOTAL (ALL AREAS)
99 – UNKNOWN
POINT OF FIRST CONTACT
INSURANCE CO.
POLICY NO.
TELEPHONE

**EXHIBIT 1** McFADDEN Inj 5/9/10 SS

**DAMAGED PROPERTY OWNER NAME:** VILLAGE of OAK PARK / STATE of IL Light Pole
**PROPERTY OWNER ADDRESS:** 123 W. MADISON OAK PARK IL 60302
**ARREST NAME:** McFADDEN, THOMAS **CITATION NO.:** 11-6060 / 3-207 YJ-059-18880 **SECTION:** 10-17-7
**ARREST NAME:** McFADDEN, THOMAS **CITATION NO.:** 10-17-7 **SECTION:** 23-0-2-48
**OFFICER I.D.:** 0175 **BEAT NO.:** 5728 **COURT DATE:** 10-16-07
**OFFICER:** 1 KING

**CONTRIBUTORY CAUSE(S):**
PRIMARY: 18
SECONDARY: 28

**POSTED SPEED LIMIT:** 35

*P1201*

*IF YES TO HAZMAT SPILL OR COM VEH ABOVE, COMPLETE COMMERCIAL VEHICLE AREA ON BACK OF FORM

SR 1050 510M (REPRINT 10/05)

5720 Oak

**2146652**

**DIAGRAM**

**KEY**
○ Light Pole

WESLEY

ROOSEVELT RD.

INDICATE NORTH
BY ARROW ⬅

**COMMERCIAL VEHICLE** UNIT NO.

OWNER NAME
ADDRESS
CITY — STATE — ZIP

**NARRATIVE** (Refer to vehicle by Unit No.)

THE DRIVER OF UNIT #1 STATED THAT HE WAS W/B ON ROOSEVELT

FROM WESLEY WHEN HE STRUCK THE LIGHT POLE ON THE NORTH SIDE

OF ROOSEVELT APPROX 50 FT WEST OF WESLEY. DRIVER OF UNIT #1

STATED THAT HE DOES NOT RECALL ANYTHING PRIOR TO THE ACCIDENT.

UNIT #1 STATED THAT HE OWNS THE BLUE CAB THAT HE WAS

DRIVING. THE DRIVER OF UNIT #1 (MCFADDEN) DID NOT RECALL HAVING

A FARE (PASSENGER ROSE BRANINGTON-SANMEAS) IN THE REAR. BOTH

PARTIES WERE TRANSPORTED TO LOYOLA HOSPITAL AND WERE TREATED

BY THE TRAUMA UNIT.

**LOCAL USE ONLY** COMEX DATE FOR MCFADDIN IS 24 OCT 07 @ 9:00 AM ROOM 110

AT MAYBROOK COURT.

08 RS 009

ATTY ID NO: 44296

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION

ROSE M. WASHINGTON-SANDERS,      )
                                 )
        Plaintiff,               )
                                 )
    vs.                          )    No. 07 L 13584
                                 )
THOMAS MCFADDEN, individually and as an  )
Agent and/or employee of BLUE CAB CO., INC.  )
and BLUE CAB CO., INC., an Illinois corporation,  )
                                 )
        Defendants.              )



## NOTICE OF FILING

**TO:**   Carolyn Daley Scott, Esq.
          Power, Rogers & Smith, PC
          70 W. Madison, 55th Floor
          Chicago, Illinois 60602-4212

    **PLEASE TAKE NOTICE** that we have this 31st day of July, 2008, filed with the Circuit Court of Cook County, *Defendant Thomas McFadden's Answers to Plaintiff's Motor Vehicle Interrogatories.*

_____
Attorney for the Defendants

Guth Rubio, Ltd.
123 N. Wacker, Suite 1800
Chicago, IL 60601
(312) 474-1642
Attorney No. 44296

## CERTIFICATE OF SERVICE

    The undersigned served the foregoing to the above-named person by mailing same on the 31st day of July, 2008.

_____

SUBSCRIBED and SWORN to before me
this 31st day of July, 2008.



NOTARY PUBLIC

08 RS 009

ATTY ID NO: 44296

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION

| | | |
|---|---|---|
| ROSE M. WASHINGTON-SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 07 L 13584 |
| | ) | |
| THOMAS MCFADDEN, individually and as an | ) | |
| Agent and/or employee of BLUE CAB CO., INC. | ) | |
| and BLUE CAB CO., INC., an Illinois corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT THOMAS MCFADDEN'S ANSWERS
## TO PLAINTIFF'S MOTOR VEHICLE INTERROGATORIES

Now comes the Defendant, Thomas McFadden, by and through his attorneys, Guth Rubio, Ltd., and for his Answers to Interrogatories issued by the Plaintiff, states as follows:

1.  State your full name, as well as your current residence address, date of birth, marital status, driver's license number and issuing state, and social security number. And, if different, give the full name, as well as the current residence address, date of birth, marital status, driver's license number and issuing state, and social security number of the individual signing these answers.

**ANSWER:**

Thomas McFadden
1618 Home Road
Berwyn, IL 60402
DL # M213-8304-4023
SSN █████████

2.  State the full name and current residence address of each person who witnessed or claims to have witness the occurrence that is the subject of this suit.

**ANSWER:**

Parties.

3.   State the full name and current residence address of each person not named in interrogatory no. 2 above who was present and/or claims to have been present at the scene immediately before, at the time of, and/or immediately after the occurrence.

**ANSWER:**

Unknown passerby and responding medical personnel.

4.   As a result of the occurrence, were you made a defendant in any criminal or traffic case? If so, state the court, the caption, the case number, the charge or charges filed against you, whether you pleaded guilty thereto and the final disposition.

**ANSWER:**

I was issued two citations. Investigation continues as to court, caption, case number, and the charges.

5.   Were you the owner and/or driver of the vehicle involved in the occurrence? If so, state whether the vehicle was repaired and, if so, state when, where, by whom and the cost of the repairs.

**ANSWER:**

I was both the owner and the driver of the vehicle involved. The vehicle was not repaired.

6.   Were you the owner and/or driver of any vehicle involved in the occurrence? If so, state whether you were named or covered under any policy, or policies, of liability insurance effective on the date of the occurrence and, if so, state the name of each such company or companies, the policy number or numbers, the effective period(s) and the maximum liability limits for each person and each occurrence, including umbrella or excess insurance coverage, property damage and medical payment coverage.

**ANSWER:**

See Insurance Policy produced in Response to Request for Production

7.   Do you have any information:

(a)   That any plaintiff was, within the five years immediately prior to the occurrence, confined in a hospital and/or clinic, treated by a physician and/or other health professional, or x-rayed for any reason other than personal injury? If so, state each plaintiff so involved, the name and address of each such hospital and/or clinic, physician, technician and/or other health care professional, the approximate date of such confinement or service and state the reason fro such confinement or service;

(b)   That any plaintiff has suffered any serious personal injury and/or illness prior to the date of the occurrence? If so, state the name of each plaintiff so involved and state

2

when, where and how he or she was injured and/or ill and describe the injuries and/or illness suffered;

(c)     That any plaintiff has suffered any serious personal injury and/or illness since the date of the occurrence? If so, state the name of each plaintiff so involved and state when, where and how he or she was injured and/or ill and describe the injuries and/or illness suffered;

(d)     That any plaintiff has ever filed any other suit for his or her own personal injuries? If so, state the name of each plaintiff so involved and state the court and caption in which filed the year filed, the title and docket number of the case.

**ANSWER:**     No

8.     Were any photographs, movies and/or videotapes taken of the scene of the occurrence or the persons and/or vehicles involved? If so, state the date or dates on which such photographs, movies and/or videotapes were taken, the subject hereof, who now has custody of them, and the name, address and occupation and employer of the person taking them.

**ANSWER:**

None

9.     Have you (or has anyone acting on your behalf) had any conversations with any person at any time with regard to the manner in which the occurrence complained of occurred, or have you overheard any statements made by and person at any time with regard to the injuries complained of by plaintiff or the manner in which the occurrence complained of occurred? If the answer to this interrogatory is in the affirmative, state the following:

(a)     The date or dates of such conversations and/or statements;
(b)     The place of such conversations and/or statements;
(c)     All persons present for the conversations and/or statements;
(d)     The matters and things stated by the person in the conversations and/or statements;
(e)     Whether the conversation was oral, written and/or recorded; and
(f)     Who has possession of the statement if written and/or recorded

**ANSWER:**

None

10.     Do you know of any statements made by any person relating to the occurrence complained of by the plaintiff? If so, give the name and address of each such witness and the date of the statement, and state whether such statement was written and/or oral.

**ANSWER:**

None.

3

11.     Had you consumed any alcoholic beverage within 12 hours immediately prior to the occurrence? If so, state the names and addresses of those from whom it was obtained, where it was consumed, the particular kind and amount of alcoholic beverage so consumed by you, and the names and current residence addresses of all persons known by you to have knowledge concerning the consumption of the alcoholic beverages.

**ANSWER:**

No.

12.     Have you ever been convicted of a misdemeanor involving dishonesty, false statement or a felony? If so, state the nature thereof, the date of the conviction, and the court and the caption in which the conviction occurred. For the purpose of this interrogatory, a plea of guilty shall be considered as a conviction.

**ANSWER:**

No

13.     Had you used any drugs, prescription medications, over the counter medications, or herbal supplements within 24 hours immediately prior to the occurrence? If so, state the names and addresses of those from whom it was obtained, where it was used, the particular kind and amount of drug or medication so used by you, and the names and current residence addresses of all persons known by you to have knowledge concerning the use of the drug or medication.

**ANSWER:**

Plaintiff may have taken medication for high cholesterol and/or his high blood pressure. Cholesterol medication is called Simvastatin, Dr. Grodinski at Hines Hospital, 20 mg per day. Blood pressure medication is called Atenolol, Dr. Grodinski, 75 mgs per day and Lisinopril, Dr. Grodinski, 5 mgs per day.

14.     Were you employed on the date of the occurrence? If so, state the name and address of your employer, and the date of employment and termination, if applicable. If your answer is in the affirmative, state the position, title and nature of your occupational responsibilities with respect to his employment.

**ANSWER:**

I was independent contractor.

15.     Were you an agent and/or employee of Blue Cab Co. Inc. on the date of the occurrence.

**ANSWER:**

No.

4

16. What was the purpose and/or use for which the vehicle was being operated at the time of the occurrence?

**ANSWER:**

Business purpose

17. State the names and addresses of all persons who have knowledge of the purpose for which the vehicle was being used at the time of the occurrence.

**ANSWER:**

Parties and dispatch at Blue Cab Co.

18. State the name and address of the registered owner of each vehicle involved in the occurrence.

**ANSWER:**

Thomas McFadden
1618 Home Road
Berwyn, IL 60402

19. State the name and address of the registered owner of taxi medallion #21552TX on the date of the occurrence in question.

**ANSWER:**

He was the owner of license plate number 21552 TX.

20. Have you ever had your driver's license suspended or revoked? If so, state whether it was suspended or revoked, the date it was suspended or revoked, the reason for the suspension or revocation, the period of time for which it was suspended or revoked, and the state that issued the license.

**ANSWER:**

No.

21. Have you had any restrictions on your driver's license? If so, state the nature of any and all restrictions.

**ANSWER:**

No.

5

22.    Do you, and did you at the time of the occurrence, have any medical and/or physical condition which required a physician's report and/or letter of approval in order to drive? If so, state the nature of the medical and/or physical condition, the physician or other health care professional who issued the letter and/or report, and the names and addresses of any physician or other health care professional who treated you for this condition prior to the occurrence.

**ANSWER:**

No.

23.    State the name and address of any physician, ophthalmologist, optician or other health care professional who performed any eye examination on you within the last five years and the dates of each such examination.

**ANSWER:**

None.

24.    State the name and address of any physician or other health care professional who examined and/or treated you within the last 10 years and the reason for such examination and/or treatment.

**ANSWER:**

Dr. Grodinski at Hines Hospital

25.    Pursuant to Illinois Supreme Court Rule 213(f), provide the name and address of each witness who will testify at trial and all other information required for each witness.

**ANSWER:**

The Defendant reserves the right to provide answers to 213(f) interrogatories in accordance with the Court's order.

26.    List the names and addresses of all other persons (other than yourself and persons heretofore listed) who have knowledge of the facts of the occurrence and/or of the injuries and damages claimed to have resulted therefrom.

**ANSWER:**

None

27.     Identify any statements, information and/or documents known to you and requested by any of the foregoing interrogatories which you claim to be work product or subject to any common law or statutory privilege, and with respect to each interrogatory, specify the legal basis for the claim as required by Illinois Supreme Court Rule 201(n).

**ANSWER:**

None.

Respectfully submitted,

THOMAS MCFADDEN AND BLUE CAB
CO. INC.

By: _____
                    Guth Rubio, Ltd.
                    Their Attorneys

Guth Rubio, Ltd.
123 N. Wacker, Suite 1800
Chicago, IL 60606
(312) 474-1642
Atty No. 44296

7

STATE OF ILLINOIS)
               ) SS.
COUNTY OF COOK)

## ATTESTATION

    I, Thomas McFadden, being first duly sworn on oath, deposes and states that he is a Defendant in the above captioned matter, that he has read the foregoing document, and the answers made herein are true, correct and complete to the best of his knowledge and belief.

Thomas McFadden

SUBSCRIBED and SWORN to before me
this _____, 2008.

OFFICIAL SEAL
MARCI ANN ROSWALSKA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES

_____
NOTARY PUBLIC

Guth Rubio, Ltd.
Attorney for Defendant McFadden
123 N. Wacker, Suite 1800
Chicago, Illinois 60606
312-474-1640
Attorney No.: 44296

#7

## BLUE CAB COMPANY OWNER-OPERATOR AGREEMENT

This Agreement (the "Agreement") is made this _23rd_ Day of _March 2006_, Between Blue Cab Company, Inc. (hereinafter, the "Company" or "Blue Cab") Thomas Mcfadden-1618 S. Home Berwyn, II, 60402 hereinafter, "Owner" or "Owner/Driver").

WHEREAS, the Company is the holder of municipal taxi owner licenses in the Oak Park, River Forest and other areas in Illinois;

WHEREAS, the Company, through its intimate knowledge the taxicab business has developed methods and techniques for the profitable operation of taxicabs;

WHEREAS, as a result of its knowledge and its success in developing business through advertising and other means, Blue Cab has built a reputation for prompt and courteous service in the areas authorized by its licenses.

WHEREAS, the success of Blue Cab depends on the continuation of this reputation and goodwill and upon its maintaining the high standards of prompt, efficient,, safe and courteous service to the public.

WHEREAS, the Owner/Driver, being duly aware of the reputation of Blue Cab and its business standards herein above set forth, has acquired a vehicle and desires to operate his or her vehicle as a taxicab as an independent contractor under the Blue Cab name under a leasehold agreement:

Now, therefore, in consideration of the foregoing and of the mutual agreements contained herein, Blue Cab and the Owner/Driver agree as follows:

1.     **Term.** This Agreement shall be in effect until this Agreement is terminated as provided for in Paragraph 19 below. Nothing in this Agreement shall constitute a promise by Blue Cab to contract with Owner for any specific duration.

2.     **Compliance with regulations.** Owner/Driver hereby recognizes and agrees that Blue Cab has certain responsibilities and duties under its various municipal licenses to operate taxicabs and pursuant to various city ordinances, state and federal statutes. Owner/Driver agrees to comply with and abide by all laws, ordinances, rules and regulations of federal, state, county, municipal and other government agencies and with any directive of any public officer acting pursuant to law.

3.     **Infringement on trade name.** Owner/Driver hereby acknowledges the validity of the trade name "Blue Cab" and also acknowledges that it is the property of Blue Cab. Owner/Driver agrees not to infringe upon, harm, or contest Company's right to or interest in the name "Blue Cab".

4.     **Use of mark.** Owner/Driver shall not use any mark, logo, design or name of Blue Cab other than as herein authorized.



5. **Reputation of Company.** Owner agrees to give his or her personal loyalty to the goals and purposes of the company and to promote the growth and the identity of the company and its good reputation for prompt courteous customer service to the public. Owner agrees not to act in anyway detrimental to the public image and/or business interest of Blue Cab.

6. **Maintenance of Vehicle(s).** Owner agrees to maintain all vehicles used for Blue Cab taxi service in good condition and Owner agrees to repair and to pay all costs, expenses, fees, and charges incurred in connection with the operation, titling, licensing and registration of said vehicle(s) including, but not limited to, maintenance, repairs, fees and servicing, taxes, assessments, and other governmental charges whatsoever payable on said vehicle(s) or on the use, possession or operation thereof.

7. **Inspection.** Owner agrees to present the taxicab to the Company for inspection as to condition, cleanliness and safety at a mutually agreeable upon reasonable notice to the Owner once each 30 days on mutually agreeable date.

8. **License.** Owner agrees that the taxi owner's license may be used only upon this specific vehicle until such time as it is properly authorized by the Company for a replacement vehicle.

9. **Assignment.** Any rights of the owner under this Agreement shall not be sold, assigned or transferred.

10. **Non-Conveyance.** Nothing contained herein shall have the effect of transferring or conveying to Owner any right, title or interest in any equipment furnished by Blue Cab, or any licenses or duties relating to.

11. **Independent Contractor Relationship.** This agreement does not render the Owner/Driver an agent, legal representative, joint venturer or partner of Blue Cab for any purpose whatsoever, it being understood between the parties hereto that the Owner is to act as an independent contractor, and is in no way authorized to make any contract, agreement, warranty or representation on behalf of Blue Cab. It is expressly agreed, stipulated, and understood that Owner/Driver shall not be deemed or considered an employee of Blue Cab, or as being entitled to participate in any plans, distributions or benefits extended by Blue Cab to any of its regular employees. The Owner agrees to pay any required state or federal employment taxes, social security or unemployment taxes. The Owner understands and agrees that as an independent contractor, there is no employer/employee relationship, and coverage under workmen's compensation insurance is not provided or required.

11. **Liability Insurance.** The owner will maintain public liability insurance of at least $250,000.00 with Blue Cab as the named insured. Certificates of insurance indicating this coverage must be issued and presented to the Company naming Blue Cab as certificate holder.

12. **Maintenance of Equipment.** Computer, meter and Two-way radio and camera

2

maintenance will be provided by the company except in the case of vandalism or abuse. Theft of any equipment or components will be chargeable at the Company's cost and shall be credited towards Owner's required $1,300.00 deposit as described in Paragraph 13 below. The deficiency will immediately be reimbursed to the Company. This deposit may be used to offset any outstanding payments for, but not limited to, dispatching, repairs or notes to the Company or its affiliates.

13.    **Covenants of Company and Owner; Deposit.** The Company agrees to furnish to the Owner its goodwill and trade name to be affixed by permanent decal or lettering to each side of the taxicab, a two way radio, meter, camera system, computer, side decals, a toplight and radio dispatch service; free access to all of the Company's taxi stands, the right of participation in the charge account system of the Company, and the Owner agrees in consideration of the foregoing to furnish to the general public a taxicab in good working order and in a safe and clean condition and painted in the company colors and agrees to bear all of the operating costs thereof, as set forth above. Owner further agrees to place a deposit of $1,300.00 (the "Deposit") with Company upon the execution of this Agreement. The Deposit shall be used to offset expenses described in Paragraph 12 above. Upon the termination of this Agreement for any reason, Company shall inspect the equipment and components used by Owner and shall refund Owner's entire Deposit, less any expenses or costs necessary to repair said equipment and components. The Authorization to Remove Equipment attached hereto is made a part of this Agreement.

14.    **Installation and Weekly Lease Fees.** The Owner further agrees for this aforesaid consideration to pay a flat fee of $350.00 for the installation of the two-way radio, computer meter and decals. Such fee will be recurring as the vehicle is replaced. The Owner agrees to pay $195.00 per week on the first day of the week in advance, to the Company for the continuing considerations recited herein above. It is understood and agreed that dispatch service will not be provided at any time the fees are in arrears.

15.    **Approval of Drivers.** The Owner agrees to submit the names of potential drivers of the vehicles operated under this Agreement to Company officials for approval and to refrain from hiring, leasing to or otherwise engaging the services of any taxicab driver until such driver has been approved by the Company. Owner agrees to strictly prohibit the operation of any taxicab motor vehicle listed in schedule A (attached hereto) by other than an approved driver.

16.    **Approval of Advertising.** In the event that the Owner desires to carry display advertising on the inside or outside of the taxicab, the Owner agrees that the company shall have full exclusive power to approve or disapprove the content of such advertising based on the image projected for the Company.

17.    **Rate increases; Permissible Rates.** It is further agreed by the Company that in the event of a rate increase the company guarantees that the fees charged under the terms of this Agreement will be increased not more than the same percentage of the rate increase. Owner agrees that the rates of fare charged by any driver of the taxicab named in this Agreement shall be only those approved by the licensing municipality and the Company.

3

18.     **Sublease.** It is further agreed that the owner has no right to assign or sublease this Agreement.

19.     **Termination.** Company shall have the right to terminate this Agreement immediately for one or more of the following reasons: (a) If Company learns that Owner or any person permitted by Owner to operate the motor vehicle(s) described in Exhibit A as a taxicab does not possess all required permits and licenses; (b) In the event Owner fails to make all payments to Company when due; (c) If the Owner or any person permitted by Owner to operate the motor vehicles described in Exhibit A is convicted of or pleads guilty to the possession of a motor vehicle or the operation of a motor vehicle while under the influence of intoxicating liquors or drugs; or (d) a violation of Paragraph 20 below. Both Owner and Company may terminate this Agreement by providing the other with 30 days written notice.

20.     **Non-Competition.** During the term of this Agreement (including any renewals) and for one (1) year thereafter, Owner shall not:

    (a)     Directly or indirectly solicit any long-standing, regular clients of Blue Cab for taxi services with whom Owner became acquainted by virtue of his relationship with Blue Cab;

    (b)     Use Blue Cab's dispatch service in any manner for the benefit of any other person or entity or in any manner unrelated to his performance of taxi services under this Agreement;

    (c)     Take an ownership interest in, manage, or otherwise control or direct another taxicab company which is licensed by any municipalities whose boundaries are within a seven (7) mile radius of the municipalities in which Blue Cab is currently licensed (Oak Park, Berwyn, Forest Park, North Riverside, River Forest, Hillside);

    (d)     Solicit or attempt to cause any other current Blue Cab drivers or other employees to discontinue their affiliation (in the case of an independent contractor) or leave their employment (in the case of an employee) with Blue Cab.

Owner agrees that a violation of this Paragraph 20 shall irreparably injure Blue Cab, and Blue Cab shall be entitled to a temporary restraining order and a permanent injunction against Owner.

21.     **Successor Agreement.** This Agreement may be replaced by mutual agreement by a successor agreement at the rates for services in effect at the time of replacement.

22.     **Choice of Law; Consent to Venue.** This Agreement shall be construed under the laws of the State of Illinois. Any action brought related to this Agreement shall be brought in the Circuit Court of Cook County, and all parties hereto consent to venue in Cook County.

23.     **Authority.** The persons executing this Agreement represent that they have

4

authority to do so and that they intend their signatures to bind the parties on whose behalf they have signed this Agreement.

In witness whereof, the parties hereby enter into and execute this Agreement as of the date first above written.

**CAR OWNER**                                    **Blue Cab Company**

*Thomas J McFadden*                          By: *B. Waito-CH*
                                                          *Joe Blue*

5

## SCHEDULE A

### DESCRIPTION OF MOTOR VEHICLE
### 2000 FORD CROWN VICTORIA
### <u>2FAFP71W6YX166916</u>
### <u>21552TX</u>
### <u>AUTHORIZATION TO REMOVE EQUIPMENT</u>

The Owner agrees to allow Blue Cab or any of it affiliated companies to remove all the taxi cab related equipment that was originally installed in Owner's vehicle. Blue Cab shall reserve the right to remove all taxi equipment and decals at any time. Blue Cab or affiliates will not be responsible for any holes or damages caused by removal of equipment.

Owner Agrees to allow Blue Cab or any affiliated to Tow or have Towed vehicle to Blue cab office with or without owners Authorization.

_____
Owner

_____
Print

6

## STIPULATION AND WAIVER

Re:  Insured:      Blue Cab Co.
     Claim No.:    813309
     Policy No.:   CAP 851 71 81
     D/L:          9/28/07
     Lawsuit:      Sanders v. McFadden et al., No. 07 L 13584 (Cook County, IL)

1.      This stipulation and waiver relates to the lawsuit of *Sanders v. McFadden et al.*, No. 07 L 13584 (Cook County, IL) (the "*Sanders* suit"). The *Sanders* suit claims that there was an automobile accident on September 28, 2007 (the "Accident"), in which Thomas McFadden ("McFadden") was driving a 2000 Ford Crown Victoria (the "Auto"), and Rose Washington-Sanders ("Sanders") was a passenger in the rear seat of the Auto. In her lawsuit, Sanders claims that she was seriously injured as a result of the Accident.

2.      At the time of the Accident, McFadden owned the 2000 Ford Crown Victoria that was involved in that Accident. The Auto was not owned by Blue Cab Company.

3.      At the time of the Accident, McFadden was not an employee or agent of Blue Cab Company.

4.      Attached to this Stipulation is a copy of the "Blue Cab Company Owner-Operator Agreement." McFadden signed this Agreement in or about March 2006. It was still in effect on the date of the Accident on September 28, 2007.

5.      Cincinnati sent a letter to McFadden explaining its determination that the insurance policy purchased by Blue Cab Company from Cincinnati does not provide coverage for McFadden for the *Sanders* suit. Cincinnati also told McFadden that it may bring a declaratory judgment action seeking a ruling from the court that Cincinnati owes no duty to provide insurance coverage for McFadden in connection with the *Sanders* suit.

6.      McFadden hereby agrees not to contest Cincinnati's decision regarding coverage, including defense and/or indemnity from Cincinnati, in connection with the *Sanders* suit as it is currently pled.

7.      McFadden stipulates that Cincinnati owes no coverage to him with respect to that lawsuit in its present form.

8.      McFadden will not seek insurance coverage from Cincinnati under any policy issued to Blue Cab Company in connection with the *Sanders* lawsuit.

9.      McFadden recognizes that Cincinnati will rely on this document in connection with its handling of this matter, and in particular will forgo bringing a declaratory judgment action against him to have the court rule on the insurance coverage issue.

# 4

10. If the pleadings in the Sanders suit are amended in such a way that McFadden believes that coverage may be available to him pursuant to the Cincinnati policy, McFadden may make a written claim for coverage from Cincinnati with an explanation of why that amendment may affect Cincinnati's coverage determination (a "Supplemental Coverage Claim"). Any Supplemental Coverage Claim will not request reimbursement of attorneys' fees or costs that were incurred prior to the date of that Supplemental Coverage Claim.

11. McFadden represents that it will make no effort to encourage Sanders or any other party to change their claims in the underlying case for the purpose of allowing McFadden to assert any such Supplemental Coverage Claim.

12. This waiver does not affect any rights that McFadden may have for coverage from Cincinnati in connection with any other claim.

13. These statements are true and correct to the best of my knowledge.

Signed: _Thomas J. McFadden_
Thomas McFadden

Date: _12 MAR 08_

Agreed: _Kathleen L. Bishop_
Cincinnati Insurance Company

Position: _Attorney_

Date: _March 17, 2008_

2